# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**LLC KOMSTROY, as successor in interest to LLC ENERGOALLIANCE,**

Petitioner,

v.

**REPUBLIC OF MOLDOVA,**

Respondent.

Case No. 14-cv-01921 (CRC)

## <u>MEMORANDUM OPINION</u>

Ukraine-based LLC Komstroy, as successor in interest to LLC Energoalliance, petitions this Court to confirm an arbitral award issued in the latter's favor and against the Republic of Moldova. The award stemmed from a dispute over a series of contracts from 1999 and 2000 to supply electric power to a Moldovan state-owned utility, with payments passing through a third party. After the utility defaulted, the third party transferred its interest in the debt to Energoalliance, which eventually initiated arbitration proceedings against Moldova under the Energy Charter Treaty ("ECT"). In 2013, an arbitral tribunal in Paris concluded it had jurisdiction over the dispute by construing the debt originating from the contracts as an "investment" under the ECT. It then determined that Moldova had violated the treaty by denying Energoalliance the benefits of that investment and awarded Energoalliance almost $46.5 million.

Award in hand, Energoalliance commenced confirmation proceedings in a number of jurisdictions, including this Court in 2014. At the same time, Moldova filed an action to set aside the award with the Paris Court of Appeal, which in 2016 concluded that the tribunal had misinterpreted the subject debt as an "investment" under the ECT. Energoalliance then appealed

that ruling to the highest civil court in France—the Court of Cassation—which reinstated the award in 2018 after finding that the intermediate court had introduced an additional requirement for "investment" not contained in the ECT. The case is now back before the Paris Court of Appeal to consider alternative arguments advanced by Moldova to set aside the award.

Meanwhile, in November 2018, this Court determined that because the award is presently enforceable under French law notwithstanding the pendency of the set-aside proceedings, it would be appropriate to lift a stay—which it had imposed when Moldova initiated the set-aside action—and proceed to the merits of the confirmation petition. See LLC Komstroy v. Republic of Moldova, No. 14-cv-1921 (CRC), 2018 WL 5993437 (D.D.C. Nov. 13, 2018). The Court does so now. In what follows, the Court first ensures that it has subject matter jurisdiction under the Foreign Sovereign Immunities Act before considering Moldova's objections to confirming the award. Concluding that the country has not met its substantial burden of resisting confirmation under the applicable treaty, the Court will grant the petition to confirm the award and deny Moldova's motion to dismiss.

## I.   Background

This case began in November 2014, when Energoalliance filed a Petition to Confirm Foreign Arbitral Award pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the New York Convention, as implemented by Chapter 2 of the Federal Arbitration Act. See Petition, ECF No. 1. The petition seeks recognition of a final arbitral award issued in October 2013 by an *ad hoc* tribunal in Paris, France in favor of Petitioner and against the Republic of Moldova. Id. ¶ 1.

The parties' dispute goes back decades.[1]  Before the collapse of the Soviet Union,

Moldova received its electricity from Ukraine pursuant to economic plans approved by Moscow.

See Ex. B, Part I to Decl. of Viacheslav Lych ("Award"), ECF No. 8-4, ¶ 187 (filed under seal).

After the collapse, Energoalliance—a private Ukrainian company—undertook the task of

providing power to Moldova pursuant to a series of supply contracts dating from February 1999.

As relevant here, Agreement No. 1/01 provided that Energoalliance would purchase electricity

from Ukraine's state-owned electricity producer for export to Moldova's state-owned utility,

Moldtranselectro.  Id. ¶ 69.  Under Agreement No. 24/02, Energoalliance would sell the

Ukrainian electricity to a third-party British Virgin Islands entity, Derimen, which would then

resell the electricity to Moldtranselectro.  Id. ¶¶ 70–71.  The agreements were structured this way

because if Energoalliance were to sell electricity directly to Moldtranselectro, it would bear the

risk of steep regulatory fines pursuant to Ukrainian currency controls should the Moldovan entity

fail to make timely payments.  Id. ¶¶ 203–04, 217; see also Declaration of Viacheslav Lych

("Lych Decl.") in Supp. of Petition, ECF No. 1-3, ¶ 7.  As it turned out, Moldova did fall behind

on its payments to Derimen, leading Derimen in May 2000 to assign the debt to Energoalliance

pursuant to Agreement No. 06/20.  See Award ¶¶ 72–74.

Energoalliance's efforts to collect the debt directly from Moldtranselectro proved

fruitless due in large part to interference by the Moldovan government.  For instance, the

government in October 2000 reorganized Moldtranselectro by transferring its assets and

functions to a new state-owned company while leaving its obligations intact.  Id. ¶¶ 87–88.  In

2002, the Moldovan auditing chamber, in a quasi-judicial, *ex parte* proceeding, concluded that it

---

[1] The following summary of the underlying dispute is drawn from the findings of the arbitral panel.

could not be proven that Energoalliance had provided electricity to Moldtranselectro, id. ¶ 101, and ordered the utility "to cancel its debts related to said electricity supplies," id. ¶ 102. Energoalliance's appeal of that determination was unsuccessful. Id. ¶ 106. Other efforts in Moldovan courts were similarly futile. Id. ¶¶ 113–16.

After a decade of unsuccessful collection efforts, Energoalliance instituted arbitration proceedings before an *ad hoc* tribunal in Paris, France in July 2010. Petition ¶¶ 17–18. The arbitration arose under the Energy Charter Treaty ("ECT"), 2080 U.N.T.S. 100—a multilateral treaty to which Moldova and Ukraine are parties—and was conducted under the United Nations Commission on International Trade Law ("UNCITRAL") Arbitration Rules. Id. ¶ 18. After a full exchange of written evidence and pleadings as well as a three-day hearing in July 2012, see Award ¶¶ 15–17, 19–20, 24, 37–39, 41–42, a majority of the tribunal concluded in October 2013 that it had jurisdiction under the ECT[2] and that Moldova had breached its obligations under the treaty.[3] It ordered Moldova to pay Energoalliance the following:

1. 195,547,212 Moldovan Lei ("MLD") as the amount of Energoalliance's lost investment;

2. MLD 357,916,008 in interest for the period up to May 31, 2012;

3. MLD 39,417,175 in interest for the period between June 1, 2012 and the date of the Award;

4. $200,000 U.S. Dollars ("USD") for Energoalliance's attorneys' fees in the arbitration;

5. $340,000 USD in arbitration costs.

---

[2] The president of the arbitral tribunal dissented on the question of jurisdiction under the ECT.

[3] The tribunal rejected Enegoalliance's alternative argument for jurisdiction based on the bilateral investment treaty between Moldova and Ukraine, reasoning that the definition of "investment" under that treaty is narrower than under the ECT. See id. ¶¶ 285–87, 289, 292.

Id. ¶ 436. These items totaled almost $46.5 million based on the exchange rate on that date.

