UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**LLC SPC STILEKS**,

        Petitioner,

        v.

**REPUBLIC OF MOLDOVA**,

        Respondent.

Case No. 14-cv-01921 (CRC)

## OPINION AND ORDER

This is a long-running dispute over energy supply contracts between a Ukrainian electricity provider and a Moldovan state-owned utility dating back to 1999. This Court's involvement in the matter, however, began in 2014 when petitioner's predecessor-in-interest, LLC Energoalliance, moved to confirm a foreign arbitral award rendered in its favor, and against the Republic of Moldova, by an *ad hoc* arbitral tribunal seated in Paris, France. After an extended stay, this Court confirmed the award and entered judgment in favor of petitioner. See LLC Komstroy v. Republic of Moldova, No. 14-cv-01921 (CRC), 2019 WL 3997385 (D.D.C. Aug. 23, 2019). Moldova appealed to the D.C. Circuit, and the Circuit affirmed this Court's orders lifting its earlier stay, confirming the arbitral award, and awarding prejudgment interest. LLC SPC Stileks v. Republic of Moldova, 985 F.3d 871 (D.C. Cir. 2021). However, rather than affirming the judgment, the D.C. Circuit vacated the Court's order converting the judgment amount from Moldovan lei to U.S. dollars, and remanded for further consideration of that issue. Id. at 883. On remand, both sides agree to denominate the award in Moldovan lei. Still before the Court, however, is petitioner's motion to determine the prejudgment interest rate and yet another motion by Moldova for a stay pending the outcome of the still-ongoing proceedings in

France.  For the reasons explained below, the Court will deny the motion for a stay and grant prejudgment interest based on the average U.S. prime rate.

I.  **Background**

The history of case is recounted in detail in this Court's previous rulings and the D.C. Circuit's decision, LLC SPC Stileks v. Republic of Moldova, 985 F.3d 871 (D.C. Cir. 2021).  In brief, Ukrainian energy provider Energoalliance contracted with a series of intermediaries to sell electricity to a state-owned Moldovan utility.  When the utility fell behind on its payments, Energoalliance tried to collect on the debt in Moldovan courts (unsuccessfully), and then via arbitration proceedings in France (successfully).

In 2014, Energoalliance sought to confirm the arbitral award in the United States, filing suit in this Court.  Moldova responded by applying for a stay while it pursued set-aside proceedings in the French courts.  The Court granted the stay.  Although Moldova was initially successful before the Paris Court of Appeal, the Court of Cassation (France's highest civil court) reinstated the award and remanded the matter to the Paris Court of Appeal, where proceedings are currently ongoing.

After the Court of Cassation sided with Energoalliance, LLC Komstroy (Energoalliance's successor-in-interest) moved this Court to lift the stay and confirm the award.  The Court lifted the stay, LLC Komstroy v. Republic of Moldova, No. 14-cv-01921 (CRC), 2018 WL 5993437 (D.D.C. Nov. 13, 2018), and confirmed the award, LLC Komstroy, 2019 WL 3997385.  The Court also awarded Komstroy pre-judgment interest based on the average U.S. prime rate and converted the award into U.S. dollars.  LLC Komstroy v. Republic of Moldova, No. 14-cv-1921 (CRC), 2019 WL 4860826 (D.D.C. Oct. 2, 2019).

Moldova appealed. The D.C. Circuit affirmed the Court's lifting of its earlier stay and its confirmation of the arbitral award. The Circuit vacated the judgment, however, and remanded for this Court to consider whether Moldova had a settled expectation that the judgment would be denominated in Moldovan lei instead of U.S. dollars. Stileks, 985 F.3d at 883.

On remand, the parties agree that the award is currently in full force and effect. Stay Mot. at 4, ECF No. 89-1; Stay Opp. at 7, ECF No. 91. Reversing its prior position before this Court and the D.C. Circuit, petitioner now consents to an award denominated in Moldovan lei rather than U.S. dollars. See Joint Status Report (May 28, 2021), ECF No. 83. It has moved to determine the prejudgment interest rate. See Pet'r Mot. to Determine Prejudgment Interest, ECF No. 86. For its part, Moldova has once again moved for a stay pending the outcome of the proceedings in France. Therefore, what is left for the Court to decide is whether to stay the case pending the outcome of the proceedings in France, and in the absence of a stay, what interest rate should be used to calculate the prejudgment interest. Both motions are ripe for the Court's consideration.

