UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LLC SPC STILEKS<br>Petitioner,<br>v.<br><br><br>THE REPUBLIC OF MOLDOVA,<br>Respondent. | Case No. 1:14-cv-01921 (CRC) |

**PETITIONER'S OPPOSITION TO**
**<u>RESPONDENT'S MOTION FOR RELIEF FROM JUDGEMENT</u>**

## **TABLE OF CONTENTS**

I.   BACKGROUND .................................................................................................... 1

    A.   The Transaction at Issue (1998-2000) ...................................................... 1

    B.   The Arbitration (2010-2013) ...................................................................... 2

    C.   The First Paris Court of Appeal Set Aside Action (2013-2016) ................... 3

    D.   The Court of Cassation Decision (2016-2018) ............................................ 3

    E.   The CJEU Proceeding (2019-2021) ............................................................ 4

    F.   The Second Paris Court of Appeal Decision (2021-2023) ........................... 5

    G.   The Ensuing Cassation Appeal .................................................................. 5

    H.   Proceedings in the United States (2014-Present) ...................................... 6

II.  ARGUMENT ...................................................................................................... 7

    A.   The Court Retains Jurisdiction under the FSIA Despite Annulment of the Award ......... 7

        1.   The Court Has Jurisdiction under the FSIA Arbitration Exception Because *Chevron* and *Stileks I* Jurisdictional Requirements Are Met ......................................................... 7

        2.   The Court Has Jurisdiction Under the FSIA Waiver Exception .............................. 13

    B.   Relief Under Rule 60(b)(5) Should be Denied Because Paris Court of Appeal Judgment Does Not Serve as Res Judicata for This Court .................................................... 15

        1.   The High Bar of Rule (60)(b)(6) and the Principles of Comity Militate in Favor of Keeping the Judgment Intact ............................................................................. 16

        2.   The CJEU and, by Implication, Paris Court of Appeals Decisions Should not be Granted Comity ............................................................................................... 17

    C.   Exceptional Circumstances Here do not Warrant Relief ............................ 22

    D.   Moldova's Procedural Arguments are Unavailing .................................... 24

    E.   Foreign Sovereign Compulsion and Act of State ...................................... 25

III. CONCLUSION .................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Agostini v. Felton*, 521 U.S. 203, 239 (1997) ................................................................. 16

*Akins v. Islamic Republic of Iran*, 549 F. Supp. 3d 104, 115 (D.D.C. 2021) .............................. 16

*Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191, F.3d 194, 196, 197 n.3. (2d Cir. 1999) ... 18

*BCB Holdings Ltd. v. Gov't of Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016) ............................ 23

*Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99 (2015)........................................................ 10

*Blasket Renewable Invs., LLC v. Kingdom of Spain*, No. 21-3249 (RJL), 2023 U.S. Dist. LEXIS 54502 (D.D.C. Mar. 29, 2023).......................................................................................... 11

*Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015) ................................... 7, 8

*Chromalloy Aeroservices v. Arab Republic*, 939 F. Supp. 907, 914 (D.D.C. 1996) ................... 16

*Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429 (10th Cir. 2023) ................................................................. 9, 18, 19, 20

*Corporación Mexicana de Mantenimiento Integral v. Pemex Exploración y Producción ("Pemex")*, 832 F.3d 92 (2d Cir. 2016).......................................................... 9, 14, 18, 23

*Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999)............................. 13

*David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 250 (2d Cir. 1991) ...................................................................................................................... 13

*Disconto Gesellschaft v. Umbreit*, 208 U.S. 570, 28 S. Ct. 337 (1908) ...................................... 17

*Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 811 F. Supp. 2d 216, 231 (D.D.C. 2011) ................................................................................................................ 17

*European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014)........................................... 26

*Getma International v. Republic of Guinea,* 862 F.3d 45, 48 (D.C. Cir. 2017) .......................... 18

*Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895)............................................................................. 26

*In re Sealed Case*, 825 F.2d 494, 498-499 (D.C. Cir. 1987) ....................................................... 25

*Int'l Trading & Indus. Inv. Co. v. DynCorp Aero. Tech.*, 763 F. Supp. 2d 12, 24 (D.D.C. 2011) 15

*Kramer v. Gates*, 481 F.3d 788, 791-92 (D.C. Cir. 2007) ........................................................... 16

*LLC SPC Stileks v. Republic of Mold.* (*"Stileks I"*), 342, 985 F.3d 871 (2021) ............. 6, 8, 10, 12

*LLC SPC Stileks v. Republic of Moldova*, No. 21-7141, 2022 U.S. App. LEXIS 35311 (D.C. Cir. Dec. 21, 2022) .................................................................................... 7

*Martin v. Howard Univ.*, No. 10-7142, 2011 WL 2262489, at \*1 (D.C. Cir. May 9, 2011) ........ 16

*O.N.E. Shipping, Ltd. v. Flota Mercante Grancolombiana, S. A.*, 830 F.2d 449, 453 (2d Cir. 1987) .................................................................................... 25

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 27 F.4th 771, 776 (D.C. Cir. 2022) ........... 8

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 506 F. Supp. 3d 1, 10 (D.D.C. 2020) ...... 14

*Rafii v. Islamic Republic of Iran*, Case No. 01-cv-850-CKK, 2005 U.S. Dist. LEXIS 63355, 2005 WL 8167693, at \*5 (D.D.C. Oct. 25, 2005) ........................................................ 15

*Republic of Aus. v. Altmann*, 541 U.S. 677, 701 (2004) ........................................ 25

*Salazar v. District of Columbia*, 729 F. Supp. 2d 257, 263 (D.D.C. 2010) .................................. 17

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co, Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572 (2d Cir. 1993) ................................. 13

*Slowakische Republik (Slovak Republic) v. Achmea BV* (*"Achmea"*), Case No. C-284/16 ......... 21

*Standard Oil Co. of California v. U.S.*, 429 U.S. 17 (1976) .......................................... 24

*Tatneft v. Ukraine*, 771 F. App'x 9 (D.C. Cir. 2019) .................................................. 13

*Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic,* 864 F.3d 172, 176, 186 (2d Cir. 2017) ................................................................ 18

*Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1140 (D.C. Cir. 1988) .................... 16

*United States Nat'l Bank v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 454–55 (1993) ................ 24

*United States v. Flores*, 968 F.2d 1366, 1370–71 (1st Cir.1992) .................................... 24

*Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354, 363 (2d Cir. 1964) ................................................................ 13

**Statutes**

28 U.S.C. § 1605(a)(1) ................................................................ 16

28 U.S.C. § 1605(a)(6) ................................................................ 12

28 U.S.C. § 1610(c) ................................................................ 10

28 U.S.C. § 1963 ................................................................................................. 28

9 U.S.C. § 201 et seq. ......................................................................................... 28

D.C. Code § 15-361, *et seq.* ............................................................................... 29

**Rules**

Fed. R. Civ. P. 60(b)(5) ...................................................................................... 18

**Treatises**

Charles Alan Wright & Arthur R. Miller, 11 Fed. Prac. & Proc. Civ. § 2863 (3d ed.) ................ 18

## I.     <u>BACKGROUND</u>

A.     <u>The Transaction at Issue (1998-2000)</u>

The transaction that gave rise to the present controversy stems to the 1990's when following the collapse of the Soviet Union the recently independent Ukraine and Moldova strived to develop their own economies. Moldova for many years depended on power sources in Ukraine and continued requiring an uninterrupted supply of electricity to sustain its economy and population. Ukraine, on the other hand, had electric power generation and transmission facilities, but required uninterrupted payments for the supplied electricity. However, the financial disarray that followed the disappearance of the Soviet ruble, a single currency, and the breakdown of centralized regulatory bodies, resulted in a frequent inability of Moldova's electric company meeting its financial obligations. At the same time, Ukraine's own financial difficulties prompted its government to implement strict currency control regulations that penalized Ukrainian suppliers for their foreign counterparts' failure to pay their obligations.