In November 2014, Moldova made a formal application to the Paris Court of Appeal to set aside the Award on grounds similar to those it advanced before the *ad hoc* tribunal—that the tribunal lacked jurisdiction over the claims under the ECT and that the Award violated public order. Petition ¶ 28. During the pendency of the set-aside proceeding before the Paris Court of Appeal, Petitioner requested and received from the High Court of Paris an "*exequatur*," or order to enforce the Award. Lych Decl. ¶ 16.

As previously noted, Petitioner initiated this case in November 2014. Moldova—acting through its Ministry of Justice and without entering an appearance by counsel[4]—submitted a document titled "Reference" received by this Court in July 2015. See ECF No. 12. The Court construed this submission as a motion to dismiss and directed Petitioner to respond, which it did. See ECF Nos. 14, 16, 17. Moldova then requested a stay pending resolution of the set-aside proceeding before the Paris Court of Appeal. See ECF No. 20. But before the Court could rule on that request, Petitioner informed the Court that the Paris Court of Appeal had, in April 2016, vacated the 2013 Award for lack of jurisdiction. See Pet'r Notice, ECF No. 21, at 1. The Paris court did not reach Moldova's argument regarding international public order. Petitioner informed this Court that it intended to appeal the adverse decision to the *Cour de Cassation* ("Court of Cassation"), the highest civil court in France, and requested a stay of this matter pending resolution of that appeal. Id. Moldova concurred in this stay request. See ECF No. 22. The Court thus stayed the case. See Apr. 22, 2016 Minute Order. Despite the stay, both parties

---

[4] In response to a request from the Court, Moldova indicated that it did not intend to secure legal representation in this matter. See Letter, ECF No. 19.

continued to litigate the case—at least in part. Petitioner filed a more extensive reply to Moldova's motion to dismiss the petition, see ECF No. 27, and Moldova filed a renewed motion to dismiss, see Renewed Mot. to Dismiss ("Renewed MTD"), ECF No. 37.

A few years later, Petitioner informed the Court that in March 2018, the Court of Cassation had issued a decision in its favor. See Status Report re: *Cour de Cassation Proceedings*, ECF No. 32 at 2. That decision reversed and voided the 2016 Paris Court of Appeal's jurisdictional decision and remanded the case to a "differently composed" panel to consider Moldova's remaining arguments. See Ex. A to Status Report re: *Cour de Cassation Proceedings* ("Court of Cassation Decision"), ECF No. 32-1, at 2–3. Petitioner submitted that it was finally time for the Court to consider the confirmation petition on the merits. See Pet'r Mot. to Lift Stay, ECF No. 33. Moldova objected, asking the Court to extend the stay pending the renewed proceedings in the Paris Court of Appeal. See Motion to Extend Stay, ECF No. 35.

In light of the Court of Cassation's decision and finding that the *exequatur* made the Arbitral Award presently enforceable under French law, this Court lifted the stay in November 2018. See LLC Komstroy v. Republic of Moldova, No. 14-cv-1921 (CRC), 2018 WL 5993437 (D.D.C. Nov. 13, 2018). After proceeding without counsel for four years, Moldova finally retained representation. See ECF Nos. 46, 47. Counsel for Moldova then requested leave to withdraw the country's previous submissions, acknowledging the Court's prior observation that the materials "do not conform to the Federal Rules of Civil Procedure and are generally lacking in legal analysis, including citations of law." Mot. for Leave to Withdraw, ECF No. 48, at 1. The Court denied that request, reasoning that because Moldova was a sophisticated party and had made an informed decision to proceed unrepresented, the Court would not "undo all that has come before simply because Moldova has now changed its mind and retained counsel." Order

6

Denying Motion to Withdraw, ECF No. 52, at 2.  That said, it allowed Moldova to file a reply in support of its renewed motion to dismiss.  Id. at 2–3.  After Petitioner filed its surreply, see Pet'r Surreply in Opp. to Renewed MTD, ECF No. 54, the Court granted Moldova leave to file a supplemental reply, and Petitioner the opportunity to file one final reply, see Mar. 7, 2019 Minute Order.

With that, Moldova has now had a full opportunity to lodge its objections to confirmation, and the petition and the renewed motion to dismiss are at last ripe for this Court's review.  Through its string of filings in support of the motion to dismiss, Moldova has raised the following grounds for dismissal: (1) the Court lacks subject matter jurisdiction because Moldova enjoys sovereign immunity from suit; (2) the Court should dismiss the petition under the doctrine of *forum non conveniens*; and (3) the Court should deny confirmation of the Award pursuant to two defenses under the New York Convention.  See Renewed MTD at 3–4, 9, 13; Reply in Further Support of Renewed Motion to Dismiss ("Reply in Supp. of Renewed MTD"), ECF No. 53, at 4, 11; Supplemental Reply in Further Support of Renewed Motion to Dismiss ("Suppl. Reply in Supp. of Renewed MTD"), ECF No. 56, at 1–4, 10.  Should these arguments fail, Moldova also disputes the terms by which the Award should be confirmed, contending that (1) the Court should not convert the Award into U.S. dollars (2) but if it does, it should use the currency exchange rate from the date of this Court's judgment; and (3) the Court should not award pre or postjudgment interest.  Renewed MTD at 19; Reply in Supp. of Renewed MTD at 21–25; Suppl. Reply in Supp. of Renewed MTD at 11–15.

## II.    Legal Standards

Before addressing the parties' arguments, the Court briefly sets out the legal authorities underlying the Court's analysis: the Foreign Sovereign Immunities Act, which governs this

Court's jurisdiction over Respondent Moldova, and the New York Convention, which governs enforcement of foreign arbitral awards.

### A. Foreign Sovereign Immunities Act

The Foreign Sovereign Immunities Act of 1976 ("FSIA") is the "sole basis for obtaining jurisdiction over a foreign state in the courts" of the United States. Belize Soc. Dev. Ltd. v. Gov't of Belize, 794 F.3d 99, 101 (D.C. Cir. 2015) (internal quotation omitted). Under the statute, "a foreign state is presumptively immune from the jurisdiction of the United States courts[ ] unless a specified exception applies." Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993). Because subject matter jurisdiction depends on the existence of one of the specified exceptions, a threshold determination of every action in a district court against a foreign state is whether one of the exceptions applies. See Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493–94 (1983). The Court addresses relevant exceptions below.

A petitioner "bears the initial burden of supporting its claim that an FSIA exception applies." Chevron Corp. v. Ecuador ("Ecuador"), 795 F.3d 200, 204 (D.C. Cir. 2015). The burden then shifts to the respondent—here, Moldova—to prove by a preponderance of the evidence that the petitioner's "allegations do not bring its case within a statutory exception to immunity." Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000) (citation omitted); see also Ecuador, 795 F.3d at 204.