## II. Analysis

### A. Moldova's Stay Motion

#### 1. Legal Standard

The parties disagree at the outset about what standard governs the Court's consideration of Moldova's motion for a stay. Petitioner argues the standard under Federal Rule of Civil Procedure 62 applies because this Court is "constructively" in the post-judgment phase. Stay Opp. at 1. Under Rule 62, a stay may be obtained "any time after judgment is entered" by "providing a bond or other security." Fed. R. Civ. P. 62(b). For a post-judgment stay *without a bond*, the Court must balance four equitable factors, including whether the applicant has made a

"strong showing" that he or she is likely to succeed on the merits, whether irreparable injury would result absent a stay, and whether the balance of equities and the public interest favor a stay of the judgment.  Pao Tatneft v. Ukraine, No. CV 17-582 (CKK), 2021 WL 2209460, at *5 (D.D.C. June 1, 2021) (discussing the "traditional test" for determining whether to grant a stay without a bond found in Hilton v. Braunskill, 481 U.S. 770, 776 (1987)).

Moldova submits that the Rule 62 standard does not apply.  Moldova argues that because the D.C. Circuit vacated this Court's October 2, 2019, order entering the judgment against it, there is effectively no judgment in the case.  Stay Reply at 3–4, ECF No. 93.  Moldova instead suggests that the factors found in Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310 (2d Cir. 1998) apply, because Moldova is seeking a stay pending the outcome of parallel proceedings in France to set aside the arbitral award.  Stay Mot. at 6–7, ECF No. 89-1; Stay Reply at 3; see Europcar, 156 F.3d at 316–18.

The Court agrees with Moldova.  Although there is admittedly not much left for the Court to decide in this matter, we are not in the "post-judgment" phase, either literally, or, as petitioner suggests, "constructively."  The order entering judgment on October 2, 2019 was vacated, and this Court has not entered another judgment in the interim.  See ECF Nos. 66, 75.  And, as the parties are aware from their briefing on the topic, the Court must still decide what interest rate should be used to compute the prejudgment interest on the award before it can calculate the amount of judgment.  Therefore, the Court will consider Moldova's motion for a stay under the Europcar factors.[1]

---

[1] If the Hilton test did apply, however, the Court would still not grant Moldova a stay without bond.  Moldova has not made a "strong showing" of its likelihood of success on the merits, as the D.C. Circuit has already affirmed this Court's confirmation of the award.  Nor has Moldova shown "irreparable injur[y]" absent a stay.  Tatneft, 2021 WL 2209460, at *5.  For

4

> *2. Europcar Factors*

"Under the New York Convention, a district court may, if it considers it proper, adjourn—that is, impose a stay of—confirmation proceedings if an application to vacate the award has been made in another jurisdiction." Stileks, 985 F.3d at 879 (internal quotation marks omitted). Under Europcar, there are six factors a district court should consider before deciding to grant a stay:

> (1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;
>
> (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;
>
> (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;
>
> (4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;
>
> (5) a balance of the possible hardships to each of the parties . . .; and
>
> (6) any other circumstances that could tend to shift the balance in favor of or against adjournment.

---

reasons substantially similar to those discussed below under the Europcar factors, the harm to petitioner and the public interest in the recognition and enforcement of international arbitral awards also weigh against stay under the Hilton test. Therefore, the Court would deny the motion regardless of which standard applies.

Europcar, 156 F.3d at 317–18.  The D.C. Circuit has held that the first two of these factors are the most important, and a district court would "abuse its discretion" if it failed to consider them. Stileks, 985 F.3d at 880.

The first factor does not favor a stay.  The overarching goals of arbitration are the "expeditious resolution of disputes and the avoidance of protracted and expensive litigation." Europcar, 156 F.3d at 317.  Petitioner initiated arbitration proceedings against Moldova over ten years ago and brought this case to confirm the award in 2014.  As this Court noted when it lifted the first stay in this case in 2018, "this is hardly an 'expeditious resolution' of the dispute."  LLC Komstroy, 2018 WL 5993437, at *3 (quoting Hardy Exploration & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas, 314 F. Supp. 3d 95, 106 (D.D.C. 2018)).  The further delay since that time does not favor Moldova.  Accordingly, this factor weighs against a stay.