It is against that background, in the end of 1990's, LLC Energoalliance ("Energoalliance"), the original petitioner in this case, developed a structure that, on the one hand, permitted the Ukrainian electricity to flow to Moldova and, on the other hand, hedged against non-payment by Moldtranselectro, a Moldovan state-owned electric company. The structure involved Derimen, a third-party British Virgin Islands company that became responsible for the payment of electricity to Energoalliance to ensure the latter's compliance with Ukrainian currency control regulations. Energoalliance, in turn, supplied electricity directly to Moldtranselectro, which was the receiver. Moldtranselectro was obligated to pay Derimen, and Derimen was obligated to pay Energoalliance. Thus, even if Moldtranselectro failed to make timely payments to Derimen, Derimen would still be obligated to pay Energoalliance on time. In

1

essence, Derimen became a guarantor of Moldtranselectro's obligations. Energoalliance remained bearing the risk of non-payment by Derimen.

Ultimately, Moldtranselectro failed to pay for the supplied electricity. Derimen paid Energoalliance the amounts owed and, in July 2000, assigned its Moldtranselectro receivables to Energoalliance. As such, Energoalliance end up owning Moldtranselectro's receivables. Energoalliance's attempts to collect from Moldtranselectro in Moldova proved to be fruitless, largely due to the Moldovan government's efforts. For instance, in October 2000, the government issued an order invalidating Moldtranselectro's debt to Energoalliance and stripping all of the latter's assets, which made any collection in Moldova futile.

**B.**     **The Arbitration (2010-2013)**

Having failed to collect from Moldtranselectro for almost a decade, in July 2010, Energoalliance instituted arbitration in Paris, France, asserting that Moldova breached its obligations of fair and equitable treatment of Energoalliance's investment in violation of the relevant provisions of the Energy Charter Treaty ("ECT"), 2080 U.N.T.S. 100. The arbitration was conducted under the rules of arbitration of the United Nations Commission on International Trade Law. ("UNCITRAL Rules"). Following the exchange of pleadings and witness statements, and a three-day hearing, in October 2013, the tribunal issued the award signed by the majority of the arbitral tribunal, concluding that it has jurisdiction to hear the dispute and awarded Energoalliance damages for Moldova's breach. *See* Ex. B, Part I to Decl. of Viacheslav Lych ("Award"), ECF No. 8-4, ¶ 187 (filed under seal)[1]. Subsequently, on June 30, 2014, Energoalliance obtained an *exequatur*—an order confirming the award signed by the President of

---

[1] Following the initial filings in this case, the Award was published and is available at https://www.italaw.com/cases/2579.

the superior court of Paris. *See* Ex. C, to Decl. of Viacheslav Lych at 6, ECF No. 8-4 (filed under seal).

**C.**      **The First Paris Court of Appeal Set Aside Action (2013-2016)**

In November 2013, Moldova filed an application with the Paris Court of Appeal seeking to annul the Award.[2] See Lych Decl., ECF 1-3, ¶ 18. In support of the annulment, Moldova argued *inter alia* that the Tribunal incorrectly determined that it had jurisdiction under the ECT because, according to Moldova, Energoalliance did not make investment, as such term is defined in the ECT. Despite the pendency of annulment proceedings, Moldova did not seek a stay of enforcement, and the Award meanwhile remained valid and binding. On April 12, 2016, Paris Court of Appeal ruled in favor of Moldova and annulled the Award. ECF No. 21-1.

**D.**      **The Court of Cassation Decision (2016-2018)**

Energoalliance appealed in the Court of Cassation – the highest court of France for commercial matters. On April 11, 2018, the Court of Cassation reversed Paris Court of Appeal, holding that the court went outside of the text of the treaty in deciding whether Energoalliance made an investment. ECF No. 32-1 at 2. In particular, the Court of Cassation has held that the Court of Appeal erred *inter alia* in holding (i) that investment under the ECT required a contribution because the text of the ECT did not include such a requirement, *id*. at 6, and (ii) that Energoalliance did not engage in the economic activity in Moldova considering Energoalliance's contracts and related intergovernmental agreements between Ukraine and Moldova in the energy sector, *id*. at 7. The effect of the 2018 Court of Cassation decision was that the Award was reinstated and became valid and binding again. The Court of Cassation remanded the case for new consideration by the Paris Court of Appeal. *Id*. at 1-2.

---

[2] The Petition inadvertently stated that the annulment was filed in November 2014.

E.      **The CJEU Proceeding (2019-2021)**

On remand, Moldova requested that the Paris Court of Appeal refer questions relating to the definition of investment for preliminary opinion to the Court of Justice of the European Union ("CJEU")—the highest EU court authorized to rule on issues of EU law. Notably, Moldova again did not seek a stay of execution or enforcement, and the Award remained valid and binding. ECF No. 33-1 at 3-4. The Paris Court of Appeal granted Moldova's request and referred the questions to the CJEU provide a preliminary ruling.  As a first step in the CJEU proceedings, on March 3, 2021, the Advocate General issued his preliminary opinion. ECF No. 89-1 ("Opinion") at 4, fn 2, ¶¶ 2-3, https://curia.europa.eu/juris/document/document_print.jsf?mode=lst&pageIndex=0&docid=2384 41&part=1&doclang=EN&text=&dir=&occ=first&cid=773293. There, he acknowledged that the dispute between Komstroy and Moldova had no connection with the European Union but, nevertheless, recommended that the CJEU take the case because of the importance of issues presented to EU legal order. ECF No. 89-1 at 4, fn 2, ¶¶ 2-3, https://curia.europa.eu/juris/document/document_print.jsf?mode=lst&pageIndex=0&docid=2384 41&part=1&doclang=EN&text=&dir=&occ=first&cid=773293. The Advocate General also noted that the governments of Hungary, Finland, and Sweden objected to CJEU's jurisdiction because the dispute concerned ECT, an international treaty, rather than an intra-EU law. Id. ¶ 72. Ultimately, the Advocate General concluded that a contract for the supply of electricity did not fall into the definition of investment under the ECT because an investment requires a contribution. *Id*. ¶¶ 127-129. This holding, as noted above, was contrary to the decision of the Court of Cassation.