### B. The New York Convention

The 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the New York Convention, is a multilateral treaty providing for "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." Convention on the Recognition and

Enforcement of Foreign Arbitral Awards ("New York Convention"), opened for signature June 10, 1958, art. 1.1, 21 U.S.T. 2517. The Convention has been incorporated into United States law through the Federal Arbitration Act ("FAA"). 9 U.S.C. §§ 201 et seq. Federal court review of foreign arbitral awards is extremely deferential under both the FAA and the Convention. "Consistent with the 'emphatic federal policy in favor of arbitral dispute resolution' recognized by the Supreme Court[,] . . . the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." Belize Soc. Dev. Ltd. v. Gov't of Belize, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985)). And under the New York Convention, the Court *must* "confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in [Article V of the] Convention." 9 U.S.C. § 207. "The party resisting confirmation"—here, Moldova—"bears the heavy burden of establishing that one of the grounds for denying confirmation in Article V applies." Gold Reserve, Inc. v. Bolivarian Republic of Venezuela, 146 F. Supp. 3d 112, 120 (D.D.C. 2015).

**III. Analysis**

These provisions in mind, the Court first considers its subject matter jurisdiction before addressing Moldova's two challenges to confirmation of the Award under Article V of the New York Convention. The Court also addresses Moldova's *forum non conveniens* argument. The Court concludes by considering whether to convert the Award into U.S. dollars and whether to award prejudgment interest.

A.      Subject Matter Jurisdiction

"[T]wo conditions must be satisfied" for this Court to exercise subject matter jurisdiction "over a foreign sovereign for the enforcement of an arbitral award": "'First, there must be a basis

upon which a court in the United States may enforce a foreign arbitral award; and second, [the foreign sovereign] must not enjoy sovereign immunity from such an enforcement action.'" Diag Human, S.E. v. Czech Republic-Ministry of Health, 824 F.3d 131, 134 (D.C. Cir. 2016) (alteration in original) (quoting Creighton Ltd. v. Gov't of the State of Qatar, 181 F.3d 118, 121 (D.C. Cir. 1999)). Following the D.C. Circuit's lead in Diag Human, the Court takes these requirements in reverse, see id., first considering the applicability of any exceptions to sovereign immunity before examining whether the New York Convention provides a basis upon which the Court may enforce the Award. The Court finds both conditions satisfied.

Petitioner asserts that the Court may exercise subject matter jurisdiction pursuant to what are known as the arbitration and waiver exceptions under the FSIA. Petition ¶¶ 5–6. The Court need only address the first to conclude that it has subject matter jurisdiction here. The arbitration exception provides for federal court jurisdiction

> in any case . . . in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party . . . or to confirm an award made pursuant to such an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6). "For FSIA purposes," a petitioner need only make "a prima facie showing that there was an arbitration agreement by producing [a treaty or other international agreement] and the notice of arbitration." Ecuador, 795 F.3d at 205. Petitioner has done so here by producing a copy of the Energy Charter Treaty, see Ex. A to Declaration of Gene M. Burd ("Burd Decl."), ECF No. 1-14, as well as the two notices of arbitration requesting an *ad hoc* tribunal in accordance with the UNCITRAL Arbitration Rules pursuant to Article 26(4)(b) of the ECT, see Ex. E to Lych Decl., ECF No. 1-8; Ex. F to Lych Decl., ECF No. 1-9. For good

measure, Petitioner has also offered a copy of the UNCITRAL Arbitration Rules. See Ex. F to Burd Decl., ECF No. 1-19.

The burden thus shifts to Moldova "to demonstrate by a preponderance of the evidence that the [international agreement] and the notice to arbitration did not constitute a valid arbitration agreement between the parties." Ecuador, 795 F.3d at 205. To satisfy this burden, Moldova advances what amounts to an arbitrability argument—that is, an argument about the scope of the parties' consent to arbitrate. It contends that the *ad hoc* tribunal "exceeded its powers under Article 26 of the [ECT]" by "decid[ing] several issues not contemplated by the agreement to arbitrate." Reply in Supp. of Renewed MTD at 9. Reading between the lines, Moldova could be arguing that although it may have agreed to arbitrate, its acquiescence was limited to the terms of the agreement; in other words, Moldova did *not* agree to the arbitration that occurred because it went beyond the scope of the agreement. But this argument was recently foreclosed by the D.C. Circuit. In Ecuador, the country claimed it "never agreed to arbitrate" because Chevron's breach of contract claims were not covered by the relevant bilateral investment treaty. 795 F.3d at 205. The D.C. Circuit rejected Ecuador's assertion that "the arbitrability question is therefore a jurisdictional question" that must be answered when evaluating the § 1605(a)(6) exception because that "conflates the jurisdictional standard of the FSIA with the standard for review under the New York Convention." Id. Guided by Ecuador, the Court concludes that Moldova has failed to rebut Petitioner's prima facie showing of an agreement to arbitrate and leaves any questions of arbitrability to whether to enforce the Award.

There is also a basis for this Court to enforce the Award—the FAA and the New York Convention. As explained above, the Convention allows for "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and

enforcement of such awards are sought." New York Convention, art. 1.1. The Convention plainly applies here: Petitioner seeks recognition and enforcement in the United States (a signatory to the Convention) of an arbitral award made pursuant to an international agreement (the ECT) in France (also a signatory). As the D.C. Circuit has long held, the FSIA's arbitration exception "by its terms" applies to actions to confirm arbitration awards under the New York Convention, which "is exactly the sort of treaty Congress intended to include in the arbitration exception." Creighton, 181 F.3d at 123–24.

Moldova counters that the Convention does not provide a basis to enforce the Award because it is not final. See Reply in Supp. of Renewed MTD at 5–7. But as the D.C. Circuit explained in Diag Human, "[w]hether the arbitration award is final will be a question going to the merits of the case, as it could determine whether the arbitration award can be enforced or not," rather than to a federal court's "subject matter jurisdiction to proceed with this case." 824 F.3d at 137–38. What's more, even if it were appropriate to consider finality arguments when determining jurisdiction, the Court has heard this tune already. Moldova's current finality argument simply echoes those it previously advanced when asking the Court to continue the stay pending further proceedings in the Paris Court of Appeal. See Reply in Supp. of Renewed MTD at 5–7 (citing, inter alia, Europcar Italia, S.P.A. v. Maiellano Tours, 156 F.3d 310, 317 (2d Cir. 1998)). Citing the Court's previous stay orders, Moldova asserts that "[t]here is no reason to deviate from this practice." Id. at 7. But here's an obvious one: the Court has already determined that the Award is presently enforceable under French civil procedure rules and that the Europcar factors weigh in favor of lifting the stay under the New York Convention despite the set-aside proceedings. See LLC Komstroy, 2018 WL 5993437, at *3. The Court will not revisit that decision here.

The Court is thus satisfied that the arbitration exception to the FSIA applies such that it has subject matter jurisdiction to enforce the Award. It need not, therefore, address the parties' alternative arguments regarding the waiver exception under § 1605(a)(1). The Court will deny Moldova's renewed motion to dismiss on sovereign-immunity grounds.