The second factor concerns the status of the foreign proceedings and the estimated time for their resolution.  This factor also weighs against stay.

As a refresher, Moldova initiated set-aside proceedings before the Paris Court of Appeal in 2013.  Moldova contended that the arbitral tribunal lacked jurisdiction because Energoalliance's contract with Moldova did not constitute an 'investment' under the Energy Charter Treaty ("ECT").  The Paris Court of Appeal agreed with Moldova and set aside the award.  The Court of Cassation thought otherwise and remanded to a new panel of the Paris Court of Appeal to consider Moldova's other arguments for setting aside the decision.  See LLC Komstroy 2018 WL 5993437, at *4.  That is where things stood when this Court lifted its first stay and confirmed the award.

Moldova then requested that the Paris Court of Appeal seek the opinion of the Court of Justice of the European Union ("CJEU") on "three distinct questions" of law related to the

6

arbitral tribunal's jurisdiction.  Stay Mot. at 3.  The CJEU issued its decision on September 2, 2021.  See Notice of Filing of Decision, ECF No. 92-1.  The CJEU sided with Moldova, ruling that a contract for the supply of electricity is not an 'investment' under the ECT.  Id.

The parties are now poised to argue the impact of the CJEU decision before the Paris Court of Appeal, with a hearing scheduled for March 2022.  ECF No. 96 at 2.  That decision will be subject to another round of appeal to the Court of Cassation, which could last between twelve and twenty-four months.  See Declaration of Sara Nadeau-Seguin at 5, ECF No. 95-1.[2]  The French proceedings could conclude by April or May 2023 at the earliest but could easily stretch into the spring of 2024 or beyond.  See Stileks, 985 F.3d at 880 (noting "the previous appeal-reversal-remand round at the Paris court and the Court of Cassation took over four years").

Moldova argues this Court should enter a stay because the French courts "must apply" the CJEU decision, "which will lead to a nullification of the Award in short order."  Stay Reply at 5.  Yet, it seems far from preordained that the Paris Court of Appeal will automatically "convert" the CJEU's decision into a judgment vacating the award, as Moldova suggests, or even if it does, that this will happen "in short order."  For one, the Court of Cassation has already held that the *ad hoc* tribunal correctly determined it had jurisdiction, in contrast to the CJEU ruling.  In addition, it is not obvious that the CJEU interpretation of the ECT would apply to the ECT's non-EU member signatories—like Moldova and Ukraine.  While the CJEU decision is binding on French courts as to matters of EU law, it is for Paris Court of Appeal to apply the law to the specific facts of this case.  Stay Opp. at 7.[3]

---

[2] Petitioner's last appeal to the Court of Cassation in this matter took two years and four months to resolve.  See LLC Komstroy, 2018 WL 5993437, at *4.

[3] The CJEU's guidance states that "[w]hen ruling on the interpretation or validity of EU law, the [CJEU] makes every effort to give a reply which will be of assistance in resolving the

Even if the Paris Court of Appeal agrees with Moldova and sets aside the award, that decision will be subject to another round of appeal to the Court of Cassation. Those proceedings could continue for two or three more years, much longer than the "few more months" Moldova suggests. Stay Reply at 6. In light of the fact that the Court of Cassation has already ruled against Moldova once, the Court sees no reason to further stay these proceedings.[4] See Belize Soc. Dev. Ltd. v. Gov't of Belize, 668 F.3d 724, 731–32 (D.C. Cir. 2012) ("[A] court abuses its discretion in ordering a stay of indefinite duration in the absence of a pressing need."); see also Tatneft v. Ukraine, 301 F. Supp. 3d 175, 198 (D.D.C. 2018), aff'd, 771 F. App'x 9 (D.C. Cir. 2019) (denying stay where there was "no foreseeable conclusion to Ukraine's challenge of the underlying Merits Award in the French Cassation Court"); Chevron Corp. v. Republic of Ecuador, 949 F. Supp. 2d 57, 72 (D.D.C.), judgment entered, 987 F. Supp. 2d 82 (D.D.C. 2013) (denying stay even though appeal of the award to the Dutch Supreme Court was in progress). For those reasons, the second factor does not weigh in favor of granting Moldova a stay.