On September 2, 2021, against objections of the European Commission itself, and the governments of Hungary, Finland, and Sweden, the CJEU issued a judgment finding that it has

jurisdiction to interpret ECT and to answer questions presented. ECF No. 95-1, ¶ 38,

https://perma.cc/TNR2-9EW8. The CJEU reasoned that it had jurisdiction because (a) ECT is an

act of its institutions, *id*. at 13; and (b) that the arbitrations took place in Paris and is, thus,

subject to French law as *lex fori, id*. at 13-14. On the merits, the CJEU held that a claim arising

out of a contract for the supply of electricity does not constitute an investment under the ECT

because such contract constitutes trade under the ECT. ECF No. 95-1, ¶ 79 and at 20. In so

holding, the CJEU refused to follow Advocate General's conclusion regarding the requirement

of contribution under the ECT. In any event, the result of the CJEU's decision was that its

interpretation of the ECT became binding on the national court.[3]

**F.     The Second Paris Court of Appeal Decision (2021-2023)**

On January 10, 2023, over nine years after the tribunal issued the Award, the Paris Court

of Appeal, issued its ruling. Declaration of Ioana Salajanu, ECF No. 127-1 at 3 *et seq*. The Court

of Appeals has held that the CJEU judgment is mandatory for the court, *id*. at 15, and that Stileks

did not make an investment under the ECT, *id*. at 17. Accordingly, the court annulled the award.

*Id*. at 19.

**G.     The Ensuing Cassation Appeal**

Following the Paris Court of Appeal decision, Stileks was informed that it has the right to

appeal the Paris Court of Appeal decision to the French Court of Cassation. Eighth Declaration

---

[3] Notably, the arbitral tribunal examined the issue of whether the electricity supply agreement could be an investment for the purposes of the ECT and found that it could. Award ¶ 225. The tribunal explained that because "trade" expressly falls under the definition of "[Economic] Activities in the Energy Sector" under the ECT, art 1(5), and Energoalliance's rights were connected with such activity because they arose as a result of the sale of electricity, Energoalliance's rights were connected with the [Economic] Activity in the Energy Sector. *Id*. Importantly, neither the Advocate General opinion nor the CJEU judgment makes any mention of Article 1(5) of the ECT and does not address the issue resolved by the tribunal.

Vyacheslav Lych ("Lych 8th Decl."), Ex. A. According to French counsel, the time to file the

cassation appeal, is two months after Stileks is served with the Paris Court of Appeal decision

plus allowance for distance. *Id*., Ex. A. at 1. As of the date of filing of this motion, Stileks has

not been served with the Paris Court of Appeals decision. *Id*. ¶ 8. Accordingly, Stileks is still

able to appeal the decision.

**H.** **Proceedings in the United States (2014-Present)**

This Court is well familiar with proceedings before it and the two appeals before the D.C.

Circuit Court. For purposes of brevity, Stileks will only emphasize pertinent portions of this

long-running case. This action was commenced in November 2014 by Energoalliance filing its

Petition to Confirm the Award. ECF No. 1. Moldova objected to the recognition, arguing that the

Court has no subject matter jurisdiction and that the Award should not be enforced based on the

defenses set forth in Article V of the New York Convention. After the Paris Court of Appeals set

aside the Award for the first time, on July 5, 2017, the Court entered stay upon parties' consent.

Following Court of Cassation's reinstatement of the Award, Petitioner moved to lift the stay,

which the Court granted. ECF No. 42. The Court then issued its opinion recognizing and

enforcing the Award. ECF No. 60. The Court rejected Moldova's argument that it did not have

jurisdiction under the FSIA, holding that Petitioner met its burden by presenting the treaty and

notice of arbitration. *Id*. at 10. The Court also rejected Moldova's New York Convention

defenses, including due process under Article V(1)(b), *id*. at 14, the arbitrability, *id*. at 21, and

objections to tribunal's jurisdiction, *id*. 22. On appeal, the DC Circuit affirmed this Court's

jurisdictional findings and its rejection of Moldova's New York Convention defenses. *LLC SPC

Stileks v. Republic of Mold. ("Stileks I")*, 342, 985 F.3d 871 (2021). The appellate court,

however, remanded on the issue of the currency of the award and the denomination of

prejudgment interest. *Id*.

On remand, Moldova requested that the Court stay pending resolution of CJEU proceedings. ECF No. 89. The Court declined to stay the case and issued a judgment in favor of Petitioner. ECF Nos. 97 and 100. Moldova again appealed, and the Court of Appeals again affirmed the District Court. *LLC SPC Stileks v. Republic of Moldova ("Stileks II")*, No. 21-7141, 2022 U.S. App. LEXIS 35311 (D.C. Cir. Dec. 21, 2022). Subsequently, the Court issued an order authorizing enforcement of the judgment pursuant to 28 U.S.C. § 1610(c). ECF No. 166.

## II.    **ARGUMENT**

### A.    **The Court Retains Jurisdiction Under the FSIA Despite Annulment of the Award**

Moldova's subject matter jurisdiction argument misconstrues D.C. Circuit Court of Appeals decisions in *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015) and *Stileks I*. Moldova continues to conflate FSIA jurisdictional grounds with grounds for non-enforcement enumerated in Article V of the New York Convention, which relate to the merits of the case. As discussed below, Petitioner meets the jurisdictional requirements under the clear holdings of the D.C. Circuit in *Chevron* and *Stileks I* based on the FSIA arbitration exception. Alternatively, this Court has jurisdiction under the FSIA waiver exception to address the issue of whether *vel non* the award that was annulled is still enforceable under the New York Convention.

### 1.    **The Court Has Jurisdiction Under the FSIA Arbitration Exception Because *Chevron* and *Stileks I* Jurisdictional Requirements Are Met**

Both *Chevron* and the *Stileks I* decisions explain that jurisdiction under the FSIA arbitration exception specifically requires a factual evidentiary showing:

> In most instances, the existence of an arbitration agreement is a purely factual predicate independent of the plaintiff's claim. Likewise, the existence of an award is a factual question that the District Court must resolve in order to maintain jurisdiction. If there is no arbitration agreement or no award to enforce, the District Court

> lacks jurisdiction over the foreign state and the action must be dismissed.

*Chevron*, 795 F.3d at 204-05 (citing *Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008); *see also Stileks I* at 877 ("Stileks has produced copies of the ECT, the notices of arbitration and the tribunal's decision. In *Chevron*, we said that the petitioners, by producing similar documents, demonstrated that the arbitration exception applied."); *Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 27 F.4th 771, 776 (D.C. Cir. 2022) ("The application of the arbitration exception here is straightforward, as all of the jurisdictional facts required by the statute exist. 28 U.S.C. § 1605(a)(6)") (citing *Stileks I*). Here, an arbitration award exists, as does the arbitration agreement in the ECT. Only their existence is required –their application and construction are not part of the jurisdictional analysis under the FSIA.