### B. *Forum Non Conveniens*

Moldova next asks the Court to dismiss the petition under the doctrine of *forum non conveniens*. Reply in Supp. of Renewed MTD at 11. But the D.C. Circuit has clearly held that "*forum non conveniens* does not apply to actions in the United States to enforce arbitral awards against foreign nations." BCB Holdings Ltd. v. Gov't of Belize, 650 F. App'x 17, 19 (D.C. Cir. 2016) (citing TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 304 (D.C. Cir. 2005)). Acknowledging Moldova's need to preserve arguments for appellate review, see Reply in Supp. of Renewed MTD at 11–21, the Court will, as it must, apply D.C. Circuit precedent and deny Moldova's motion to dismiss on this ground.

### C. New York Convention Defenses

The Court now turns to Moldova's objections to confirmation of the Award under the New York Convention. As explained above, a court "may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." TermRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 933 (D.C. Cir. 2007) (quoting Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 23 (2d Cir. 1997)); 9 U.S.C. § 207. Moldova resists confirmation of the Award on two grounds: the arbitration did not meet minimum requirements of due process under Article V(1)(b) and the arbitral tribunal exceeded the scope of its authority under Article V(1)(c). The Court considers these defenses in turn, and concludes that Moldova has not satisfied its "heavy burden" on either.

1.     <u>Article V(1)(b): Due Process</u>

A court may deny enforcement of an arbitration award if "[t]he party against whom the award is invoked . . . was . . . unable to present his case." New York Convention, art. V(1)(b). This provision "sanctions the application of the forum state's standards of due process," <u>Belize Bank Ltd. v. Gov't of Belize</u>, 191 F. Supp. 26, 38 (D.D.C. 2016) (quoting <u>Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie du Papier (Rakta)</u>, 508 F.2d 969, 975 (2d Cir. 1974)), which in the United States means "the opportunity to be heard 'at a meaningful time and in a meaningful manner,'" <u>id.</u> (quoting <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976)). "[T]he strong federal policy in support of encouraging arbitration and enforcing arbitration awards dictates that [courts] narrowly construe the defense that a party was 'unable to present its case.'" <u>Gold Reserve, Inc.</u>, 146 F. Supp. 3d at 128–29 (quoting <u>Rive v. Briggs of Cancun, Inc.</u>, 82 F. App'x 359, 364 (5th Cir. 2003)). Accordingly, the party resisting confirmation bears the substantial burden of showing actual prejudice. It may do so by, for example, presenting the district court "with any additional information or evidence that [it] would have presented at the arbitration had it had the opportunity to do so." <u>Id.</u> (quoting <u>Rive</u>, 82 F. App'x at 364); <u>see also</u> <u>Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 481 F.3d 813, 818 (D.C. Cir. 2007) ("[A] federal court may vacate an award only if the panel's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings.") (internal quotation omitted).

Moldova claims it was "unable to present its case" within the meaning of Article V(1)(b) because the tribunal (1) refused to admit a proffered expert opinion while holding the absence of an expert opinion against it; (2) failed to present the parties with the full audio recording of the July 2012 hearing; and (3) based the Award on new arguments and evidence advanced by

Petitioner for the first time during the hearing and in its written post-hearing final statement. As will follow, the Court finds that Moldova has not met its heavy burden of demonstrating that it was denied due process and thus unable to present its case under Article V(1)(b) on any of these grounds.

First, the expert witness. Moldova contends that the tribunal erroneously refused to admit the opinion of an expert witness and did not allow the expert to testify during the arbitral hearing. See Suppl. Reply in Supp. of Renewed MTD at 6. According to Moldova, the tribunal compounded this error by "paradoxically" holding the absence of an expert against the country, emphasizing in the Award that "[t]he parties did not bring any witnesses or experts to appear at the hearing." Id. (citing Award ¶ 42). The record undermines Moldova's assertions. In a December 2011 procedural order, the tribunal explained that it would construe the expert opinion "as one and the same statement submitted on behalf of the Respondent [Moldova]" because the expert's areas of expertise—"special knowledge of Russian legislation on the capital market and corporate law of the CIS countries"—were not "relevant to this dispute" and because the opinion extended beyond those areas to also address general factual and legal issues. See ECF No. 57-6, at 5. In other words, the tribunal considered the substance of the expert's opinion as part of Moldova's answer, but discounted its relevance. See Award ¶ 21. Although Moldova says it was error not to give the expert opinion "its own weight," Suppl. Reply in Supp. of Renewed MTD at 6, it does not explain what the opinion would have separately shown or how this purported error actually "affected its ability to present its case," see Gold Reserve, Inc., 146 F. Supp. 3d at 129.

Moreover, contrary to Moldova's assertion, the tribunal did not criticize the country for failing to produce an expert; rather, the Award simply observes in the "procedural background"

section of its decision that "[t]he Parties have not brought witnesses and experts to produce any statements to the hearing."  Award ¶ 42.  Moldova's reliance on <u>Iran Aircraft Industries v. Avco Corp.</u>, 980 F.2d 141 (2d Cir. 1992), is therefore misplaced.  <u>See</u> Suppl. Reply in Supp. of Renewed MTD at 5–6.  In that case, the Second Circuit concluded that Avco was unable to present its case within the meaning of Article V(1)(b) where the arbitration panel dismissed Avco's claim for lack of certain evidence after having initially advised it that it need not produce that evidence.  <u>Iran Aircraft Indus.</u>, 980 F.2d at 146.  Here, by contrast, the tribunal's unadorned comment merely relays that neither party submitted witnesses or experts subject to cross examination; the tribunal did not rule against Moldova on the basis that it did not submit any expert opinions.  The Court therefore rejects Moldova's first due-process claim.

Moldova next argues that it was unable to present its case because "the Tribunal failed to present to the parties the full audio recordings of the hearings."  Suppl. Reply in Supp. of Renewed MTD at 6.  It generally asserts that this "severely prejudiced Respondent in its ability to support its arguments at the subsequent appeals and during this confirmation proceeding[]."  <u>Id.</u>  But again, because Moldova does not explain *how* not having the recordings prejudiced it, the country has failed to satisfy the heavy burden of avoiding enforcement under Article V(1)(b) on this ground as well.

Finally, the purported new arguments and evidence.  Moldova asserts that it was denied due process because the arbitral tribunal based the Award on new evidence and arguments from Petitioner without giving the country an opportunity to respond.  According to Moldova, Energoalliance argued during the hearing "*for the first time* in the Arbitration" that its "qualified 'Investment' is also covered by Contract No. 24/02."  <u>Id.</u> at 7 (emphasis in original) (citing

Declaration of Mihail Buruiana ("Buruiana Decl."), ECF No. 57, ¶ 56). Certain language in the Award suggests that at the very least, Petitioner's theory of "investment" evolved over time:

> Initially, the Claimant affirmed that it has acquired its alleged 'investment/Investment' on the date of two Agreements (06-20 and 07-20) i.e. on 30 May 2000, and not on any earlier date. However, some transformation was available in position of the Claimant, including its reference to the fact that Agreement No. 24/02 (according to the Claimant's words) is of 'long-term' nature (what as if indicates that just Agreement No. 24/02 and not Agreement No. 06-20 falls within the definition of 'investment').