---

dispute in the main proceedings, but it is for the reviewing court or tribunal to draw case-specific conclusions." Stay Opp. at 7 (citing Court of Justice of the European Union, *Recommendations to national courts and tribunals in relation to the initiation of preliminary ruling proceedings*, ¶ 11, 2019 O.J. (C 380) 4), *available at* https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=OJ:JOC_2019_380_R_0001).

[4] Moldova relies on Hulley Enterprises Ltd. v. Russian Fed'n, 502 F. Supp. 3d 144, 151 (D.D.C. 2020), in which the district court granted a stay pending the outcome of parallel proceedings in the Netherlands. Unlike in Hulley, however, this Court has already assured itself of jurisdiction and confirmed the award, and both determinations have been affirmed on appeal. In Hulley, by contrast, the stay issued at a much earlier stage of the proceedings when the outcome of the Dutch proceeding would be informative, could potentially save considerable judicial resources, and could avoid inconsistent results across jurisdictions. This Court stands to gain much less by way of judicial economy than did the district court in Hulley.

The third factor—the level of scrutiny that the arbitral award will receive in the French system compared to this Court—weighs modestly against a stay. In this Court's 2018 decision lifting the earlier stay in this case, it said:

> The Paris Court of Appeal will review the ad hoc tribunal's decision de novo, which is more exacting than this Court's deferential examination. . . . At the same time, the Paris Court of Appeal may set aside the arbitral award only on grounds narrower than those of Article V of the New York Convention, the applicable standard in this case. . . . Moreover, the *Cour de Cassation* has already concluded that one of Moldova's arguments for setting aside the award—that the ad hoc tribunal lacked jurisdiction—is without merit, leaving just the argument that the arbitral award is contrary to public policy for consideration. This reduces the likelihood that the arbitral award will be set aside and thus counsels in favor of lifting the stay.

LLC Komstroy, 2018 WL 5993437, at *4 (citations omitted). These standards of review have not changed. Although the CJEU decision appears to conflict with the Court of Cassation's, the grounds for setting aside an arbitral award in France remain narrower than the reasons this Court considered under the New York Convention.[5] This factor, if it favors either party at all, tips the scales against a stay.

The fourth factor combines the characteristics of the foreign proceedings, whether those proceedings were brought to set aside the award, and whether they were initiated under circumstances indicating an intent to delay resolution of the dispute. These factors have not changed since the Court's 2018 decision and come out a wash. See LLC Komstroy, 2018 WL 5993437, at *4. Just as before, Moldova initiated the set-aside proceedings in 2013 before

---

[5] See Declaration of Benoit LeBars, ECF No. 16-2 (noting that an arbitral decision can only be set aside in French courts for one of five reasons: (1) the tribunal wrongly declared that it had or did not have jurisdiction, (2) the tribunal was improperly constituted, (3) the tribunal issued a ruling without fulfilling its mandate, (4) the adversarial principle was not observed, or (5) the recognition or enforcement of the award is contrary to international comity). The Court of Cassation ruled on the first ground, in favor of petitioner.

petitioner commenced this action. But Moldova is seeking to set aside the award, which weighs against a stay. Therefore, this factor is neutral.

The fifth factor is the balance of hardships, which weighs slightly against a stay. In 2018, this Court noted that this dispute began in the 1990s and the award was issued in 2013. Id. If the Court were to stay proceedings now, the total delay could end up being more than a decade. Although the Court is cognizant of the impact that the COVID-19 pandemic has had on governments all over the world, including Moldova, Stay Mot. at 10–11, the burden of Moldova's non-payment appears to have led to the insolvency of both the original petitioner, Energoalliance, and its successor, Komstroy. Stay Opp. at 6. Although petitioner will be compensated for the delay by prejudgment interest, as discussed below, another lengthy delay would certainly impose a burden.

For the reasons above, the Court finds the balance of the Europcar factors do not favor a stay. Most crucially, the first two Europcar factors do not support granting a stay, as the delay in this case has already been lengthy, and the parallel proceedings in France began in 2013 and have yet to be resolved, with no obvious conclusion in sight. The remaining factors are either neutral or do not favor a stay. Accordingly, the Court will deny Moldova's motion to stay the proceedings.

B. Prejudgment Interest

"Prejudgment interest is an element of complete compensation in U.S. law." Stileks, 985 F.3d at 881 (cleaned up). The D.C. Circuit affirmed this Court's decision to award prejudgment interest. Id. at 881–82. Now that petitioner has agreed to an award denominated in Moldovan lei, the only question left is what rate of prejudgment interest should apply to the award.