(a)   <u>The Award, Arbitration Agreement, and Arbitration Notices Exist</u>

Nothing has changed since the time this Court issued its opinion enforcing the Award with respect to the evidentiary nature of the documents submitted by Petitioner. ECF No. 60 at 10. The Award still factually exists, and Moldova never challenged and cannot challenge its evidentiary nature. *Id*. The ECT and the notices of arbitration issued by Energoalliance are still there. *Id*. Petitioner had met its burden under the FSIA in the past and does it now. *See Chevron*, 795 F.3d at 205.

Moldova once again advances an argument that this Court has already rejected, and the court of appeals affirmed: it asserts that the Paris court's invalidation of the award removed the case from the jurisdictional reach of the Court. However, once again, this argument is precluded by *Chevron*. Just like the arbitrability under Article V(1)(c), the annulment of an award under Article V(1)(e) of the New York Convention is a merits issue, not a jurisdictional one. *See Stileks I* at 878 ("If Moldova is correct, it might have a defense to confirmation under the New York

Convention, which provides for non-recognition of an award if the award deals with a difference

not contemplated by or not falling within the terms of the submission to arbitration, or it contains

decisions on matters beyond the scope of the submission to arbitration.") (cleaned up).

The FSIA arbitration exception establishes federal court jurisdiction

> in any case . . . in which the action is brought, either to enforce an agreement made
> by the foreign state with or for the benefit of a private party . . . or to confirm an
> award made pursuant to such an agreement to arbitrate, if . . . the agreement or
> award is or may be governed by a treaty or other international agreement in force
> for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6). Moldova, in essence, claims that an annulled award does not exist for

FSIA jurisdiction purposes. This, however, does not comport with cases where courts in the U.S.

enforced arbitration awards that have been annulled at the seat of arbitration. *See, e.g.*,

*Corporación Mexicana de Mantenimiento Integral v. Pemex Exploración y Producción*

*("Pemex")*, 832 F.3d 92 (2d Cir. 2016) (affirming district court's enforcement of the award that

was annulled in Mexico); *Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de*

*Chihuahua S.A.B. de C.V.*, 58 F.4th 429 (10th Cir. 2023) (refusing to vacate district court

judgment enforcing the award that was annulled in Bolivia after the judgment was issued). What

follows is that an annulled award is not a legal nullity, at least for jurisdictional purposes, in the

country where the enforcement is sought. Otherwise, there would be nothing to enforce, and

Article V(1)(e) of the Convention would be superfluous.

Ironically, as Professor Bermann explains, French courts, which annulled the Award

here, ignore foreign judicial decisions annulling the award, explaining that "an international

arbitral award, which does not belong to any state legal system, is an international decision of

justice and its validity must be examined according to the applicable rules of the country where

its recognition and enforcement are sought"). Declaration of George A. Bermann ("Bermann

Decl."), ¶ 19. Accordingly, Petitioner has met its burden to demonstrate all elements of the FSIA

arbitration exception. *See Stileks I* ("the existence of an arbitration agreement, an arbitration award and a treaty governing the award are all jurisdictional facts that must be established.) (citing *Chevron*, 795 F.3d at 204). Accordingly, the evidentiary predicate for the FSIA arbitration exception is met here.

(b)  *Moldova Conflates Article V Objections with Jurisdiction*

Moldova's overall mistake is that it conflates New York Convention's Article V defenses from the enforcement with jurisdictional predicates under the FSIA. To that end Moldova's argument that the arbitration agreement must be "valid" is misplaced. Moldova relies on *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99 (2015) but the issue there was the purported lack of authority of the prime minister who executed the agreement. *See id*. The court emphasized that the agreement to arbitrate is distinct from the overall agreement, and that Belize had presented nothing that would support of its argument that the arbitration agreement never existed. *Id*. at 103. Unlike *Belize*, the issue here is not whether the arbitration agreement existed—Moldova never contended that its signature under the ECT was invalid—but whether the agreement covered the controversy at issue here. Moldova claims that it raised the issue of whether the agreement to arbitrate existed in its submission made through the Ministry of Justice and styled as a Motion to Dismiss. ECF No. 37. Although it is true that Moldova argued that the dispute is outside of the scope of the ECT based on the definition of investment, *see* ECF No. 37 at 16-20, that argument goes to the *scope* of the arbitration agreement, which is a merits argument under Article V(1)(c) of the New York Convention as discussed above, and not a jurisdictional argument. The difference is crucial because a question concerning the validity of the arbitration agreement based, for example, on the traditional grounds of lack of authority, could be a basis for jurisdictional challenge but the *scope* of the arbitration agreement cannot. The challenge to the scope of the arbitration agreement is a New York Convention Article V

defense. It goes to the merits of the case and is not jurisdictional. Accordingly, this Court retains
FISA jurisdiction under the arbitration exception.

Moldova's invocation of *Blasket* is equally unavailing because Moldova misconstrues the
grounds upon which *Blasket* was decided. *Blasket Renewable Invs., LLC v. Kingdom of Spain*,
No. 21-3249 (RJL), 2023 U.S. Dist. LEXIS 54502 (D.D.C. Mar. 29, 2023). In *Blasket*, two
Dutch companies brought investment claims against Spain, alleging, as Petitioner alleged here,
that Spain was in breach of the ECT. Both the Netherlands and Spain are signatories of the ECT.
*Id*. at *3. The arbitral tribunal ruled in favor of the investors. That's where similarities between
*Blasket* and this case end.

In *Blasket*, both the Netherlands, the domicile of the investors, and Respondent Spain are
members of the EU. *Id*. at *5. As such, they both signed the Treaty of European Union ("TEU")
and the Treaty on the Functioning of the European Union ("TFEU"), which are the ultimate
sources of EU law. *Id*. The "final arbiter of questions of EU law under the EU Treaties" is the
CJEU. *Id*. The ECT is a treaty that the EU and each EU member state has ratified, but it is not a
treaty governed by EU law. ECT, art 26(6). Spain argued that the arbitration agreement was
invalid because "it lacked the legal capacity to make a valid offer to arbitrate" based on the
CJEU decision in *Slovak Republic v. Achmea*, Case CO284/16 (6 March 2018),
ECLI:EU:C:108:158, ECF No. 51-3. *Id*. at *11. In *Achmea*, the CJEU invalidated a bilateral
investment treaty between the Slovak Republic and the Netherlands because, according to the
court, EU Member States are prohibited from entering into a treaty that would remove
application or interpretation of EU law from the jurisdiction of its own courts. *Id*. at *6. The
district court agreed with Spain and concluded that it lacked subject matter jurisdiction under the
FSIA's arbitration exception because no valid arbitration agreement existed. "Because there was

no *valid offer* to arbitrate, there is no arbitration agreement, which is required to establish subject matter jurisdiction under 28 U.S.C. § 1605(a)(6)." *Id*. at \*21.