Award ¶ 166. But even if Energoalliance's theory "transformed" leading up to the hearing, Moldova does not explain why it didn't respond to that argument in its own final statement, which it submitted in August 2012, more than a month after the hearing.

Moldova does argue that the post-hearing final statement was not enough to counter other new arguments because Petitioner also "submitted three new legal authorities and put forward new arguments based on these authorities" in its post-hearing memorandum. Suppl. Reply in Support of Renewed MTD at 8. According to Moldova, the gist of these new arguments was that Energoalliance and Derimen should be considered a "'group of companies' or otherwise 'consolidated'" for purposes of the ECT. Id. Moldova claims it could not rebut *these* new arguments and materials because the parties submitted their post-hearing final statements on the same date in August 2012 and because the tribunal's procedural order barred additional submissions. Id.

Moldova's due-process defense on this ground fails for two reasons. First, evidence in the record before the Court suggests these were not new arguments at all. Petitioner has offered a declaration from Energoalliance's arbitration counsel, who avers that his client "always maintained that its investment in Moldova was not based on a sole contract but on the combination of economic relationships that emanated from the supply and providing financing

for the supply of electricity into the territory of Moldova." Fifth Decl. of Viacheslav Lych ("Fifth Lych Decl."), ECF No. 58-1, ¶ 9. The tribunal likewise found that the arguments in the Petitioner's final statement were "mainly provided by it already in the claim materials, as well as expressed by it in the course of oral hearings." Award ¶ 168. Other language in the Award suggests that Energoalliance's final statement logically flowed from its position during the hearing. For instance, the Award explains that the "Claimant has amplified this argument [on Agreement 24/02 described in paragraph 166 of the Award] in its Final Statement," and quotes the final statement's argument "that all and any transactions associated with electricity supplies for exports to [the Republic of Moldova] ought to be considered as a unit, a single transaction." Id. ¶ 167 (alteration in Award); see also id. ¶ 177 ("Thus, in accordance with amplified position of the Claimant, the electricity supplies, if interpreted under ECT, was of investment nature and has a number of investment elements from the very beginning."). The record before the Court thus supports a conclusion that Petitioner's post-hearing brief merely elaborated on previous arguments such that Moldova could have reasonably anticipated and responded to them. Cf. Flyers Rights Educ. Fund, Inc. v. FAA, 864 F.3d 738, 748 n.6 (D.C. Cir. 2017) (declining to find argument waived where "the manner in which [the plaintiff] substantiated [its] argument evolved from its opening to reply brief" because "[w]hat matters is that the core of [the plaintiff's] argument . . . remained the same").[5]

---

[5] The same holds true for the three legal authorities on which Petitioner purportedly relied for the first time in its post-hearing final statement. As Petitioner explains, these legal authorities "were well-known international arbitral decisions" related to the scope of "investment" under the ECT and decided years ago. See Pet'r Opp. to Suppl. Reply, ECF No. 58, at 5. Moldova fails to convince the Court that it was unable to present its case simply because the Petitioner cited three well-known and relevant legal authorities.

Second, even if Petitioner did advance new arguments in its post-hearing brief, Moldova waived any objections to these procedural irregularities by not raising them before the tribunal. See Europcar Italia, S.p.A., 156 F.3d at 315–16 (holding that party to arbitration waives defense to confirmation of award by not raising issue in arbitration itself); Gold Reserve, Inc., 146 F. Supp. 3d at 126–27 (concluding that respondent waived defense by failing to clearly raise it before arbitral tribunal). Moldova does not indicate that it tried to bring the issue to the tribunal's attention; instead, it says it couldn't. See Suppl. Reply in Supp. of Renewed MTD at 8. The record suggests otherwise. The parties submitted their final statements August 2012 and the tribunal issued the Award in October 2013. *Both* parties submitted additional materials in the intervening fourteen months. For example, in the fall of 2012, Energoalliance informed the tribunal that because it had entered into bankruptcy proceedings, its previous counsel no longer represented its interests. Award ¶¶ 46–47. After some confusion, and objections from Moldova, the tribunal recognized an official receiver as Petitioner's "only representative." Id. ¶¶ 51, 56. In February 2013, Energoalliance's new representative asked "to supplement and amend" its previous final statement. Id. ¶ 59. Over Moldova's objection, id. ¶ 60, the tribunal granted Energoalliance leave to file a new statement, id. ¶ 61; had it done so, Moldova could have submitted an additional final statement in response, id. But there was a catch: Energoalliance would be required to pay an additional $40,000. Id. Ultimately, Energoalliance decided not to submit a new final statement and avoided paying the additional fee. Id. ¶ 63.

Moldova does not acknowledge "submit[ting] various statements to the Arbitration Court" between August 2012 and February 2013, as described the arbitration decision. See id. ¶ 60. Nor does it explain why it could not have objected to Petitioner's purported new arguments if the Petitioner was able to object to its previously submitted final statement. Instead, it accuses

19

Energoalliance of "strategically manipulat[ing] the arbitration proceedings in order to prevent Respondent [Moldova] from filing its rebuttal" to the new arguments. Suppl. Reply in Supp. of Renewed MTD at 9. Moldova is mistaken. The country takes out of context the tribunal's February 2013 procedural order which allowed Energoalliance to submit a new final statement and granted Moldova the opportunity to respond to that new statement. If anything, the procedural order demonstrates that the tribunal was willing to entertain submissions from the parties raising any irregularities they thought existed.

In light of these facts, the Court concludes that on these grounds, too, Moldova has not met its substantial burden of demonstrating that it was denied due process and prevented from presenting its case under Article V(1)(b).[6]

## 2.    Article V(1)(c): Scope

Moldova next contends that the Award exceeds the scope of its consent to arbitrate. The country invokes Article V(1)(c) of the New York Convention, which provides in relevant part:

> Recognition and enforcement of the award may be refused . . . if . . . [t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration.

_____

[6] The Court notes that in its renewed motion to dismiss, Moldova also argues that the tribunal "deliberately and willfully" ignored many of Moldova's arguments by "reformulat[ing]" them. Renewed MTD at 8 (quoting Award ¶ 179). Although the Buruiana declaration also generally references paragraph 179 of the Award, see Buruiana Decl. ¶ 41 (quoting Award ¶ 179), Moldova's counsel did not pick up the argument in either the reply or supplemental reply and the declaration does not provide sufficient detail for the Court to evaluate. Moreover, the Court notes that the tribunal states that it occasionally rephrased _both_ parties' arguments. See, e.g., Award ¶ 296 (explaining that it would "present[] its understanding of the arguments in a generalized form and not the exact words used in the Parties' pleadings"). Moldova fails to persuade the Court this violated due process.