Petitioner asks the Court to apply the interest rates prevailing in Moldova to the Moldovan lei portion of the judgment.[6]  Mot. at 1, ECF 86-1.  Petitioner notes that the arbitral tribunal used the "an average first-class borrower short-term credit bank rate prevailing in Moldova . . . based on the rate reported by the National Bank of Moldova ('NBM')."  Mot. at 3.  Petitioner argues that prejudgment interest should "be exercised in a manner consistent with the underlying arbitration award."  Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria, 932 F. Supp. 2d 153, 164 (D.D.C. 2013); see Mot. at 4-5.  According to petitioner, it would be consistent with the arbitral award to apply the Moldovan interest rate instead of the prime rate.

Moldova, by contrast, urges this Court to apply the U.S. prime rate.  Moldova argues that the D.C. Circuit "did not vacate" the interest rate previously chosen for the prejudgment interest, and therefore that aspect of this Court's decision still governs.  Opp. at 4, ECF No. 87.  Moldova also claims using the Moldovan rate would overcompensate the petitioner.  Id. at 8.

The determination of "how to compute prejudgment interest is discretionary with the district court."  Forman v. Korean Air Lines Co., 84 F.3d 446, 450 (D.C. Cir. 1996).  Like other circuits, the D.C. Circuit prefers the use of the prime rate in cases confirming foreign arbitral awards.  Cont'l Transfert, 932 F. Supp. 2d at 164–65.  The prime rate is generally preferred when calculating prejudgment interest for awards in U.S. dollars because it is the "market rate"—i.e., "what the victim must pay—either explicitly if it borrows money or implicitly if it finances things out of cash on hand—and the rate the wrongdoer has available to it."  Matter of Oil Spill,

---

[6] The arbitral tribunal awarded Energoalliance MLD 592,880,395 (which included MLD 195,547,212 as the amount of Energoalliance's lost investment; MLD 357,916,008 in interest for the period up to May 31, 2012; and MLD 39,417,175 in interest for the period between June 1, 2012 and the date of the Award).  LLC Komstroy, 2019 WL 3997385, at *13.  The tribunal also awarded $540,000 (in USD) for attorneys' fees and the cost of the arbitration.  Id.

11

954 F.2d 1279, 1332 (7th Cir. 1992).  However, courts applying the prime rate are usually doing so to an award denominated in U.S. dollars, as that is the "norm" in this jurisdiction.  Cont'l Transfert, 932 F. Supp. 2d at 158.  The Restatement (Third) of Foreign Relations Law provides that "[i]f no statutory rate of interest is applicable, the court *may*, *in appropriate cases*, order interest to be based on the interest rate applicable at the principal financial center of the state issuing the currency in which the judgment is payable."  Restatement (Third) of Foreign Relations Law § 823 (1987) (emphasis added).[7]  The Restatement suggests, then, that this Court has the authority to do what Stileks asks, *in appropriate cases*, but it is not required to apply the interest rate applicable at the NBM.  Id.

Moreover, there is no requirement that the prejudgment interest exactly match the rate of interest applied by the arbitral panel.  In Cont'l Transfert, the D.C. Circuit affirmed the district court's use of the prime rate instead of the eighteen-percent interest rate used by the arbitral panel.  See 932 F. Supp. 2d at 165.  Although the eighteen-percent rate was based on the prevailing rate in Nigeria, and the award was originally denominated in Nigeran naira and British pounds, the district court nevertheless adopted the prime rate.  The D.C. Circuit affirmed, reasoning that while the "district court may have had the *authority* to adopt a rate that better approximates what a specific defendant might pay for an unsecured loan," the choice of the prime rate was "appropriate even though it 'may miss the mark for any particular party.'"  Cont'l

---

[7]   This Court has found examples of foreign-currency-denominated awards in which a statutorily mandated or contractually agreed upon interest rate was applied.  See, e.g., Mitsui & Co. v. Oceantrawl Corp., 906 F. Supp. 202, 203 (S.D.N.Y. 1995) (award in Japanese yen, statutory interest rate); Dye v. Kopiec, No. 16CV2952LGSKNF, 2019 WL 2527218, at *8 (S.D.N.Y. May 10, 2019) (interest in euros based on contractually-provided-for rate of 1%).  This Court has been unable to locate a case in which the district court entered a judgment in a foreign currency and applied and interest rate based on the rates prevailing abroad, and Stileks has not brought any such case to the Court's attention.