Thus, similarly to *Belize*, the issue in *Blasket* was the lack of legal capacity to enter into arbitration agreement, which puts in question the existence of the arbitration agreement itself. Here, on the other hand, there is no issue that the Moldova has agreed to arbitrate under the ECT, and its consent to arbitration was never questioned – the Paris court did not annul the award on that basis. The issue here is whether the scope of disputes that Moldova agreed to arbitrate includes specific claims brought by Petitioner is a merits issue. *See Blasket*, U.S. Dist. LEXIS 54502, at \*14-15 ("Both *Stileks* and *Chevron* resolved questions about the "scope of arbitrability." In *Stileks*, the parties disagreed whether the specific investment at issue fell within the ambit of the ECT by nature of the type of investment . . .. neither challenge was predicated on an argument that, under the law applicable to them, the parties were incapable of entering into an agreement to arbitrate anything at all.).

Moldova never challenged and cannot challenge the validity of the arbitration agreement itself. It cannot do so under *Achmea,* in any case, because Achmea applies only to EU Member states and neither Ukraine nor Moldova are.[4]

(c)   <u>The Court Must Follow The Law of The Case</u>

Additionally, D.C. Circuit's decision in *Stileks I* constitutes the law of the case that this Court must follow. *See Stileks II*, 2022 U.S. App. LEXIS 35311, at \*5 ("same issue presented a second time in the same case in the same court will not lead us to a different result") (quoting *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 697 (D.C. Cir. 2022) (internal quotations

---

[4] Applying *Achmea* to this case is egregious not only because the parties are not from EU Member States, but also because *Achmea* was decided in 2018, long after this arbitration was concluded in 2013.

omitted). The appellate court squarely addressed and resolved the issue of whether the validity of

the award is jurisdictional or a New York Convention defense. Accordingly, that determination

is controlling on the Court.

### 2.     The Court Has Jurisdiction Under the FSIA Waiver Exception

Alternatively, the FSIA waiver exception applies because Moldova acceded to the New

York Convention and agreed to any arbitration governed by that treaty. There is an unbroken line

of authorities in this Circuit holding that the FSIA waiver exception, 28 U.S.C. § 1605(a)(1),

applies in the situations like here, where a claim arising out of international arbitration award

subject to New York Convention is at issue. *See, e.g., Tatneft v. Ukraine*, 771 F. App'x 9 (D.C.

Cir. 2019), cert. denied sub nom., *Ukraine v. Pao Tatneft*, 140 S. Ct. 901 (2020); *Creighton Ltd.*

*v. Gov't of the State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999); *Seetransport Wiking Trader*

*Schiffarhtsgesellschaft MBH & Co, Kommanditgesellschaft v. Navimpex Centrala Navala*, 989

F.2d 572 (2d Cir. 1993); *see also Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y*

*Transportes*, 336 F.2d 354, 363 (2d Cir. 1964). Under the waiver exception, federal courts have

jurisdiction over any action against a foreign state that "has waived its immunity either explicitly

or by implication, notwithstanding any withdrawal of the waiver which the foreign state may

purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1).

Moldova's waiver of immunity stems from the New York Convention, which

"promote[s] the enforcement of arbitral agreement in contracts involving international commerce

so as to facilitate international business transactions on the whole." *David L. Threlkeld & Co.,*

*Inc. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 250 (2d Cir. 1991) (citing *Scherk v.*

*Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974)). The New York Convention declares that it

"shall apply to the recognition and enforcement of arbitral awards made in the territory of a State

other than the State where the recognition and enforcement of such awards are sought" and that

"[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in

accordance with the rules of procedure of the territory where the award is relied upon[.]" New

York Convention, arts. I, III. Thus, when a state that has acceded to the New York Convention

agrees to an arbitration where the award will be governed by the New York Convention, it does

so with the understanding that the resulting award may be enforced in other contracting states.

Moldova relies on *Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 962 F.3d 576,

583 (D.C. Cir. 2020), in arguing that annulment of the award creates a jurisdictional bar. ECF

No. 127 at 21. Unfortunately for Moldova, further history of that case puts its argument to rest.

As the court in further proceedings explained,

> it bears emphasis that by  . . .finding a waiver of sovereign immunity  . . ., the Court
> does not deprive [Respondent] of the opportunity to argue as a defense that the
> award [Petitioner] seeks to enforce has been lawfully set aside by Nigeria's Federal
> High Court. The Court's holding means simply that the set-aside issue will be
> addressed at the merits stage of this litigation, not as part of the jurisdictional
> analysis under the FSIA. This approach is faithful to the text of the New York
> Convention, which expressly grants courts discretion to refuse confirmation at the
> merits stage if the award has been lawfully annulled.

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 506 F. Supp. 3d 1, 10 (D.D.C. 2020) *aff'd*

by *Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 456 U.S. App. D.C. 154, 27 F.4th 771

(2022). The court emphasized that annulment is treated as a merits issue. *Id*. at 10-11 (citing

*TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 930 (D.C. Cir. 2007); *Pemex*, 832 F.3d at

111. The waiver stems from the country's agreement to arbitrate in a New York Convention

state. *Id*. at 8 fn. 4 ("a New York Convention signatory state … waives its immunity when it

agrees to arbitrate 'in the territory of' another Convention signatory … That theory makes sense

because Convention signatories presumably know that, under the Convention, arbitral awards

will be judicially enforced if they are 'rendered in a state party to the Convention.'"). By

acceding to the Convention, the country concedes to enforcement in another New York

Convention state. *Id*. As a New York Convention signatory, Moldova was on notice that it might

sometimes be subjected to the jurisdiction of U.S. courts in cases that raise the issue of whether

an arbitral award has been lawfully set aside. *See id*. at 11. For the above reasons, Moldova's

arguments that this Court lacks subject matter jurisdiction fail.

**B.**     **Relief Under Rule 60(b)(5) Should be Denied Because Paris Court of Appeal**
           **Judgment Does Not Serve as Res Judicata for This Court.**

Rule 60(b)(5) applies "when the judgment is based on a prior action that has been

satisfied, reversed, or vacated."*Rafii v. Islamic Republic of Iran*, Case No. 01-cv-850-CKK, 2005

U.S. Dist. LEXIS 63355, 2005 WL 8167693, at *5 (D.D.C. Oct. 25, 2005) (citing *NLRB v.*

*Harris Teeter Supermarkets*, 215 F.3d 32, 35 (D.C. Cir. 2000); Fed. R. Civ. P. 60(b)(5). The

application of Rule 60(b)(5) is "limited to a judgment that has been reversed or otherwise

vacated—based in the sense of res judicata, collateral estoppel, or somehow part of the same

proceeding." *Rafii at *5*; *see also* Charles Alan Wright & Arthur R. Miller, 11 Fed. Prac. & Proc.

Civ. § 2863 (3d ed.) ("This ground is limited to cases in which the present judgment is based on

the prior judgment in the sense of claim or issue preclusion.").