As a fellow court in this district has observed, a scope defense "actually involves a two-part inquiry." Gold Reserve Inc., 146 F. Supp. 3d at 120. The reviewing court must "decide, substantively, whether the Tribunal acted within its permissible scope to arbitrate" but also "procedurally, the amount of deference it should grant the Tribunal's *own* determination of such scope, insofar as that question was itself delegated to the Tribunal." Id. at 121. The Court starts with the latter, procedural aspect of the inquiry.

a.    Arbitrability

Where the parties "clearly and unmistakably" delegated questions of arbitrability to the arbitrator, Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002), a court must "give considerable leeway to the arbitrator, setting aside [its] decision only in narrow circumstances," First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995). The parties did so here. Article 26(5) of the ECT provides that disputes shall be settled in accordance with the UNCITRAL Arbitration Rules. Under those rules, which are incorporated by reference into the ECT, "[t]he arbitral tribunal *shall have the power to rule on objections that it has no jurisdiction*, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement." UNCITRAL Arbitration Rules, G.A. Res. 31/98 art. 21 (Dec. 15, 1976) (emphasis added). Petitioner and Moldova therefore consented to allow the arbitral tribunal to decide questions of arbitrability—including whether Energoalliance had an "investment" within the meaning of the ECT as is required for jurisdiction under the treaty. See Ecuador, 795 F.3d at 207–08 ("Incorporation of the UNCITRAL arbitration rules . . . constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." (quoting Oracle Am., Inc. v. Myriad Group A.G., 724 F.3d 1069, 1077 (9th Cir. 2013)).

b.      The tribunal's jurisdiction

Because the parties agreed to arbitrate arbitrability, the Court will consider Moldova's "arguments in light of the substantial deference owed to the Tribunal's own findings concerning its scope to act." <u>Gold Reserve Inc.</u>, 146 F. Supp. 3d at 122. Under this deferential review, "the 'beyond the scope' defense to confirmation 'should be construed narrowly' and [] the party resisting confirmation on such basis 'must . . . overcome a powerful presumption that that the arbitral body acted within its powers.'" <u>Chevron Corp. v. Republic of Ecuador</u>, 949 F. Supp. 2d 57, 67 (D.D.C. 2013) (quoting <u>Parsons</u>, 508 F.2d at 976), <u>aff'd</u> 795 F.3d 200 (D.C. Cir. 2015).

Counsel for Moldova's submissions regarding a scope defense under Article V(1)(c) echo the arguments advanced by the country before it was represented. The Court discerns three challenges under the umbrella of Article V(1)(c): (1) the tribunal erroneously concluded that it had jurisdiction based on an incorrect interpretation of "investment" under the ECT; (2) the tribunal deliberately ignored Moldova's arguments regarding Agreement 24/02 (which interposed Derimen between Energoalliance and Moldtranselectro in the payment chain); and (3) the tribunal exceeded the scope of its authority by deciding issues regarding Moldtranselectro even though the former state-owned utility was not a party to the arbitration. <u>See</u> Renewed MTD at 9–13; Suppl. Reply in Supp. of Renewed MTD at 2–4. Before reaching Moldova's contentions, the Court will briefly summarize jurisdiction under the ECT and the arbitral panel's jurisdictional findings in this case.

***Jurisdiction under the ECT.*** The Energy Charter Treaty provides a comprehensive framework for resolving disputes between investors and contracting parties. Article 26 of the ECT provides for jurisdiction over "[d]isputes between a Contracting Party and an Investor of

another Contracting Party relating to an Investment of the latter in the Area of the former." ECT, art. 26(1). Thus, a dispute must (1) be between an investor and a contracting party, (2) relating to an investment, (3) made by the investor in the territory of the contracting party. The ECT defines a "contracting party" as "a state . . . which consented to be bound" by the treaty. Id., art. 1(2). The treaty defines an "investor" as a "company . . . organized in accordance with the law applicable in [a] . . . Contracting Party." Id., art. 1(7). And Article 1(6) of the ECT defines "investment" as "every kind of asset, owned or controlled directly or indirectly by an Investment and includes . . . (c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment." Id., art. 1(6)(c). That section further emphasizes that "'Investment' refers to an investment associated with an Economic Activity in the Energy Sector." Id., art. 1(6).

*__The tribunal's jurisdictional findings.__* Both Moldova and Ukraine are contracting parties to the ECT. The tribunal found that Energoalliance "is a legal entity, incorporated and registered in accordance with legislation of Ukraine." Award ¶ 142. It therefore concluded that Energoalliance "is an 'Investor' for the purposes of ECT.'" Id. ¶ 159. Moldova has not challenged this finding in the confirmation proceeding.

The tribunal next turned to whether the acquired debt arising out of the energy-supply contract constituted an "investment" under the ECT. The tribunal devoted more than 100 paragraphs to this question, id. ¶¶ 160–272, carefully outlining the parties' arguments before concluding that Energoalliance's "investment that arose under Contracts No. 24/02 and No. 06-20 is covered by the notion of 'Investment' in the meaning of Article 1 Paragraph 6 of the ECT," id. ¶ 250. In support of this conclusion, the tribunal first reasoned that the concept of an "investment" should be interpreted broadly under the treaty because Article 1(6) provides only a

"non-exhaustive" list of "assets," as indicated by the use of "includes" and as explained by the Energy Charter Secretariat's ECT Reader's Guide. See id. ¶¶ 226, 230, 251. The tribunal also cited other arbitral awards interpreting "investment" broadly to cover "all types of assets," id. ¶ 231; scholarly articles advocating for an "extensive" definition of investment, id. ¶ 228; and the "history of drafting the ECT" which referenced "every kind of asset in energy field," id. ¶ 229; see also id. ¶ 227. Finally, the tribunal explained that a broader interpretation of "investment" was consistent with the overarching goal of the ECT to promote "the long-term cooperation in the field of energy," which requires "private foreign capital" being confident that it will receive "international legal protection" of its energy-related investments. Id. ¶ 245.

In light of the broad concept of "investment" under the ECT, the tribunal then examined the "functional nature of the activities of the parties" to the various agreements at issue. Id. ¶ 225. Under Agreement No. 1/01, Energoalliance was to purchase electricity from a Ukrainian power producer for export to Moldtranselectro, the Moldovan state-owned utility. Id. ¶ 190. But because Moldova had not historically "made timely payments," this arrangement exposed Energoalliance to a risk of steep fines under Ukrainian currency controls. Id. ¶ 203. To mitigate this risk, Agreement No. 24/02 provided that "Energoalliance was the supplier, Derimen was the buyer (payer), and Moldtranselectro was the receiver." Id. ¶ 190. The tribunal recognized that Energoalliance's exposure was not eliminated entirely, however, because Derimen had 80 days to pay Energoalliance after Energoalliance exported electricity to Moldtranselectro. Id. ¶ 201. Accordingly, "*both* the supplier and the payer assumed the risks connected with the payments for the electricity which had been already supplied and consumed (including that transformed into other tangibles)." Id. (emphasis added); see also id. ¶ 249 (concluding that Energoalliance "transferred highly liquid energy resources necessary for the Defendant's economy to the

territory of the Republic of Moldova on actually unguaranteed terms of payment on credit, which resources were accepted and distributed by the Defendant's state-owned company and became a material resource for the support and development of its national economy"). The tribunal described "Energoalliance's activities relating to the supply of electricity" as its "investment activities." Id. ¶ 205.