Transfert, 603 F. App'x at 5 (quoting Forman, 84 F.3d at 45); see also Liberty Media Corp. v. Vivendi Universal, S.A., No. 03 CIV. 2175 SAS, 2013 WL 105776, at *4 (S.D.N.Y. Jan. 9, 2013) (awarding judgment in euros and calculating prejudgment interest rate based on the average rate of return for one-year Treasury bills).

The Court is not working from a blank slate, however. When it confirmed the award in 2019, this Court converted the award into USD and granted prejudgment interest based on the prime rate. LLC Komstroy, 2019 WL 3997385, at *14. Neither petitioner nor Moldova challenged the choice of the prime rate on appeal. Petitioner also could have requested an alternative interest rate in 2018 in the event the Court did not grant its motion to convert the award into USD, but it did not do so. See ECF Nos. 58; 63-1. Instead, this is the first time in over seven years of litigation that petitioner has mentioned the interest rate applicable at the NBM. And, as Moldova points out, petitioner initially requested the statutory rate of 6%, "without any reference to whether the currency would affect the applicable rate" for prejudgment interest. Opp. at 6, ECF No. 87 (citing ECF Nos. 1, 54); see also LLC Komstroy, 2019 WL 3997385, at *14 (noting that petitioner requested the statutory rate found in D.C. Code § 28-3302). Therefore, petitioner has waived its argument for an alternative prejudgment interest rate.

Even if the argument was not waived, however, the Court would not find it appropriate in this case to apply the rate prevailing at the NBM. The prime rate is preferred in cases confirming international arbitral awards "because it best approximates 'the market rate,'" Cont'l Transfert, 932 F. Supp. 2d at 165, and reflects "the rate banks charge for short-term unsecured loans to creditworthy customers." Forman, 84 F.3d at 451 (quoting Matter of Oil Spill, 954 F.2d at 1332). "The average prime rate . . . has been repeatedly held as appropriate by the D.C. Circuit; indeed, the D.C. Circuit has found it 'more appropriate' than a fixed investment rate like the 6–

13

month Certificate of Deposit rate." McKesson Corp. v. Islamic Republic of Iran, 116 F. Supp. 2d 13, 40–41 (D.D.C. 2000). Petitioner urges this Court to apply the rate prevailing at the NBM but has not made a showing that that rate "best approximates" the market rate available to it. Petitioner is by all accounts a Ukrainian financial player who has come to this litigation relatively recently, after acquiring Komstroy's rights in the award during bankruptcy proceedings in 2019. See Sixth Declaration of V. Lych, ECF No. 84-2. Stileks has made no showing that it had to take out loans at the Moldovan interest rate during the relevant time frame, or that it has transacted any business related to Moldova aside from the purchase of Komstroy's rights in the award. The Court therefore discerns "no particular circumstances" that weigh in favor of the rate Stileks proposes. Cont'l Transfert, 932 F. Supp. 2d at 165; see also McKesson Corp., 116 F. Supp. 2d at 41 (using the prime rate where no circumstances in that case supported a departure from Forman).

For all those reasons, the Court will apply prejudgment interest based on the average U.S. prime interest rate between October 25, 2013 and November 16, 2021.

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [89] Respondent's Motion to Stay the Case is DENIED. It is further

**ORDERED** that [86] Petitioner's Motion to Determine the Prejudgment Interest Rate is GRANTED. It is further

**ORDERED** that for the purposes of determining prejudgment interest in the judgment against the Republic of Moldova, the average daily U.S. prime rate compounded annually shall apply to both the Moldovan lei denominated portion of the judgment and the U.S. dollar denominated portion of the judgment. It is further

**ORDERED** that Petitioner shall, by November 23, 2021, file a proposed order of judgment reflecting the amount of the constituent parts of the Award, along with a brief summary of its calculations of the interest applied consistent with this opinion.  Prejudgment interest shall be awarded from October 25, 2013 to November 16, 2021, after which the statutory rate for post-judgment interest shall apply, pursuant to 28 U.S.C. § 1961.  Moldova may respond to the form of the proposed order and the associated calculations within seven days thereafter.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date:  November 16, 2021