Foreign judgments are not automatically afforded the effect of *res judicata* or collateral

estoppel. *Int'l Trading & Indus. Inv. Co. v. DynCorp Aero. Tech.*, 763 F. Supp. 2d 12, 24

(D.D.C. 2011) ("*res judicata* effect has . . .traditionally been afforded foreign country judgments

entitled to recognition consistently with principles of comity.") (quoting *Guinness PLC v. Ward*,

955 F.2d 875, 893 n.14 (4th Cir. 1992). Importantly, affording comity to foreign judgments is

not mandatory. *Id*. (citing *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info.*

*Techs.*, 369 F.3d 645, 654 (2d Cir. 2004) ("United States courts may choose to give *res judicata*

effect to foreign judgments on the basis of comity, but are not obliged to do so."); *see also*

*Chromalloy Aeroservices v. Arab Republic*, 939 F. Supp. 907, 914 (D.D.C. 1996) (declining to

grant *res judicata* effect to the decision of the Egyptian Court of Appeal annulling arbitration

award). Comity will be granted to the decision of a foreign court if it is shown that "the foreign

court is a court of competent jurisdiction, and that the laws and public policy of the forum

state . . . will not be violated." *Int'l Trading & Indus. Inv.*, 763 F. Supp. 2d at 24 (citing *Cunard

S.S. Co. v. Salen Reefer Serv. AB*, 773 F.2d 452, 457 (2d Cir. 1985).

 Moldova seeks to convince this Court to rubberstamp the Paris Court of Appeal's

judgment. The principles of justice and public policy stand against such automatic recognition

and weigh in favor of dismissing Moldova's request to "de-recognize" the Award.


### 1.      The High Bar of Rule (60)(b)(6) and the Principles of Comity Militate in Favor of Keeping the Judgment Intact

 The D.C. Circuit has cautioned that Rule 60(b)(6) should only be used sparingly and is

reserved for cases involving "extraordinary circumstances." *Kramer v. Gates*, 481 F.3d 788, 791-

92 (D.C. Cir. 2007); *see also Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1140

(D.C. Cir. 1988). In order to demonstrate extraordinary circumstances and obtain relief under

this subsection a movant must clear a "high bar." *Kramer*, 481 F. 3d at 792. As Moldova

acknowledges, it is well established that "extraordinary circumstances required to trigger relief

from judgment under Rule 60(b)(6) are not present when there has been an intervening change in

case law," *Akins v. Islamic Republic of Iran*, 549 F. Supp. 3d 104, 115 (D.D.C. 2021) (quotation

omitted); *see also Agostini v. Felton*, 521 U.S. 203, 239 (1997) ("Intervening developments in

the law by themselves rarely constitute the extraordinary circumstances required for relief under

Rule 60(b)(6)"); *Martin v. Howard Univ.*, No. 10-7142, 2011 WL 2262489, at *1 (D.C. Cir. May

9, 2011) ("[A]n intervening change in case law is not a sufficient basis for granting a motion

under Federal Rule of Civil Procedure 60(b)(6).") (quotation omitted); *Salazar v. District of Columbia*, 729 F. Supp. 2d 257, 263 (D.D.C. 2010) ("Changes in the law, by themselves[,] rarely constitute the extraordinary circumstances required for relief under this subsection of the Rule . . . Rule 60(b)(6) provides no avenue for relief where the motion is based solely on a change in intervening law.") (quotation omitted); *Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 811 F. Supp. 2d 216, 231 (D.D.C. 2011) ("[C]hanges in case law that occur after a final judgment has been entered are generally not the type of 'extraordinary circumstances' which warrant 60(b)(6) reconsideration."). For this reason alone the judgment should remain in place.

Moldova, nevertheless, argues that this Court should vacate its prior judgment to accomplish justice. *See* ECF 127 at 22. However, as discussed below, the equity is on the side of Petitioner. Stileks inherited almost two decades of litigation, including more than nine years in this Court, and will have no forum for relief if the judgment is vacated. As discussed in the Declaration of Professor Bermann, the disrespect to international law reflected in the CJEU decision and, by implication, the Paris Court of Appeal decision, justify this Court's denial of comity. Furthermore, the litigation in France is not over and may last for years because the Paris Court of Appeals' decision is still subject to appeal in the Court of Cassation. "De-recognizing" the award would encourage endless litigation against public policy and against finality. Consequently, Rule 60(b)(6) relief should be denied.

### 2. The CJEU and, by Implication, Paris Court of Appeals Decisions Should not be Granted Comity

A court may refuse to grant comity to acts of foreign sovereigns if they are against public policy. *Disconto Gesellschaft v. Umbreit*, 208 U.S. 570, 28 S. Ct. 337 (1908). This principle applies with equal force in situations where courts consider whether to grant comity to foreign

annulment orders. *See Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191, F.3d 194, 196, 197
n.3. (2d Cir. 1999) (suggesting that U.S. public policy can overcome comity to a foreign
annulment order); *Pemex*, 832 F.3d at 106 (holding that the enforcement forum must balance
comity to foreign annulment against considerations of public policy); *Thai-Lao Lignite*
*(Thailand) Co. v. Gov't of Lao People's Democratic Republic,* 864 F.3d 172, 176, 186 (2d Cir.
2017) (holding that a primary jurisdiction's annulment is not "dispositive," and a court may
refuse to accord comity to an annulment "to vindicate fundamental notions of what is decent and
just in the United States"); *TermoRio*, 487 F.3d at 939 (holding that foreign annulment can be
unenforceable as against public policy to the extent that it is repugnant to fundamental notions of
what is decent and just in the United States.); *Getma International v. Republic of Guinea,* 862
F.3d 45, 48 (D.C. Cir. 2017) (holding that the court may disregard foreign annulment in
"extraordinary circumstances.") (quoting *TermoRio*, 487 F.3d at 938).

### (a)   *United States' Interest in Finality*

In a case decided earlier this year, 10th Circuit Court of Appeals affirmed the
district court's refusal to respect an annulment of the award at the seat after the award was
enforced by the district court based on public policy grounds. *Inversiones*, 58 F.4th 429. The
factual pattern of *Inversiones* is strikingly similar to the case at hand. There, the transaction that
led to the dispute that took place in 2005 and the dispute arose in 2009-2011. *Id*. at 437-438.
Here, the transaction took place in the 1990's and the dispute lasted in Moldovan agencies and
courts for over a decade. In *Inversiones*, the arbitration took place in 2011-2015. *Id*. Here, it
commenced in 2010 and ended in October 2013. Following the arbitration, in both cases, the
losing respondent sought annulment in the courts of the seat of arbitration. *Id.* at 440; ECF No.
60 at 1-2. At about the same time, the winning petitioners commenced U.S. enforcement
proceedings. *Inversiones,* 58 F.4th at 442; ECF No. 60 at 5. Back at the seat, respondents in both

cases continued their annulment efforts, which ultimately succeeded. *Inversiones,* 58 F.4th at 443; ECF No. 127 at 5. The respondents then moved district courts in Colorado and here to vacate judgment enforcing the awards based on the annulment at the seat. The district court in Colorado denied the respondent's motion. "It "conclude[d] that application of the [Bolivian] orders would offend basic standards of justice," which outweighed according comity to those orders." *Inversiones*, 58 F.4th at 444.