The tribunal then took a step back to consider "the interconnection between the key parties to the totality of the transactions." Id. ¶ 206. It reasoned that "Derimen's right to claim arose" out of Energoalliance's investment activities in Moldova. Id. ¶ 205. And when Derimen's right to claim "returned [to Energoalliance] as a result of the assignment [pursuant to Agreement No. 06/20], it became liable [for] the protection provided for by the ECT" as an "asset" under Article 1(6). Id. Closing the loop, the tribunal explained that the acquired debt was "associated with an Economic Activity in the Energy Sector" because it "arose as a direct result of the electricity sale." Id. ¶ 225 (citing ECT, art. 1(5)–(6)).[7]

The tribunal recognized that Agreement No. 24/02 "and the other related legal deeds" gave rise to a "peculiar legal relationship," id. ¶ 199, because "the functions which are usually fulfilled by one party (the investor) were 'split' among the members of the group"— Energoalliance and Derimen, id. ¶ 218. But this was "because of explainable reasons," id.: minimizing exposure under Ukrainian currency control legislation while fulfilling the "common purpose" of "an uninterrupted provision of the Moldovan economy with electricity." Id. ¶ 199.

---

[7] The Court takes the English translation of the Award's reference to "Business Activities in the Energy Sector," id., to refer to "Economic Activity in the Energy Sector" as that phrase is used in Article 1(5) and (6) of the ECT.

And ultimately, those functions were "consolidated (by the conclusion of the assignment contracts) subsequently." Id. ¶ 218.

The tribunal also considered, and rejected, Moldova's many arguments against treaty jurisdiction. For instance, the country had argued that Agreement No. 24/02 could not support jurisdiction under the ECT because it was merely a commercial contract regarding the supply of goods having no relation to an "investment." Id. ¶ 225. As explained above, however, the tribunal found that Energoalliance bore considerable risk when exporting electricity to Moldova. Based on that history, the panel concluded that Energoalliance was not just a "debt collector" when it obtained Derimen's right to claim pursuant to Agreement No. 06-20. See Id. ¶ 221.

The tribunal also rejected Moldova's argument that an investment may only receive protection under the ECT if it was initially made by a party that qualifies as an investor under the treaty. According to Moldova, this would mean that the acquired debt here would not qualify because it was originally held by Derimen, an entity registered in the British Virgin Islands, which is not a contracting party to the ECT. Yet the tribunal concluded that nothing in the treaty suggested that previous ownership would be relevant to whether an asset presently qualified as an "investment" subject to protection. Id. ¶ 147.

**Moldova's contentions.** Again, Moldova asserts that the arbitral panel strayed beyond the scope of its authority under Article V(1)(c) in three ways. The Court starts with the country's argument that "the Tribunal invented, *sua sponte*, the concept of the 'Business Transaction' to justify its holding that [Energoalliance] had an 'Investment' in Moldova, exceeding the powers conferred on it." Suppl. Reply in Supp. of Renewed MTD at 3–4 (citing Buruiana Decl. ¶¶ 90–94). "Business transaction" is the shorthand phrase the tribunal used to describe "the totality of the transactions" between the parties described above. See Award ¶ 206. So by challenging "the

concept of the 'Business Transaction,'" Moldova in essence challenges the tribunal's jurisdictional holding in its entirety. But "the New York Convention 'does not sanction second-guessing the arbitrator's construction of the parties' agreement," Gold Reserve Inc., 146 F. Supp. 3d at 124 (quoting Parsons, 508 F.2d at 977), which is precisely what Moldova would have the Court do. There is "nothing on the face of the panel's" interpretation of its jurisdiction—based on the complicated series of energy-supply and financing transactions—"which suggests the panel failed to construe the contract." Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175, 1182 (D.C. Cir. 1991). Because the tribunal's jurisdictional analysis withstands the Court's most cursory review, the Court will deny Moldova's motion to dismiss on this ground. In reaching this conclusion, the Court takes no position on the ultimate merits of the arbitral panel's finding that the dispute involved an "investment" under the ECT, or the dissenting member's contrary interpretation.

Moldova contends the tribunal also exceeded its authority by deciding issues regarding Moldtranselectro, which it says "was not a party to the Arbitration." Suppl. Reply in Supp. of Renewed MTD at 2. But Moldtranselectro was the Moldovan-owned utility involved in the 1999 supply agreements that gave rise to the dispute. Of course the tribunal needed to construe those contracts for purposes of determining its jurisdiction. And ultimately, the specific arguments Moldova advances regarding Moldtranselectro make clear that it seeks substantive review of the tribunal's Award. All of the findings Moldova disputes regarding Moldtranselectro appear in the tribunal's analysis of Energoalliance's loss amounts, not its jurisdictional analysis. See id. at 2–3 (citing Award ¶¶ 396, 403, 408, 410). Moldova's arguments about Moldtranselectro, then, are not properly brought under Article V(1)(c).

Moldova's remaining argument reframes yet another substantive objection to the amount of the Award as a jurisdictional claim under Article V(1)(c). The country argues that the tribunal erroneously applied Agreement No. 24/02 retroactively to January and February of 1999 even though it entered into force in March 1999. See id. at 3 (citing Buruiana Decl. ¶ 115). The upshot of this purported error? A major impact "on the amount of damages under the Arbitral Award." Buruiana Decl. ¶ 97. This is not a jurisdictional scope question. Therefore, once more, Moldova has failed to meet its heavy burden of establishing grounds under Article V(1)(c) to deny confirmation of the Award.

*   *   *

The Court must confirm the Award unless it finds that Respondent has established one of the grounds for refusal specified in the New York Convention. See 9 U.S.C. § 7. Having rejecting Moldova's arguments under Article V(1)(b) and (c), the Court therefore will confirm the Award.

> D.   The Award

Which leads the Court to the final questions before it: how much to award, and in what currency?

The arbitral tribunal awarded Energoalliance MLD 592,880,395 (which included MLD 195,547,212 as the amount of Energoalliance's lost investment; MLD 357,916,008 in interest for the period up to May 31, 2012; and MLD 39,417,175 in interest for the period between June 1, 2012 and the date of the Award)[8], and $540,000 (which included $200,000 in attorneys' fees in

---

[8] The tribunal explained that May 31, 2012 is "the date on which the Claimant presented the final calculation of its loss in the Alternative Calculation Statement." Award ¶ 426. The tribunal distinguished between the period before and after that date because it only had "data on the average credit interest rate in Moldova" before June 1, 2012. Id.

the arbitration and $340,000 as the cost of arbitration). Award ¶ 436. Petitioner asks the Court to (1) convert the Moldovan Lei portion of the Award into U.S. Dollars using the exchange rate from the date of the Award; (2) award prejudgment interest at the statutory rate from the date of the Award to the date of entry of this Court's judgment; (3) award postjudgment interest at the statutory rate from the date of this Court's entry of judgment until the judgment is satisfied in full; and (4) award costs and attorneys' fees in this proceeding.