In affirming the district court's decision, the appellate court considered and compared standards for recognition of annulled awards under the New York Convention and standards for relief from judgment under Rule 60(b)(5).[5] The court noted that in New York Convention recognition proceedings

> [w]hen the prevailing party seeks confirmation and the nonprevailing party presents the defense that the foreign jurisdiction has set the arbitral award aside, the district court must perform a weighing analysis, generally according comity to the foreign annulment order unless doing so violates United States public policy.

*Inversiones,* 58 F.4th at 449 (citing *Pemex*, 832 F.3d at 106; *Esso*, 40 F.4th at 73-74; *Getma*, 862 F.3d at 48-49; *TermoRio*, 487 F.3d at 938). On the other hand, when the non-prevailing party moves the court to "vacate the court's previous confirmation judgment on the ground that the movant obtained an annulment order from the foreign jurisdiction, additional considerations come into play." *Inversiones,* 58 F.4th at 450. Specifically, "the moving party must provide "highly convincing" evidence that it is entitled to this extraordinary remedy and that its conduct as a matter of equity should allow vacatur." *Id.* (citing *Thai-Lao*, 864 F.3d at 182). The "highly convincing" 10th Circuit standard is consistent with this Circuit's Rule 60 "extraordinary circumstances" requirement. The court concluded that "when a court has been asked to vacate an

---

[5] While under 10th Circuit law, Rule 60(b)(5) affords the requested relief, the D.C. Circuit law, as discussed above, does not.

order confirming an arbitral award that has later been annulled, it may balance against comity considerations (1) whether the annulment is repugnant to U.S. public policy or (2) whether giving effect to the annulment would undermine U.S. public policy. *Inversiones*, 58 F.4th at 454.

Notably, the 10th Circuit pointed out that after the highest court of the seat rejected the annulment, the non-prevailing party initiated new proceedings seeking annulment, which "implicates the United States' interest in the finality of the arbitral award and the Confirmation Judgment and also raises questions about the equity of [non-prevailing party's] conduct." *Inversiones,* 58 F.4th at 450-51. The court emphasized that the reversal of recognition would "encourage proceedings without end." *Inversiones,* 58 F.4th at 458 (internal quotations deleted). The court concluded that public policies of "(1) protecting the finality of judgments, (2) upholding parties' contractual expectations, and (3) the policy in favor of arbitral dispute resolution" support the district court's decision. *Id*.

The above policies equally apply in the case at hand. This case was litigated throughout the world for over two decades. Moreover, the litigation in France is not over, as Stileks has the right to appeal the annulment decision in the Court of Cassation. That alone could extend French proceedings for another several years. Notably, Moldova did not even serve Stileks with the decision as required to start the time for appeal. Accordingly, the finality of court proceedings and the policy in favor of arbitral dispute resolution demand that the judgment recognizing the Award stay intact.

*(b)*   <u>United States' Interest in Compliance with International Law</u>

Professor Bermann submitted an in-depth declaration explaining that CJEU and Paris Court of Appeals decisions violate international law and, as such, should not be granted comity by this Court. *See* Bermann Decl. The U.S. has an established policy of compliance with international law. Bermann Decl. ¶ 61. The ECT expressly provides that is governed by

international law. ECT, art. 26(6). Accordingly, parties to arbitral proceedings under the ECT

expect that the proceedings and any subsequent review would be performed in accordance with

the principles of international law. However, as Professor Bermann explains, in asserting

jurisdiction over the dispute and deciding the question of what constitutes an investment under

the ECT, the CJEU demonstrated flagrant disregard to fundamental principles of international

law. Bermann Decl. ¶ 52.

 *First*, the ECT, as a treaty, is governed by the principles of interpretation enshrined in the

Vienna Convention on the Laws of Treaties, Opened for signature 23 May 1969, 1155 UNTS

331, entered into force 27 January 1980 ("VCLT"). *Id*. ¶ 51. The CJEU simply ignored these

principles of interpretation, focusing instead on internal EU law. *Id*. ¶ 52. Importantly, The

VCLT principles of interpretation are universally used and thoroughly followed by international

investment tribunals worldwide. *Id*. ¶¶ 53-55. Yet, the CJEU decision is silent about these

principles even though it was interpreting a treaty that expressly provides for the application of

international law. *Id*. ¶ 56. The Paris Court of Appeal annulment judgment added nothing to

CJEU's judgment. *Id*. ¶ 57. This is in stark contrast with the arbitral tribunal's thorough

treatment of the issue of investment based on the principles of international law, as noted by this

Court. *Id*. ¶ 58; ECF 60 at 23-24. Such cavalier treatment of an international law instrument

raises the serious issue of whether the Court should afford comity to the Paris Court of Appeal

judgment. Bermann Decl. ¶ 59.

 *Second*, Professor Bermann points out the truly peculiar feature of the CJEU decision, the

so-called "intra-EU" jurisdictional objection. The intra-EU objection is the upshot of the CJEU

decision in the matter *Slowakische Republik (Slovak Republic) v. Achmea BV ("Achmea")*, Case

No. C-284/16,

https://curia.europa.eu/juris/document/document_print.jsf?mode=lst&pageIndex=0&docid=1999

68&part=1&doclang=EN&text=&dir=&occ=first&cid=55096. Bermann Decl. ¶¶ 68-70. In

*Achmea,* the CJEU has held *inter alia* that international tribunals convened under intra-EU

bilateral investment treaties have no jurisdiction to interpret EU law. *Id*. ¶¶ 71-74. In *Komstroy*,

the CJEU extended *Achmea* to the ECT, holding that intra-EU objection applies to the ECT as

well. *Id*. ¶ 75. The CJEU's holdings are troubling. For one, Paris Court of Appeal did not refer

the question of intra-EU investor-State arbitration to the CJEU, which decided to address it *sua*

*sponte*. Furthermore, because neither Moldova nor Ukraine are members of the EU, the CJEU's

extension of its *Achmea* ruling to the case at hand was profoundly improper. *Id*. ¶ 33. Professor

Bermann forcefully demonstrates that the CJEU's intra-EU objection disregards international

law and dozens of decisions of investment tribunals all over the world. *Id*. ¶¶ 76-88. These

significant anomalies lead Professor Bermann to conclude that CJEU's utter disregard of

international law should not be countenanced by this Court. *Id*. ¶¶ 89-91.

C.      <u>**Exceptional Circumstances Here do not Warrant Relief**</u>

As Moldova acknowledges, relief under Rule 60(b)(6) is reserved for exceptional

circumstances. ECF 127 at 21. The circumstances here are indeed exceptional, but their

exceptionality is not in favor of Moldova. Putting aside Moldova's jurisdictional objection,

Moldova did not and cannot challenge merits of the tribunal's determination that

Moldtranselectro was indebted to Energoalliance, and that Moldova took advantage of its

government apparatus to prevent the collection of the debt. To require Moldova to compensate

the Petitioner for its losses is by any means the equitable things to do. If the judgment of this

Court is vacated, Petitioner will have no forum in which to bring its claim. It will not be able to

go back to the courts of Moldova in light of Moldova's previous attempts to prevent the

enforcement, as the arbitral tribunal concluded. It is also highly unlikely to commence another

arbitration on the merits against Moldova, even outside of the EU to avoid the CJEU's ill-fated judgment, because it would be unable to produce witnesses and evidence relating to the events that took place over two decades ago. This is a situation not unlike a *forum non conveniens* dismissal, and D.C. Circuit has held that "*forum non conveniens* does not apply to actions in the United States to enforce arbitral awards against foreign nations." *BCB Holdings Ltd. v. Gov't of Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016) (citing *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 304 (D.C. Cir. 2005)).