***Conversion to U.S. dollars.*** The Court will grant Petitioner's request to convert the Award to U.S. dollars, which appears to be the standard practice in this jurisdiction. See Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria, 932 F. Supp. 2d 153, 158 (D.D.C. 2013) ("Conversion of [] foreign currency amounts into dollars at judgment is the norm, rather than the exception."), aff'd 603 F. App'x 1 (D.C. Cir. 2015). Contrary to Moldova's contention, it would not be "manifestly unjust" to convert the Award into dollars. See Reply in Supp. of Renewed MTD at 22. The Moldovan Lei has depreciated since October 25, 2013, the date of the Arbitral Award.[9] "Refusing to convert [Petitioner's] award into dollars, therefore, would effectively reduce the value of the award." Cont'l Transfert, 932 F. Supp. 2d at 158. Moreover, contrary to Moldova's contention, see Reply in Supp. of Renewed MTD at 23–23, this case is not like Leidos, Inc. v. Hellenic Republic, 881 F.3d 213 (D.C. Cir. 2018), in which the D.C. Circuit held that the district court erred by converting an arbitral award from euros into dollars because the creditor waited to request conversion until *after* the district court's judgment. Id. at 218–20.

---

[9] The Court takes judicial notice, under Federal Rule of Evidence 201, of two facts. As of October 25, 2013, the date of the Arbitral Award, the currency exchange rate of Moldovan Lei to U.S. Dollars was MLD 12.9207 per U.S. dollar. The Moldovan Lei has depreciated since then. The currency exchange rate of Moldovan Lei to American dollars today is MLD 17.8856 per U.S. dollar. See Official Exchange Rates, http://www.bnm.md/en/content/official-exchange-rates (last accessed August 23, 2019).

Petitioner here requested conversion *before* this Court's judgment.  <u>See also</u> <u>Cont'l Transfert</u>, 932 F. Supp. 2d at 162–63 (converting arbitral award into dollars as requested by creditor in its summary judgment motion).

The Court will use the exchange rate from the date of the Award to convert the Moldovan Lei into dollars.  Petitioner's "cause of action to confirm the [Arbitral] Award arises under United States law, and thus the breach day—the date of the issuance of the [Arbitral] Award— dictates the exchange rate the Court must employ when converting the portion of the award in [Moldovan Lei] to Dollars." <u>Enron Nigeria Power Holding, Ltd. v. Federal Republic of Nigeria</u>, 13-cv-1106 (CRC), 2017 WL 6628118, at *2 (D.D.C. Apr. 26, 2017); <u>see also</u> <u>Cont'l Transfert</u>, 932 F. Supp. 2d at 158–62 (applying breach day rule from <u>Hicks v. Guinness</u>, 269 U.S. 71 (1925), in context of international arbitration award because petitioner's entitlement to judgment arose from the New York Convention by way of the FAA).  Furthermore, because the Moldovan Lei has depreciated since the date of the Award in 2013, using the breach day rule to determine the applicable exchange rate for converting the Moldovan Lei portion of the Award into U.S. dollars will more fully make Petitioner whole for the delay in Moldova's compliance with the Award.  <u>See</u> <u>Enron Nigeria Holding</u>, 2017 WL 6628118, at *2.

***Pre and postjudgment interest.***  Petitioner also requests pre and postjudgment interest. Whether to award prejudgment[10] interest on foreign arbitral awards is "subject to the discretion of the court and equitable considerations."  <u>Cont'l Transfert</u>, 932 F. Supp. 2d at 163 (quoting <u>Oldham v. Korean Air Lines Co.</u>, 127 F.3d 43, 54 (D.C. Cir. 1997)).  The purpose of prejudgment interest "is to compensate the plaintiff for any delay in payment resulting from the

_____

[10] That is, the period between the date of the Award and the date of this Court's entry of judgment.

litigation." Id. (quoting same). "[A] presumption exists in favor of" prejudgment interest "in actions to confirm arbitral awards under the New York Convention," such that "'absent any reason to the contrary,' prejudgment interest 'should normally be awarded when damages have been liquidated by an international arbitral award.'" Id. at 163–64 (quoting Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH, 141 F.3d 1434, 1447 (11th Cir. 1998)). In addition, where, as here, "an arbitral award grants pre-award interest but is 'silent' on whether a party should recover post-award interest—i.e., prejudgment interest—granting such prejudgment interest is consistent with the award." Id. at 164; see also Award ¶ 436. Exercising its judgment, the Court finds that awarding prejudgment interest is both consistent with the underlying Award and appropriate to compensate Petitioner for the almost five years Moldova has resisted compliance. Accord BCB Holdings Ltd. v. Gov't of Belize, 232 F. Supp. 3d 28, 49 (D.D.C. 2017) (awarding prejudgment interest after confirming award under New York Convention).

The next question is what rate of interest should apply to the award of prejudgment interest. This too is left to the Court's discretion. Petitioner requests the "statutory rate" in D.C. Code § 28-3302, which would amount to approximately 6%. See Petition at 8; Pet'r Surreply in Opp. to Renewed MTD at 17. While state law determines the applicable prejudgment interest rate in diversity cases, this Court has federal subject-matter jurisdiction over this petition. The D.C. Circuit has indicated a preference for the use of the prime rate in cases confirming foreign arbitral awards. See Cont'l Transfert, 932 F. Supp. 2d at 164–65 (citing Forman v. Korean Air Lines Co., Ltd., 84 F.3d 446, 450 (D.C. Cir. 1996)). Consistent with fellow courts in this district, the Court finds that prejudgment interest should be calculated, on a compound basis, using the average daily prime rate between the date of the Award and the date of judgment. See id. at 163–65; Belize Soc. Dev. Ltd. v. Gov't of Belize, 5 F. Supp. 3d 25, 43 (D.D.C. 2013).

In addition, after entry of judgment by this Court, postjudgment interest will accrue on the total judgment amount at the applicable statutory rate set forth in 28 U.S.C. § 1961 until paid.

***Attorney's fees and costs.*** Finally, having carefully considered Petitioner's request for attorney's fees and costs, the Court declines to find that Moldova's litigation of this action reflects bad faith or vexatious conduct. See Concesionaria Dominicana de Autopistas y Carreteras, S.A. v. Dominican State, 926 F. Supp. 2d 1, 2 (D.D.C. 2013) ("[I]t is well settled that the Court retains inherent power to assess attorneys' fees 'when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45–46 (1991)). Each side shall therefore bear its own fees and costs.

*     *     *

Petitioner shall, by September 5, 2019, file a proposed order of judgment reflecting the amount of the constituent parts of the Award, along with a brief summary of its calculations of currency conversions and interest performed consistent with this opinion. Moldova may respond to the form of the proposed order and the associated calculations within fourteen days thereafter.

## IV. Conclusion

For the foregoing reasons, the Court will deny Moldova's [37] Renewed Motion to Dismiss, and grant Petitioner's [1] Petition for Enforcement. A separate Order will accompany this Memorandum Opinion.

_____<br>
CHRISTOPHER R. COOPER<br>
United States District Judge

Date: August 23, 2019