The court in *Pemex*, 832 F.3d 109 stated that "[t]he imperative of having cases heard--somewhere--is firmly embedded in legal doctrine" and applied that principle to recognize an arbitral award that was annulled in Mexico. To be clear, the award in *Pemex* was annulled because of the retroactive change in the legislation, and "[r]etroactive legislation that cancels existing contract rights is repugnant to United States law." *Id.* at 108[6]. This is not the case here. Here, at issue is a decision of the CJEU—the highest court in the EU that has jurisdiction to interpret issues of EU law—concerning the issue of "investment" under the ECT, an international treaty. This is not a decision that can be easily explained. Indeed, Advocate General Szpunar stated: "[t]his case is unprecedented. First, the questions raised by the referring court are concerned with the interpretation of certain provisions of the ECT which the Court has not yet had to adjudicate upon. Secondly, the dispute in the main proceedings is between a non-EU country, the Republic of Moldova, and an undertaking from another third country, Ukraine." Opinion, ¶ 25. Clearly, the Advocate General did not find that decision to be an ordinary decision in an ordinary case. *See also* Berman Decl., ¶ 33. The answer is that the CJEU, and by

---

[6] The CJEU's decision also poses the issue of retroactivity. The *Achmea* decision, on which the CJEU relied was rendered in 2018, long after the Award was issued in 2013.

implication, the Paris Court of Appeals, ignored fundamental principles of international law. Under these exceptional circumstances, the judgment of the Court enforcing the Award must remain in place.

### D.     Moldova's Procedural Arguments are Unavailing

Petitioner does not dispute that under *Standard Oil Co. of California v. U.S.*, 429 U.S. 17 (1976), the Court has the power to entertain a Rule 60 motion without an appellate court leave. However, as discussed above, Moldova misses the main point. Relief under Rule 60(b)(4) is not warranted here not because the Court has no power to render such relief, but because the Court retains jurisdiction under the FSIA even if the award is annulled. Importantly, as discussed above, Article V of the New York Convention authorizes a court to enforce annulled awards. Article V(1)(e) states that a Contracting State's courts "may" decline to recognize an award if it has been "set aside by a competent authority of the country in which" it was made. New York Convention, art. V(1)(e). Clearly Article V(1)(e) contemplates non-recognition of annulled awards. Conversely, it does not prohibit recognition of annulled awards. If the annulled award is legal nullity for jurisdictional purposes, as Moldova contends, and there is nothing to recognize, what, if anything, is the purpose of Article V(1)(e)? A reading that renders "an integral part of the Treaty" utterly meaningless should be avoided if another plausible interpretation is available. *See, e.g.*, *United States Nat'l Bank v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 454–55 (1993); *United States v. Flores*, 968 F.2d 1366, 1370–71 (1st Cir.1992). Accordingly, there is no mandatory requirement that the award becomes legal nullity when it is annulled.[7]

---

[7] As noted above, French courts have a history of recognizing and enforcing arbitral awards that have been annulled at their seat of arbitration. Bermann Decl. ¶ 17.

Thus, the Award exists for jurisdictional purposes, and this Court has the authority to give it the appropriate weight pursuant to the principles of comity and the New York Convention.

**E.     Foreign Sovereign Compulsion and Act of State**

Neither foreign sovereign compulsion nor act of state doctrines is applicable here. None of the cases cited by Moldova involves enforcement of arbitration awards. In fact, the United States has an affirmative obligation under international law to comply with the requirements of the New York Convention, which has been incorporated into federal law. 9 U.S.C. § 201 et seq.

The foreign sovereign compulsion doctrine does not apply here. It applies where "the conduct of the [party] has been ***compelled*** by the foreign government." *O.N.E. Shipping, Ltd. v. Flota Mercante Grancolombiana, S. A.*, 830 F.2d 449, 453 (2d Cir. 1987). Moldova does not and cannot submit that it was compelled to do anything by the Government of France by the European Commission. Moldova's reliance on *In re Sealed Case*, 825 F.2d 494, 498-499 (D.C. Cir. 1987) is misplaced. The Court's judgment enforcing the award that is now annulled does not violate French law in France. The judgment has force only within the jurisdiction of the Court, in the District of Columbia unless registered under 28 U.S.C. § 1963 or recognized by the court of a foreign country.

For similar reasons, act of state doctrine does not apply either. First, Moldova cites no cases where act of state was applied in connection with enforcement of an arbitration award. Again, the United States has signed a treaty, which has been incorporated in the federal law, which governs the present case. Indeed, the act of state doctrine precludes a U.S. court from "inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Republic of Aus. v. Altmann*, 541 U.S. 677, 701 (2004) (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897); *Banco Nacional de Cuba v. Sabbatino*, 376

U.S. 398, 401 (1964)). However, here, the question is not whether *vel non* this Court is required to inquire into the validity of the public act of the EU but whether the Court should give effect to that public act in the Court's jurisdiction. See *Banco Nacional De Cuba*, 376 U.S. at 421 ("If a transaction takes place in one jurisdiction and the forum is in another, the forum does not by dismissing an action or by applying its own law purport to divest the first jurisdiction of its territorial sovereignty; it merely declines to adjudicate or makes applicable its own law to parties or property before it.").

As discussed above, the Court may choose to give effect to the French court judgment as a matter of comity, and comity is not "a matter of absolute obligation . . . " *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895). In deciding whether to give effect to the Paris Court of Appeals judgment, the Court is required to give "due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Id.* Moldova's contention that because a French court has the power to issue a judgment, its judgment must be complied within the United States is misplaced. Certainly, *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014) does not stand for that. That case considered whether the European Community is an organ of a foreign state for the purposes of FSIA jurisdiction. To hold that judgments of foreign courts must be enforced in this country based on the principles of act of state or foreign sovereign compulsion would negate and make unnecessary the principle of comity and the network of foreign judgment enforcement laws enacted by the states. *See, e.g.*, D.C. Uniform Foreign-Country Money Judgments Recognition Act, D.C. Code § 15-361, *et seq*. Accordingly, neither principle applies here.

### III.   <u>CONCLUSION</u>

Based on the foregoing, Petitioner respectfully requests that the Court dismiss Moldova's motion for relief from judgment.


Dated: September 11, 2023                FISHERBROYLES LLP

<u>By: /s/ *Gene M. Burd*</u>
Gene M. Burd (D.C. Bar No. 1004330)
1200 G Street NW
Suite 800
Washington, DC 20005
Telephone:     202.750.0529
gene.burd@fisherbroyles.com
Tiffany N. Compres (Fl Bar. No. 78118)
Miami, FL

*Counsel for Petitioner LLC SPC Stileks*