# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
:
LLC SPC STILEKS,                                                    :
:
Petitioner,          :
:
V.                                   :
:     Case No. 1:14-cv-01921 (CRC)
REPUBLIC OF MOLDOVA,                                                :
:
Respondent   :
:
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## DECLARATION OF PROFESSOR GEORGE A. BERMANN

Pursuant to 28 U.S.C. § 1746, I, GEORGE A. BERMANN, declare as follows:

## I.    INTRODUCTION

1.     I submit this Expert Declaration at the request of counsel for LLC SPC Stileks (hereinafter "Stileks"), Petitioner in this action, in connection with the current proceeding to enforce an Arbitral Award rendered in its favor against the Republic of Moldova (the "Award").

2.     Counsel for Petitioner has asked me to provide an expert opinion on the question of whether, as Respondent urges, the annulment by a Paris Court of Appeal of an Arbitral Award in Petitioner's favor so disregards international law that this Court should not afford comity to that decision and should therefore decline to rely on it to justify vacating its earlier order enforcing the Award.  In preparing this Declaration, I have consulted the following documents:

- This Court's Memorandum Opinion dated August 23, 2019, ECF No. 60[1];

- Motion for Relief from Judgment dated June 27, 2023, ECF No. 127;

- *Energoalliance Ltd v. The Republic of Moldova (the "Award")*, Arbitral Award (Paris Oct. 23, 2013), https://www.energycharter.org/fileadmin/DocumentsMedia/Disputes/ISDSC-054a-en.pdf.

- *Republic of Moldova v. Komstroy LLC,* Opinion of Advocate General Szpunar ("*AG Opinion*"), No. C-741/19 (CJEU March 3, 2023), https://curia.europa.eu/juris/document/document_print.jsf?mode=lst&pageIndex=0&docid=238441&part=1&doclang=EN&text=&dir=&occ=first&cid=773293;

- *Republic of Moldova v. Komstroy LLC* ("*CJEU Judgment*"), Case C-741/19, (CJEU Sept. 2, 2021), https://curia.europa.eu/juris/document/document_print.jsf?mode=lst&pageIndex=0&docid=245528&part=1&doclang=EN&text=&dir=&occ=first&cid=4394442; *see also* https://perma.cc/TNR2-9EW8.

- *Republic of Moldova v. Stileks Scientific and Production Firm*, *LLC ("Paris Judgment")*, Reg. No. 18/14721, Portalis No. 35L7-V-B7C-B52FG (Ct. App. Paris, 16th ch., Jan. 10, 2023). ECF No. 113-1.

- Other materials as cited in this Declaration.

3.      On the basis of my own knowledge and my review of the documents listed above, I conclude that the Paris Court of Appeal decision, as well as the judgment of the Court of Justice of the European Union ("CJEU") on which it is based, fail so seriously to apply international law to the interpretation of the treaty that lies at the heart of this case that they violate U.S. public policy and for that reason should not cause this Court to vacate its prior order enforcing the Award.

4.      In this Declaration, I first set out (in Part II) my professional background and qualifications.  In Part III, I set out very briefly the procedural background of the present petition. Part IV examines existing U.S. case law on the enforceability of awards annulled at the seat of

---

[1] ECF numbers refer to the Court's docket.

arbitration.  Part V applies the lessons of that case law to the present petition to enforce the Award and, in so doing, examines the bases on which the present Award was annulled to determine whether they justify vacating the pre-existing enforcement order.  My conclusion, set out in Part VI, is that the Paris court's annulment of the Award, which implements a ruling on the matter by the CJEU, does not justify vacating the existing enforcement order.

## II.    PROFESSIONAL BACKGROUND AND QUALIFICATIONS

5.      I am a Professor of Law at Columbia Law School in New York, where I hold the Jean Monnet Professorship in European Union Law and the Walter Gelhorn Professorship.  As a member of the Columbia faculty since 1975, I have taught, among others, the following subjects: international commercial and investment arbitration, transnational litigation, conflicts of law, EU law, World Trade Organization (WTO) law and contracts.

6.      At Columbia, I founded and currently direct the Center for International Commercial and Investment Arbitration (CICIA).  I also founded and was the first director of the European Legal Studies Center (ELSC). I am co-editor-in-chief of the *American Review of International Arbitration* (ARIA), which is produced at Columbia, as well as President of the Executive Editorial Board of the *Columbia Journal of European Law* (CJEL), which I also established.

7.      I have other regular teaching engagements at the Institute des Sciences Polities (Sciences Po) in Paris, where I am *professor affiliate* and teach in the LL.M. program in international dispute resolution.  I also teach regularly in the Masters of International Dispute Settlement (MIDS) program at the University of Geneva.  In addition, I teach as an adjunct professor at the Georgetown University Law Center in Washington, D.C.

8.    Over the past 40 years, I have served regularly as international arbitrator in both commercial and investor-State cases, and have frequently rendered expert opinions for courts and arbitral tribunals on the law of international arbitration, transnational litigation, European Union law and the law of multiple European jurisdictions.

9.    I am Chief Reporter of the American Law Institute's *Restatement of the US Law of International Commercial and Investment Arbitration*, which received final approval in May 2019. I am also the author of numerous books, including, most recently, the following: the *UNCITRAL Secretariat Guide on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York 1958)* (2016) (co-authored with Emmanuel Gaillard); *International Arbitration and Private International Law* (General Course in Private International Law of Hague Academy of International Law) (published by the Academy in *Recoil des course* of the Academy and in paperback by Brill Nijhoff) (2017); *Interpretation and Application of the New York Convention by National Courts* (Springer Pub. 2017); *Mandatory Rules in International Arbitration* (2d ed., Juris Pub. 2021); and *Cases and Materials on European Union Law* (West Pub. 4th ed. 2015) (co-authored).

10.    I am the author of numerous articles, including: *Understanding ICSID Article 54*, 35 ICSID Review – Foreign Inv. L. J. 1-2 (2020); *The Energy Charter Treaty and European Union Law*, *in International Arbitration in the Energy Sector* (M. Scherer, ed., 2018); *What Does it Mean to be "Pro-Arbitration?,"* 34 Arb. Int'l 341 (2018); *The Role of National Courts at the Threshold of Arbitration*, 28 Am. Rev. Int'l Arb. 291 (2018); *European Union Law as a Jurisdictional and Substantive Defense in Investor-State Arbitration*, *in The Impact of EU Law on International Commercial Arbitration* (Franco Ferrari, ed., 2017); *Res Judicata in International Arbitration*, *in Cambridge Compendium of International Commercial and Investment Arbitration* (A. Bjorklund

et al., eds., forthcoming 2022); *"International Standards" as a Choice of Law Option in International Commercial Arbitration*, 27 Am. Rev. Int'l Arb. 423 (2017); *The* Yukos *Annulment: Answered and Unanswered Questions*, 27 Am. Rev. Int'l Arb. 1 (2016); *Limits to Party Autonomy in Composition of the Arbitral Panel*, *in Limits to Party Autonomy in International Commercial Arbitration* 83 (F. Ferrari, ed., 2016); *International Commercial Arbitration: Present Challenges and Future Prospects*: Festschrift for John Beechey (2017); *The "Gateway Problem" in International Commercial Arbitration*, 37 Yale J. Int'l L. 1 (2012); *Navigating EU Law and the Law of International Arbitration*, 28 Arb. Int'l 397 (2012); and *Arbitrability Trouble*, 23 Am. Rev. Int'l Arb. 367 (2012).

11.　　As a member of the international arbitration community, I hold and have held positions in numerous international arbitration institutions.  These include as chair of the New York International Arbitration Center (NYIAC), member of the Governing Board of the International Court of Arbitration at the International Chamber of Commerce (ICC) in Paris, and member of the ICC's Standing Committee and International Arbitration Commission.  At the American Arbitration Association (AAA), I am a member of the Council, and at the Center for Conflict Prevention and Resolution (CPR) I am a member of the Board of Directors.

12.　　I hold honorary degrees from: the University of Fribourg, Switzerland; Université de Versailles-St. Quentin, France; Universidad César Vallejo, Lima, Perú; and Universidade Nova de Lisboa, Lisbon, Portugal.

## III.　**PROCEDURAL BACKGROUND OF THE CASE**

13.　　In October 2013, an arbitral tribunal sitting in Paris, France, in an *ad hoc* arbitration under the UNCITRAL Arbitration Rules, issued an Award in favor of Energoalliance, a company

organized in Ukraine,[2] against Respondent Republic of Moldova arising out of a transaction dating back to the 1990's and involving the funding, generation, and transmission of electricity from Ukraine to a Moldovan state-owned entity named Moldtranselectro.[3] Energoalliance argued that Moldova, through its government actions, took steps to prevent Energoalliance from collecting Moldtranselectro's debts in violation of Article 10(1) of the Energy Charter Treaty ("ECT"),[4] which guarantees investors "fair and equitable" treatment of their investments.[5]

14.     The ECT is a multilateral framework for regulation of the energy sector, to which both Ukraine and Moldova are parties. In the arbitration, Energoalliance was awarded the sum of approximately US$ 46.5 million,[6] plus interest and costs. In 2014, Energoalliance sought enforcement of the Award in this Court pursuant to the 1958 United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the New York Convention" or "Convention").[7] This Court granted enforcement of the Award, rejecting Respondent's various challenges to the Award, including lack of jurisdiction under the Foreign Sovereign Immunities Act and defenses to enforcement under the New York Convention.[8] While U.S. enforcement proceedings were pending, Energoalliance assigned the Award to LLC Komstroy, another

---

[2] Present Petitioner LLC SPC Stileks is a successor-in-interest of Energoalliance.

[3] *See* ECF No. 1

[4] International Energy Charter Consolidated Energy Charter Treaty, https://www.energycharter.org/fileadmin/DocumentsMedia/Legal/ECTC-en.pdf, entry into force April 1998.

[5] ECT, art. 10(1).

[6] The award was denominated in Moldovan lei. ECF No. 1, ¶ 23.

[7] 21 U.S.T. 2517, T.I.A.A. 6997, 330 U.N.T.S. 3.

[8] *LLC Komstroy v. Republic of Mold.*, No. 14-cv-01921 (CRC), 2019 U.S. Dist. LEXIS 143739 (D.D.C. Aug. 23, 2019), ECF No. 60.

Ukrainian company,[9] which later entered into bankruptcy, at which point the Petitioner, Stileks, also a Ukrainian company, became its successor in interest.[10]

15.     In November 2013, Moldova brought annulment proceedings against the Award in the Paris Court of Appeal, France, where the arbitration was seated. Following a hearing, the Paris court set aside the Award on the ground that Komstroy had not made a qualifying investment within the meaning of the ECT.[11] It is customary in investor-State arbitration to treat the question of whether an investment was made as a jurisdictional rather than a merits matter. The Paris court accordingly found that the tribunal lacked jurisdiction under the ECT and annulled the Award. On appeal by Komstroy, the French Cour de Cassation (France's supreme civil and commercial court) reversed that decision, remanding the case to the Paris Court of Appeal for further proceedings.[12] The Cour de Cassation based its reversal on a plain reading of the ECT, which broadly defines the term investment to include any type of asset associated with economic activity in the energy sector.

16.     The Paris court then stayed proceedings and made a preliminary reference to the CJEU under Article 267 of the Treaty on the Functioning of the European Union ("TFEU") on the question of whether Komstroy's conduct did or did not amount to an investment within the meaning of the ECT. Under European Union ("EU") law, an EU Member State court, when faced in a case before it with a question of EU law of which it is uncertain, may (and, depending on its

---

[9] ECF No. 18.

[10] ECF No. 84.

[11] ECF No. 23.

[12] ECF No. 32-1.

place in the judicial hierarchy, must) make a preliminary reference to the CJEU for a preliminary ruling on the question.[13]

### IV.  ENFORCEMENT OF ANNULLED AWARDS IN U.S. LAW

17.    The central question at this stage of the case is whether the French court's annulment of the *Komstroy* Award, which this Court has already enforced, warrants vacatur of the enforcement order, in effect "de-enforcing" the Award.

18.    Under the New York Convention, courts of signatory States are under an international treaty obligation to enforce foreign arbitral awards.[14] They may decline to enforce such an award only if one or more of the defenses to enforcement provided for in Article V of the Convention is established.[15] One of those defenses, found in Article V(1)(e), provides that a court may deny enforcement of a foreign award if the award has been annulled by a competent court at the seat or in some other jurisdiction whose arbitration law the parties chose in place of the arbitration law of the seat. Importantly, Article V in its entirety, including Article V(1)(e), is by its terms permissive rather than mandatory: Article V states that a court "may" – not "must" – refuse enforcement of an award if a ground for denying enforcement in question is established.  In other words, while a court is entitled to deny enforcement of an annulled award on the basis of one of the Convention's defenses, it is not required to do so. Of all the Convention's defenses to

---

[13] *Republic of Moldova v. Komstroy LLC* ("*Komstroy*"), Case C-741/19, https://curia.europa.eu/juris/document/document_print.jsf?mode=lst&pageIndex=0&docid=2455 28&part=1&doclang=EN&text=&dir=&occ=first&cid=4394442; *see also* https://perma.cc/TNR2-9EW8.

[14] William W. Park, *Treaty Obligations and National Law*, 58 Hastings L. Rev. 251, 3, n 15 (2006) (in ratifying the Convention, the U.S. declared, as the Convention permits, that it would be bound only to enforce awards made in the territory of other Contracting States.)

[15] Restat. Law The U.S. Law of Intl. Comm. Inv. State Arb. § 4.9(b) and comment (c).

enforcement, Article V(1)(e), i.e., annulment at the seat, is the one that claimants most often ask courts to disregard by enforcing the award, notwithstanding the fact that it would be justified in refusing to do so.

19.    Jurisdictions around the world differ considerably in their approach to the enforcement of awards annulled by a court at the seat.[16] In some, such as Germany, an award, once annulled, is deemed no longer to exist and, as such, becomes strictly unenforceable.[17]  By contrast, in other jurisdictions, of which France is the leading example, the annulment of an award by a foreign court at the seat has no bearing on the award's enforceability elsewhere.  Thus, when an annulled foreign award is brought for enforcement in France, no attention is paid to a judicial decision annulling the award or the basis on which the award was annulled. A French court will deny enforcement only if the award's enforcement would be contrary to France's own public policy.[18]

---

[16] *See generally* Emilio Bettoni, *Deference from Foreign Enforcement Courts to Decisions of the Courts of the Seat Annulling an Arbitral Award, in Deference in International Commercial Arbitration: The Shared System of Control in International Commercial Arbitration* (Franco Ferrari & Friedrich Rosenfeld, eds.) 265 (2023).

[17] *See, e.g.*, Oberlandesgericht, Rostock, Germany, Oct. 28, 1999, XXV Ybk Commc'l Arb. 717, 710 (2000) ("An award is no longer binding when it has been set aside by a competent court or appellate arbitral tribunal …"). Among other jurisdictions taking this view is Chile.  *See DF Internacional SA v. Endesa Latinoamericana SA*, XLI Ybk Commc'l Arb. 441-443 (Supreme Court, Sept. 8, 2011).

[18] *See, e.g.*, *Hilmarton Ltd v Omnium de Traitement et de Valorisation* (OTV) (1994) Rev Arb 327, (1995) XX YBCA 663, 664 ("the award rendered in Switzerland is an international award which is not integrated in the legal system of that State, so that it remains in existence even if set aside and its recognition in France is not contrary to international public policy"); *Société PT Putrabali Adyamulia v Société Rena Holding et Société Mnogutia Est Epices*,[2007] Rev Arb 507 ("[A]n international arbitral award, which does not belong to any state legal system, is an international decision of justice and its validity must be examined according to the applicable rules of the country where its recognition and enforcement are sought").

20.    Through a series of judgments over the past 25 years, U.S. federal courts have formulated what may be called an "intermediate" approach, under which a court will ordinarily exercise comity by declining under Article V(1)(e) of the Convention to enforce an annulled award, but will, in exceptional circumstances, enforce an award despite its annulment. To do so, however, the court must find that recognizing, *i.e.*, giving effect to, the annulment would be contrary to U.S. public policy. U.S. courts are not alone in taking this stand.[19]

21.    In most of the decisions thus far, respecting a foreign court's annulment of an award, and thus denying its enforcement, has not been found to be offensive to U.S. public policy. A leading case is *Baker Marine Ltd. v. Chevron*.[20] There, a Nigerian court annulled a local award on the ground that the arbitrators had improperly awarded punitive damages, exceeded the scope of the parties' submissions, incorrectly admitted parole evidence, and issued inconsistent awards. The U.S. court found that respecting that annulment would not offend U.S. public policy. It stated more generally, as have later cases, that recognizing an annulment does not offend public policy merely because the foreign court based its annulment on a ground that would not justify annulment of an award under U.S. law.

---

[19] In the case of *Yukos Capital S.à r.l. v. OAO Rosneft*, a Dutch appellate court ignored a Russian court's annulment of an award, and ordered the lower court to enforce the award, on the ground that the Russian courts are not capable of being impartial in cases involving the claimant, Yukos, which had won an over been $50 billion award in an arbitration against Russia. The appeal court said that "a Dutch court is not compelled to deny leave for recognition of an annulled arbitral award if the foreign decision annulling the arbitral award cannot be recognized in the Netherlands." *Yukos Capital S.à r.l. v. OAO Rosneft*, XXXIV Ybk Commc'l Arb. 703, 704-706 (Ct. App. Amsterdam, Apr, 28, 2009).

[20] 191 F.3d 194 (2d Cir. 1999).

22.     Similarly, in *Spier v. Calzaturificio Tecnica SpA*,[21] a U.S. court denied enforcement of an Italian award that had been annulled by a court at the seat on the ground that the tribunal had exceeded the scope of its authority.  Again, the U.S. court was unable to find annulment of an award on those grounds offensive to U.S. public policy. Indeed, it observed that excess of authority is itself a ground for vacatur under the Federal Arbitration Act ("FAA").

23.     In yet a third case, *TermoRio. v. Electrificadora del Atlantico*,[22] a Colombian court annulled an ICC award on the ground that, under Colombian law, arbitrations seated in Colombia may not validly be conducted under the ICC Rules. Here too, the U.S. court found nothing in the Colombian annulment that could be said to offend U.S. public policy. It accordingly respected the annulment and denied enforcement of the award.

24.     A more recent decision is *Thai-Lao Lignite Co Ltd v Government of the Lao People's Democratic Republic*.[23] There, as in the present case, the district court had initially granted enforcement of the award. When a court at the seat thereafter annulled the award, the district court was asked to vacate its order of enforcement on the basis of that annulment. The court agreed to do so, finding nothing objectionable in the annulment, which was based on the tribunal's having entertained claims that were brought by non-parties to the arbitration agreement and that did not relate to the underlying contract. Again, both of these grounds would justify a U.S. court in annulling an award.  The Court of Appeal affirmed that judgment.

---

[21] 71 F. Supp. 2d 279 (S.D.N.Y. 1999).

[22]  487 F.3d 928 (D.C. Cir. 2007).

[23] 864 F.3d 172 (2d Cir. 2017).

25.     In *Getma v. Guinea*,[24] the U.S. Court of Appeals likewise affirmed a district court judgment giving effect to the annulment of a Guinean award by a court at the seat. There, the Court of Justice and Arbitration of the Organization for the Harmonization of Business Law in Africa (CCJA), a supranational jurisdiction for certain Western and Central African States which operates both as an administering institution and a court for the review of awards, had fixed the arbitrators' fees at 61,000 euros. During the proceedings, the tribunal asked the CCJA to increase the fees dramatically to 450,000 euros, a request that the CCJA denied. The tribunal nevertheless withheld issuance of the award until the parties paid the higher amount. The CCJA reprimanded the tribunal and warned the claimant that the award would be annulled if it contained an invalid provision on arbitrator fees. When, following issuance of the award, the arbitrators persisted in demanding payment of the higher sum, Guinea sought and received annulment of the award on the ground that the arbitrators breached their duties by ignoring the CCJA's mandatory provisions on fees. The district court did not find the foreign judgment annulling the award on the basis of a mandatory law at the seat to be offensive to U.S. public policy and denied enforcement of the award. The Court of Appeals affirmed.

26.     Still another case in which a U.S. court concluded that giving effect to an annulment at the seat would not offend public policy is *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petro. Corp.*[25] There, the claimant alleged that it was denied due process over the course of the annulment action in a Nigerian court because that court allegedly ignored its arguments and made "result-oriented" rulings during the proceeding. The district court nevertheless respected the annulment and the Court of Appeals affirmed, finding that the claimant had simply failed to

---

[24] 862 F.3d 45 (D.C. Cir. 2017).

[25] 40 F.4th 56 (2d Cir. 2022).

establish that it had had an inadequate opportunity to be heard or that the Nigerian court's rulings were so unsound as to deserve no respect. The Court found that the Nigerian court had analyzed and decided the issues rationally under Nigerian law. It nevertheless took the claimant's challenge to the annulment seriously.

27.     None of these decisions is particularly surprising. In one (*e.g., Baker Marine*), the claimant essentially asked the court to disregard the annulment because it was based on grounds that would arguably not have been available under the FAA, which is not a basis for ignoring an otherwise valid annulment order. In three (*e.g., Spier, Thai-Lao Lignite, and Getma*), the grounds invoked by the foreign courts were indistinguishable from grounds for vacatur in the U.S.  In another (*e.g., TermoRio*), the U.S. court may have thought the ground idiosyncratic, but not objectionable. Finally, in one (*e.g., Esso*) the U.S. court simply found the claimant's argument that it had been denied due process unconvincing on the merits.

28.     However, there are other cases that paint a very different picture. In those, a court refused to respect an annulment of the award at the seat and instead enforced it despite the annulment. In the leading case of *Corporación Mexicana de Mantenimiento Integral v. Pemex Exploración y Producción*,[26] a Mexican court at the seat had annulled an award on the basis, among others, of a law that was enacted after the arbitration has already begun, declaring that the type of claim advanced in the arbitration was non-arbitrable under Mexican law, which had not previously been the case. The Second Circuit, affirming the district court, found that retroactive application of the law to extinguish a claim that was perfectly arbitrable under Mexican law when the arbitration began violated U.S. public policy against the retroactive application of law. International comity did not require that the annulment be recognized. The annulment was denied

---

[26] 832 F.3d 92 (2d Cir. 2016)

recognition not merely because the Mexican grounds for annulment differed from those in the U.S. It was disregarded because the court found retroactivity to be contrary to a fundamental principle of U.S. law.

29.     In a case decided just this year, *Compañía de Inversiones Mercantiles S.A., Petitioner - Appellee, v. Grupo Cementos de Chihuahua S.A.B. de C.V.*,[27] an arbitral tribunal sitting in Bolivia issued an award in favor of the claimant in the amount of $34 million, plus costs and interest. The Respondent sought to annul the award in a Bolivian court. Following extremely protracted proceedings, including multiple appeals going as far as the Bolivian Constitutional Court, the trial judge ultimately denied the annulment request.  The respondent thereafter initiated a new suit in Bolivia before a different judge who, again after protracted proceedings, annulled the award. By this time, as in *Thai-Lao Lignite* as well as the present case, a U.S. court had already enforced the award. Respondent asked the U.S. court to vacate the enforcement order in light of that subsequent annulment. The U.S. district court refused to vacate the order on the basis of the annulment on the ground that respecting that annulment "would offend basic standards of justice," which outweighed comity considerations. More specifically, it found that denying enforcement of the award would encourage "proceedings without end" and "an endless barrage of challenges to unfavorable awards or court orders." The court held that the U.S. public policy in favor of finality required that the Bolivian court's ultimate annulment of the award be disregarded. On appeal, the Tenth Circuit, reciting the prevailing view among U.S. courts, affirmed in the following terms:

> When the prevailing party seeks confirmation [of a foreign award] and the nonprevailing party presents the defense that the foreign jurisdiction has set the arbitral award aside, the district court must perform a weighing analysis, generally

---

[27] 58 F.4th 429 (10th Cir. 2023).

according comity to the foreign annulment order unless doing so violates United
States public policy.[28]

The Court concluded that "the district court acted within its discretion to conclude that the U.S.

interest in finality outweighed comity concerns." [29]

30.    What emerges from these two lines of cases is a crucial distinction between (a)

annulments based on unobjectionable grounds (even if sometimes different from the FAA's) and

(b) annulments respect for which would sufficiently violate well-established and important

principles of U.S. law as to be deemed contrary to U.S. public policy. It is in light of this distinction

that the annulment of the Award in the present case is to be evaluated.


## V.    THE BASIS FOR ANNULMENT IN THE PRESENT CASE

31.    As seen above, in two cases U.S. courts have enforced a foreign arbitral award,

notwithstanding its annulment by a court at the seat, on the ground that respecting the annulment

would offend U.S. public policy. In the first such case – *Pemex* – the offense to public policy was

found to lie in the annulment's violation of a substantive principle, namely, the principle of non-

retroactivity.  In the second case – *Grupos Cementos* – the court took no account of the annulment

because it found that the highly duplicative and prolonged set of annulment proceedings violated

the principle of the finality of arbitral awards. These cases provide useful benchmarks for gauging

the impact of this Court's decision on whether or not to consider itself bound by the Award's

annulment in France and thus to vacate its order of enforcement.

32.    In the preliminary ruling by the CJEU in the *Komstroy* case, which laid the

foundation for annulment of the Award by the Paris Court of Appeal, the CJEU made two major

---

[28] *Id*. at 449.

[29] *Id*. at 460.

pronouncements. *First*, it gave the term "investment" under the ECT an interpretation under which *Komstroy* failed to have made a qualifying investment.[30] *Second* – at the urging of the European Commission and certain Member States, it decided to consider whether or not the ECT applies to disputes between an investor from one Member State and another Member State (so-called "intra-EU" disputes).

33.     In fact, the CJEU should not have addressed the second question, since the dispute in *Komstroy* was between a Ukrainian investor and the Republic of Moldova. Since neither Ukraine nor Moldova is an EU Member State, *Komstroy* was decidedly *not* an intra-EU case and therefore the Court's earlier judgment condemning intra-EU arbitration -- *Slovak Republic v. Achmea* ("*Achmea*")[31] – should not have been extended to it.

34.     In fact, the CJEU acknowledged that it lacked jurisdiction to hear the case:

[T]he Court does not, in principle, have jurisdiction to interpret an international agreement as regards its application in the context of a dispute not covered by EU law. That is the case in particular where such a dispute is between an investor of a non-member State and another non-member State.[32]

35.     Notwithstanding its lack of jurisdiction "in principle," the CJEU proceeded with the case. It justified doing so on the basis of syllogistic reasoning:

(a) Article 267 of the Treaty on the Functioning of the European Union ("TFEU") gives the CJEU jurisdiction to interpret provisions of EU law;

(b) The ECT is part of EU law; ergo

---

[30] *Komstroy*, ¶ 85.

[31] *Slowakische Republik (Slovak Republic) v. Achmea BV*, Case No. C-284/16, https://curia.europa.eu/juris/document/document_print.jsf?mode=lst&pageIndex=0&docid=199968&part=1&doclang=EN&text=&dir=&occ=first&cid=55096.

[32] *Komstroy*, ¶ 28.

(c) The CJEU has jurisdiction to interpret the ECT.[33]

36.     The problem with the CJEU's reasoning is that, even if it has jurisdiction to interpret the ECT, it only has jurisdiction to do so if the case before it falls within its jurisdiction – and the *Komstroy* case, as the CJEU itself admitted, did not.

37.     The CJEU sought to overcome the difficulty through two arguments.

38.     *First,* according to the CJEU, even though the case before it had nothing to do with the EU, the question in the case – the proper interpretation of ECT Article 26 – might possibly arise in a future case having something to do with EU law:

> [W]here a provision of an international agreement can apply both to situations falling within the scope of EU law and to situations not covered by that law, it is clearly in the interest of the European Union that, in order to forestall future differences of interpretation, that provision should be interpreted uniformly, whatever the circumstances in which it is to apply.[34]

This rationale is not a serious one. The fact that there might someday arise a *similar case* falling within the Court's jurisdiction does not mean that *this dispute* did.

39.     *Second*, the CJEU observed that the arbitration was seated in Paris, France and thus governed procedurally by French arbitration law:

---

[33] According to the court:

> It is apparent from the Court's settled case-law that an [international] agreement concluded by the Council [of the European Union], constitutes, as regards the European Union, an act of one of its institutions, that the provisions of such an agreement form an integral part of the legal order of the European Union from the time it enters into force and that, in the context of that legal order the Court has jurisdiction to give a preliminary ruling on the interpretation of that agreement.

*Id.*, ¶ 23. Of course, as the European Union was not implicated at all in the dispute between Moldova and Komstroy, this does little to support the CJEU's argument.

[34] *Id.*, ¶ 29.

> T]he parties to the dispute … agreed … that the seat of the arbitration should be established in Paris. … That choice … has the effect of rendering applicable French law as the *lex fori* to the dispute in the main proceedings ….[35]

40.　　This rationale too is unsound. The fact that Paris was the seat, and the arbitration was subject to French arbitration law, has no relevance to the issue in dispute. The instrument that was the subject of the Paris court's preliminary reference to the CJEU in *Komstroy* was *not* the French arbitration law, but rather the ECT.  And the instrument that the CJEU interpreted in its preliminary ruling in *Komstroy* was *not* the French arbitration law, but rather the ECT.

41.　　Evidently, the CJEU saw in the *Komstroy* case an irresistible opportunity to extend its condemnation of intra-EU BITs in *Achmea* to intra-EU cases under the ECT. It seized that opportunity despite arguments by the EU Council of Ministers and several Member States that the case had nothing to do with the EU or the EU market, and that the CJEU therefore lacked jurisdiction.[36]  It would be especially anomalous for this Court to vacate its order enforcing the Award in this case on the basis of an annulment dictated by a CJEU judgment in a case in which the CJEU lacked jurisdiction.

42.　　In any event, upon receiving the CJEU's preliminary ruling, the Paris court annulled the Award.[37] Its ground for doing so was that, just as the CJEU had ruled in its judgment, Komstroy had not made a qualifying investment under the ECT.

43.　　In the following section, I first examine more closely the basis on which the Paris court relied in annulling the Award, namely, the ECT's requirement of an "investment. I then turn to the intra-EU objection.  Although, as noted, the Paris court could not and did not rely on the

---

[35] *Id*., ¶ 32.

[36] *Id*. ¶ 21.

[37] *See Paris Judgment*.

intra-EU objection in annulling the Award, the objection greatly preoccupied the CJEU in its *Komstroy* judgment. More importantly, the CJEU's intra-EU objection in and of itself reflects the same serious inattention to international law that the CJEU displayed in its ruling on the ECT's "investment" requirement.

## A.    Komstroy's Status as a Qualifying Investor

44.    The core question before this Court is whether giving effect to the Paris court's annulment of the Award on the ground on which it relied, namely, Komstroy's failure to make a qualifying investment under the ECT, may be regarded as contrary to U.S. public policy.

45.    In its preliminary reference to the CJEU, the Paris Court of Appeal had posed the following three questions concerning the definition of investment:

- Does a sale of electricity that does not involve any economic contribution by the investor in the host State constitute an "investment"?

- Does the acquisition by an investor of a contracting party of a claim made by an economic operator foreign to the contracting party constitute an "investment"?

- Does a claim belonging to an investor, arising from a contract for the sale of electricity delivered to the border of the host State, constitute an investment made in the area of another contracting party, where the investor does not carry out any economic activity in the territory of the latter?

46.    To answer these questions, the CJEU properly began with Article 1(6) of the ECT according to which:

"[i]nvestment" means every kind of asset, owned or controlled directly or indirectly by an investor and includes:

(a)    tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, and pledges

(b)    a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;

(c)    claims to money and claims to performance pursuant to [a] contract having an economic value and associated with an investment;

(d)      intellectual property;

(e)      returns;

(f)      any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any economic activity in the energy sector."[38]

Article 1(6) adds that the term "investment" means "any investment associated with an economic activity in the energy sector."

47.     The CJEU found that the only category of assets into which a contract for sale of electricity could possibly fall were paragraphs (c) and (f). It disposed of paragraph (f) on the ground that "a claim arising from a mere contract for the sale of electricity cannot, in itself, be regarded as having been granted in order to undertake an economic activity in the energy sector."[39]

48.     Paragraph (c) called for greater analysis. It requires that the claim in question arise out of a contract "associated with an investment." The Court found that the contract was not in fact associated with an investment because "a mere supply contract is a commercial transaction which cannot, in itself, constitute an 'investment' within the meaning of Article 1(6) ECT."[40]  It added that "[a]ny other interpretation of that provision would amount to depriving the clear distinction made by the ECT between trade, governed by Part II of that treaty, and investments, governed by Part III thereof, of its effectiveness."[41] Having determined that a contract for the sale of electricity does not constitute an investment, the CJEU had no need to address the remaining two questions.

---

[38] ECT Art. 1(6)

[39] *Komstroy*, ¶ 72.

[40] *Id*., ¶ 79.

[41] *Id*., ¶ 80.

49.     To determine the impact of the annulment in this case on U.S. public policy, it is essential to start with the judgment of the CJEU in *Komstroy*, which provided the basis for the annulment by the Paris Court of Appeal. To be sure, the actual annulment of the Award in this case was pronounced by the Paris court, not by the CJEU. But it is well-established that, having received the CJEU's preliminary ruling, the Paris court had no choice but to annul the Award.[42] In the EU, Member State courts are bound to decide the EU law issue before them in strict accordance with the interpretation given by the CJEU in its preliminary ruling. It is therefore only appropriate, in assessing the bases for the annulment that occurred in this case, to begin with the CJEU's own judgment in the *Komstroy* case, of which the annulment by the Paris court was the direct and necessary consequence.

**B.      The Effect of the Annulment in the Present Case**

50.     As demonstrated,[43] under U.S. case law, a court should decline to vacate its order of enforcement of the Award in the present case if giving effect to the Award would offend U.S. public policy. The difficulty that the CJEU's judgment in *Komstroy* raises from a public policy point of view lies in the attitude toward international law that it reflects.

---

[42] In its very judgment in this case, the Paris Court of Appeal confirmed that it was absolutely bound by the CJEU interpretation of EU law:

> It follows from the provisions of Article 91 of the procedural regulation of the Court of Justice of the European Union of September 25, 2012, that the judgments rendered by this Court are binding from the day of their pronouncement. The judgment rendered by preliminary ruling binds the national judge for the resolution of the dispute to the principal as to the interpretation of the acts it concerns; it is mandatory for the referring court.

*Paris Judgment*, ¶ 53.

[43] *supra* ¶¶ 20-30.

51.     As an international treaty, the ECT is governed in its interpretation and application by international law. [44]  The principles of interpretation of international treaties are enshrined in the Vienna Convention on the Laws of Treaties (the "VCLT").  Although the United States signed the VCLT but did not ratify it, it considers the VCLT to be a statement of customary international law which is part of U.S. law.[45]  Articles 31 and 32 set forth the principles of interpretation applicable to treaties:

Article 31

General rule of interpretation

1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

(a) any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

(b) any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3. There shall be taken into account, together with the context:

(a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c) any relevant rules of international law applicable in the relations between the parties.

---

[44] ECT, art. 26(6).

[45] US Department of State, Office of the Legal Adviser, Frequently Asked Questions, https://2009-2017.state.gov/s/l/treaty/faqs/70139.htm.

4. A special meaning shall be given to a term if it is established that the parties so intended.[46]

Article 32

Supplementary means of interpretation

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

(a) leaves the meaning ambiguous or obscure; or

(b) leads to a result which is manifestly absurd or unreasonable.

52. Notwithstanding the fact that the VCLT expressly provides that a treaty is to be interpreted in accordance with international law[47] – a proposition that the CJEU acknowledges[48] – the CJEU makes no reference at all to international law in its judgment in *Komstroy*. Indeed the CJEU makes no reference to legal authority of any kind.

53. In fact, the international law sources that tribunals and, when called upon to do so, courts consult in the sphere of investor-State arbitration are abundant. Of course, a prime source of international law for purposes of interpreting and applying an investment agreement is arbitral jurisprudence. There are in fact mountains of cases in which both arbitral tribunals and national courts have had to decide, as a jurisdictional matter, whether the action the claimant had taken amounted to an investment within the meaning of the applicable treaty.[49] This is no wonder. There

---

[46] VCLT, art. 31.

[47] ECT 26(6).

[48] *Komstroy* ¶ 48.

[49] *Salini Costruttori S.p.A. v. Kingdom of Morocco*, ICSID case no. ARB/00/4, Decision on Jurisdiction of 23 July 2001, at 44, published at 129 Journal de Droit International 196 (2002); *Fedax N.V. v. Venezuela*, ICSID case no. ARB/96/3, Award of 11 July 1997, reprinted at 37 ILM 1378 (1998); *Liberian Eastern Timber Corp. v. Republic of Liberia*, ICSID case no. ARB/83/2;

are precious few among the multitudinous investor-State claims in which the respondent State fails

to assert that the claimant was not an investor and/or did not make a qualifying investment. This

is a question that tribunals are constantly required to consider and decide.

54.     There is also a mountain of academic and professional writing on the meaning of

the term "investment" in investment agreements.[50] The proper interpretation of the term

"investment" and its application in any given case invariably necessitate vast amounts of legal

research and analysis on the part of both counsel and tribunals.

55.     Tremendous amounts of time, money and human resources over the course of an

arbitral proceeding in investment cases are devoted to this particular jurisdictional issue well

before the merits of an investment claim even begin to be addressed. The question whether what

the claimant did amounted to making a qualifying investment will be the subject of voluminous

briefs, which draw in turn upon vast quantities of prior awards and commentary, both academic

and professional. Arbitral proceedings are commonly bifurcated precisely because determining

whether there exists an investment, within the meaning of the applicable treaty, is not only legally,

but also extraordinarily factually complex. There can be tremendous waste in addressing the merits

of a claim when, as is so often the case, the claimant is ultimately found not to have made a

qualifying investment in the first place. But whether a case is bifurcated or not, counsel spend a

---

*Mihaly Int'l Corp. v. Socialist Democratic Republic of Sri Lanka*, ICSID case no. ARB/00/2, Award of 15 March 2002, published at 16 ICSID Rev – FILJ 142, pp. 151-156 (2001).

[50] Rubins, N., *The Notion of "Investment" in International Investment Arbitration*, in Horn, N. (ed.), Arbitrating Foreign Investment Disputes, 2004, pp. 283-324; Yannaca-Small, K. and Katsikis, D., *The Meaning of "Investment" in Investment Treaty Arbitration*, in Yannaca-Small, K. (ed.), Arbitration under International Investment Agreements – A Guide to the Key Issues, 2018, pp. 266-301; McLachlan, C. and Others, *International Investment Arbitration: Substantive Principles*, 2nd ed., 2017; Bischoff, J. A. and Happ, R., *Ratione Materiae*, in Bungenberg, M. and Others (eds.), International Investment Law, A Handbook, 2015, pp. 1-149.

vast amount of time and effort during the hearings (and in preparation for the hearings) on the "investment" issue, an issue that also looms extremely large in the analyses that tribunals perform.

56.     Yet, the CJEU judgment in *Komstroy* is bereft of any reference to international law in any form or based on any source whatsoever. A court such as the CJEU cannot plausibly maintain that it resolved the treaty interpretation and application issues at hand by reference to international law – as it was obligated to do – when there is not a single reference in its judgment to international law of any kind. This absence of authority is not mitigated by the lengthy Opinion of the Advocate General which, apart from several footnotes lacking any explanation, is likewise silent on international law.[51] On the contrary, the *AG Opinion* and its footnotes are replete with references to EU law,[52] almost as if the proper interpretation of the ECT is governed by EU law rather than international law, which is decidedly not the case.

57.     Turning to the Paris Court of Appeal judgment,[53] I find that it adds nothing of substance to the judgment of the CJEU. It does little more than repeat and amplify in no greater detail upon what the CJEU itself had to say on the matter.[54] Like the CJEU judgment itself, the Paris Court of Appeal judgment is bereft of any reference to international law in any form other than a passing mention of the VCLT.

58.     The contrast between the reasoning of the CJEU and the Paris Court of Appeal, on the one hand, and the tribunal in this case, on the other, is truly striking. In its decision enforcing the Award, this Court expressly recognized and appreciated the lengths to which the arbitral

---

[51] *AG Opinion*, fn. 72-80.

[52] *See, e.g.*, *id.* ¶¶ 31-45, 53-97; notes 3-18, 23-24, 26-27, 31-39, 48.

[53] *See Paris Judgment*.

[54] *Id.*, ¶¶ 69-82.

tribunal had gone in determining the meaning of the term "investment" under the ECT and applying it to the case at hand.[55] The Court acknowledged that the tribunal devoted more than 100 paragraphs to that question.[56] This is against a mere 16 paragraphs dedicated by the CJEU to the interpretation and application of the term "investment."[57] This Court remarked that the tribunal "carefully" outlined the parties' arguments[58] and that it cited and relied on a broad range of international law sources, notably other arbitral awards,[59] scholarly articles advocating for an "extensive" definition of investment,[60] the drafting history of the ECT,[61] and the ECT's objective "to promote the long-term cooperation in the field of energy," which requires that suppliers of "private foreign capital" are confident that they will receive "international legal protection" of their energy-related investments.[62] In sum, this Court clearly appreciated the range of international law sources upon which the tribunal drew in conducting its analysis and the seriousness of its efforts.

59.     It is difficult to accept the notion that this Court should vacate its order enforcing an Award – an award whose treatment of the "investment" issue it found so cogent – on the strength of a subsequent annulment of the Award that disposed of the issue as cavalierly, and with such utter disregard to the fundamental principles of international law, as did the decision of the Paris Court of Appeal and the underlying judgment of the CJEU.

---

[55] ECF No. 60 at 23.

[56] *Id*.

[57] CJEU Judgment, ¶¶ 67-83.

[58] ECF No. 60 at 23.

[59] *Id*. at 24.

[60] *Id*.

[61] *Id*.

[62] *Id*.

60.     I now return to the U.S. law standard for enforcing annulled awards, discussed in Part IV of this Declaration. In my judgment, the principle of respect for international law is no less fundamental in the U.S. legal system than the principles of non-retroactivity (on which the *Pemex* decision was based) and finality (on which the *Grupo Cementos* decision was based), both of which were found to represent U.S. public policy. This Court should not, as a matter of public policy, consider itself bound by an annulment that reflects the degree of disregard for international law exhibited by both the CJEU and the Paris Court of Appeal judgments in *Komstroy*.

61.     No one can doubt the importance of the U.S. acting, and appearing to act, in compliance with international law. This is reflected not only in case law[63] and scholarship,[64] but in government pronouncements as well. As the Legal Adviser of the U.S. State Department has stated:

> The United States does believe that international law matters. We help develop it, rely on it, abide by it, and - contrary to some impressions - it has an important role in our nation's Constitution and domestic law. … This Department, along with the rest of the Administration, will be a strong voice for international legal norms, for living up to our treaty obligations, to recognizing that American's moral authority

---

[63] *See Banco Nacional De Cuba v. Sabbatino*, 376 U.S. 398, 450-51, (1964) ("I start with what I thought to be unassailable propositions: that our courts are obliged to determine controversies on their merits, in accordance with the applicable law; and that part of the law American courts are bound to administer is international law.") (White, J, dissenting); *see also* U.S. Const. art. VI, cl. 2 ("The Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any state to the Contrary notwithstanding.")

[64] *See, e.g.,* Anne van Aaken, *Rewarding In International Law*, 115 A.J.I.L. 195; Shima Baradaran, *Does International Law Matter?*, 97 Minn. L. Rev. 743; Stacy-Ann Elvy, *Theories Of State Compliance With International Law: Assessing The African Union's Ability To Ensure State Compliance With The African Charter And Constitutive Act*, 41 Ga. J. Int'l & Comp. L. 75, 78.

in international politics also rests on our ability to defend international laws and treaties.[65]

62.     This Court should not vacate its order enforcing the Award in this case on the basis of an annulment by a foreign court that makes no attempt at all to explain itself in terms of the law that unquestionably governs the interpretation of the ECT, namely, international law. The entire fabric of international trade and commerce, and international relations more generally, depends on the determination of States to perform in good faith the international law obligations to which they committed themselves.

## C.     The U.S.'s Own Obligations under the New York Convention

63.     The U.S. may not be a party to the ECT, but it is a party to the New York Convention whose paramount objective is to ensure the enforcement of foreign arbitral awards. The Convention imposes an international law obligation, respect for which by all Contracting States, including the U.S., is essential for its proper functioning and efficacy. Accordingly, recognition and enforcement are obligatory unless the award in question falls within one or more of the defenses to enforcement set out in the New York Convention. However, as noted,[66] those defenses are permissive, not mandatory. They may, but need not, be applied.

64.     Moreover, it is well-established in U.S. case law – and in the case law of many other countries – that the defenses to enforcement under Article V of the Convention are to be

---

[65] John B. Bellinger, Legal Adviser, State Department (U.S. State Department Archives), file:///C:/Users/George/Downloads/The%20United%20States%20and%20International%20Law. pdf. For an extensive discussion of the place of international law in the U.S. legal system, *see generally*, Congressional Research Service, International Law and Agreements: Their Effect upon U.S. Law (July 12, 2023), and authorities cited therein.

[66] *supra* ¶ 18.

narrowly construed, lest the Convention's primary objective be defeated.[67] The way in which the Article V(1)(e) defense in particular is narrowed in the U.S. is precisely by allowing courts, in exceptional circumstances, to deny recognition of an award's annulment by a court at the seat and proceed to enforce the award.

65.     This is not to say that annulments by courts at the seat are not entitled to deep respect as a matter of international comity. Courts are emphatic that enforcing an annulled award

---

[67] *See, e.g., OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, 975 F.3d 487, 497 (5th Cir.2020) ("we construe the Article V defenses to enforcement 'narrowly[ ] "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts"'") (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274 (5th Cir. 2004)); *Castro v. Tri Marine Fish Co. LLC*, 921 F.3d 766, 773 (9th Cir. 2019) ("A court must confirm a foreign arbitral award unless the party resisting enforcement meets its 'substantial' burden of proving one of seven narrowly interpreted defenses [of the New York Convention]"); *MediVas, LLC v. Marubeni Corp.*, 592 F.App'x 642, 643-44 (9th Cir. 2015) ("[The party] seeking to avoid enforcement of the award … has the burden of showing the existence of a New York Convention defense. This burden is substantial because 'the public policy in favor of international arbitration is strong, and the New York Convention defenses are interpreted narrowly'"); *Polimaster Ltd v. RAE Sys., Inc.*, 623 F.3d 832, 836 (9th Cir. 2010) ("New York Convention defenses are interpreted narrowly"); *Ario v. Underwriting Members of Syndicate Lloyds for the 1998 Year of Account*, 618 F.3d 277, 290-91 (3d Cir. 2010) ("Article V of the Convention sets forth the grounds for refusal, and courts have strictly applied the Article V defenses and generally view[ed] them narrowly"); *Steel Corp. of the Philippines v. Int'l Steel Servs., Inc.*, 354 F.App'x 689, 694 (3d Cir. 2009); *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 283 (3d Cir. 2003) ("generally have construed those exceptions narrowly"); *Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Venezuela*, 2020 WL 1584378, at *5 (S.D. Miss.) ("Defenses to enforcement under the Conventions are construed narrowly"); *Int'l Trading & Indus. Inv. Co. v. Dyncorp Aerospace Tech.*, 763 F.Supp.2d 12, 29 (D.D.C. 2011) (Article V provides exclusive grounds for non-recognition of Convention awards: "Such a narrow reading of the New York Convention comports with the context in which the Convention was enacted, as a broad construction of the Convention would do nothing more than erect additional hurdles to confirmation of arbitral awards, which in turn would contravene the 'principal purpose' of the Convention, i.e., 'to encourage the recognition and enforcement of commercial arbitration agreements in international contracts'"); *Blackwater Sec. Consulting LLC v. Nordan*, 2011 WL 237840, at *10 (E.D.N.C.); Judgment of 9 December 2008, XXXIV Y.B. Comm. Arb. 810, 816 (Swiss Fed. Trib.) (2009) ("grounds for refusal under Art. V [of the New York] Convention must be interpreted restrictively in order to favour enforcement of arbitral awards"); *Sojuznefteexport v. JOC Oil Ltd*, XV Y.B. Comm. Arb. 384, 397 (Bermuda Ct. App. 1989) (1990) ("narrowly construed").

is a highly exceptional step and must not be taken lightly.[68] It therefore comes as no surprise that, as seen in the U.S. case law,[69] efforts to enforce annulled awards fail far more often than they succeed. An annulment may be ignored only if respecting it would offend U.S. public policy.

66.     But where U.S. public policy *is* at stake, Article V(1)(e) ceases to be available as a basis for refusing enforcement of an award, thus leaving the New York Convention's fundamental commitment to the enforcement of foreign arbitral awards fully intact. Under those circumstances, U.S. courts revert to their core mission under the New York Convention of granting enforcement to foreign awards. When U.S. courts do so, they give direct effect to the fundamental U.S. policy, enshrined in the New York Convention and the FAA, in favor of enforcing foreign arbitral awards.[70]

67.     This attitude on the part of the courts reflects a highly desirable symmetry. Under the clear terms of Article V(2)(b) of the New York Convention, a court may *deny enforcement* of a foreign award if enforcing it would contravene U.S. public policy. Conversely, however, U.S courts will *grant enforcement* of a foreign award, notwithstanding its annulment, if giving effect to the annulment would contravene U.S. public policy.

### D.     The Intra-EU Jurisdictional Objection

68.     As noted, the Paris Court of Appeal could not and did not base its annulment of the *Komstroy* award on the intra-EU objection. However, the objection nevertheless warrants special

---

[68] *See, e.g., TermoRio*, 487 F.3d at 939; *Getma*, 862 F.3d at 48.

[69] *See, e.g.*, *TermoRio*, 487 F.3d 928; *Getma*, 862 F.3d 45; *Esso*, 40 F.4th 56; *Baker Marine*, 191 F.3d 194.

[70] *See, e.g.*, *Enron Nig. Power Holding, Ltd. v. Fed. Republic of Nig.*, 844 F.3d 281, 289 (2016) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631).

consideration here for several reasons. In the first place, the CJEU saw fit to dwell heavily on it in its *Komstroy* decision, even though Komstroy was not in fact an intra-EU case. For his part, the Advocate General devoted a large swath of his Opinion in the case to the intra-EU objection, addressing it at length before turning to the question that the Paris court had referred.[71] And the Paris court, while not relying on the intra-EU objection to justify annulment of the Award, nevertheless endorsed it.[72]

69.     But the greatest significance of the intra-EU objection in the context of the present case is the extent to which it underscores the utter lack of commitment to international law displayed by the CJEU and the Paris Court of Appeal in their *Komstroy* judgments.

1.     The Intra-EU Objection in the *Achmea* and *Komstroy* Judgments

70.     It is important at the outset to explain what is meant by the intra-EU objection, and then examine its rationale and import. An "intra-EU" investment dispute is a dispute between an investor from one EU Member State and another EU Member State, typically under a bilateral investment agreement ("BIT") between the two States. According to the objection, the adjudication of intra-EU disputes is reserved to the courts of the Member States, so that arbitral tribunals lack jurisdiction to address them. The CJEU first announced the intra-EU objection in its landmark *Achmea* judgment.[73] In *Achmea,* an arbitral tribunal seated in Germany adjudicated a claim by a Dutch investor, Achmea, against the Slovak Republic that the latter had failed in its investor protection obligations under the BIT entered into between the Netherlands and Slovakia.

---

[71] *AG Opinion*, ¶¶ 28-100.

[72] *Paris Judgment*, ¶ 53-63.

[73] *Achmea*, *supra* note 31.

Achmea prevailed in the action and Slovakia sought annulment of the award in a German court. When the case reached the German Supreme Court, that Court made a preliminary reference to the CJEU on the question of whether an award rendered under an intra-EU BIT was valid and enforceable under EU law. In its preliminary ruling in *Achmea*, the CJEU squarely held that investment disputes under intra-EU BITs may not validly be subject to arbitration, so that a tribunal hearing such a dispute lacks jurisdiction to adjudicate and any award it might ultimately render is invalid and subject to annulment.[74]

71.     The CJEU based its ruling in *Achmea* on two grounds. The first was Article 344 of the Treaty on the Functioning of the European Union (the "TFEU") which vests jurisdiction over disputes between EU Member States exclusively in EU Member State courts. On the assumption that a dispute between an EU national and another Member State under a bilateral investment treaty (a "BIT") between two EU Member States constitutes itself a dispute between two EU Member States, the Court held that any award rendered under such a BIT is invalid under Article 344 and must be annulled. (The CJEU's position on this point is routinely criticized on the ground that a dispute between an investor from one Member State and another Member State is simply *not* a dispute between the two States.[75]).

72.     The CJEU's second and more serious rationale for *Achmea* derives from Article 267 of the TFEU which, as noted,[76] provides that whenever a question of the interpretation or

---

[74] *Achmea*, ¶ 58, *supra* note 31.

[75] *See, e.g.*, Jens Hillebrand Pohl, *Intra-EU Investment Arbitration after the Achmea case: Legal Autonomy Bounded by Mutual Trust*, Cambridge Core (19 Nov. 2018), at https://www.cambridge.org/core/journal/european-constitutional-law-review/article/intraeu-investment-arbitration-after-the-Achmea-case-legal-autonomy-bounded-by-mutual-trust/43FADF564CED51CEE49F5314315ACD78

[76] *supra* ¶ 16.

validity of EU law arises in a case before a Member State court, and the answer to that question is less than clear, the court may or must (depending on the court's position in the judicial hierarchy) stay proceedings and refer the question to the CJEU for an authoritative ruling, which is of course what the Paris Court of Appeal did in the present case. Upon receiving that ruling, the Member State court resumes proceedings, determining the EU law issue in the case before it in accordance with the CJEU's ruling. According to the CJEU, the preliminary reference procedure is essential to ensuring the consistent interpretation and application of EU law.

73.     However, TFEU Article 267 specifically reserves authority to make preliminary references to "courts or tribunals of a Member State." Because the CJEU has held that arbitral tribunals do not constitute "courts or tribunals of Member States,"[77] international arbitral tribunals are not eligible to make preliminary references to the CJEU. As a result, their rulings on EU law do not stand to be enlightened or, if need be corrected, by the CJEU. This, according to the court, would be impermissibly detrimental to the uniformity and consistency of EU law and thus to the "autonomy" of the EU legal order.[78]

74.     As a consequence of *Achmea* and its elevation of the principle of "autonomy," in every case thereafter in which a tribunal seated in an EU Member State has issued an intra-EU award, that award has been set aside by a court at the seat.[79] By the same token, every time that an

---

[77] *Nordsee Deutsche Hochseefischerei GmbH v Reederei Mond Hochseefischerei Nordstern AG & Co. KG and Reederei Friedrich Busse Hochseefischerei Nordstern AG & Co. KG.* - Reference for a preliminary ruling: Oberlandesgericht Bremen - Germany. - Aid from the European Agricultural Guidance and Guarantee Fund for the construction of fishing vessels: "Pooling"; Case 102/81 (March 23, 1982), https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:61981CJ0102.

[78] *Achmea,* ¶¶ 58-59.

[79] *See, e.g.*, *PL Holdings S.a.r.l. v. Poland*, Judgment of the Supreme Court of Sweden, Case No. T 1569-19 (Dec. 14, 2022).

intra-EU award has been brought to a Member State court for enforcement, enforcement has been denied.[80]

75.      In its ruling in *Komstroy*, the CJEU took the opportunity to determine whether the intra-EU objection it had articulated in *Achmea* in the context of an intra-EU BIT applied equally to intra-EU disputes under the ECT. The CJEU held that the same considerations of EU autonomy that invalidated intra-EU BITs did indeed also prohibit arbitration of disputes under the ECT between an investor from one Member State and another Member State (*i.e.,* intra-EU ECT disputes).[81]

## 2.      The Intra-EU Objection under International Law

76.      The reason why the intra-EU objection, as set forth in the *Komstroy* judgment, is important to the present case is not simply that it figured prominently in the CJEU's, the Advocate General's and the Paris Court of Appeal's decisions. It is mostly important because the CJEU's reasoning in the case reveals much the same dismissive attitude toward international law reflected in its determination of whether Komstroy had made a qualifying investment under the ECT.

77.      *First*, the CJEU takes the position in *Komstroy* that the ECT by its terms contemplates a "carve-out" for intra-EU disputes. But the ECT does no such thing. According to its Article 26, the ECT applies to "[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former. …"

---

[80]*See, e.g.*, *Micula et al. v. Romania*, Luxembourg, Court of Cassation, Case No. 116/2022, Cas-2021-00061 dated 14 July 2022; *RWE AG v. Kingdom of the Netherlands*, HRC Cologne, No. SchH 15/21 (Sept 1, 2022); *Uniper v. Kingdom of the Netherlands*, HRC Cologne, No. SchH 14/21 - 1 Sept 2022.

[81] *Komstroy*, ¶ 62.

Without question, the term "Contracting Party" includes all States that are party to the ECT, which includes all EU Member States. Similarly, the term "Investor of another Contracting Party" includes investors from all States that are party to the ECT, including all EU Member States.

78.     The CJEU's reading of Article 26 is wholly at odds with the fundamental provisions of the VCLT, which is the principal instrument governing interpretation of international treaties. As noted, VCLT Article 31(1) states in part that "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."  Under any version of the "plain meaning" rule, when the ECT refers to "Contracting Parties," it is referring to all Contracting Parties. To hold otherwise is to create an exception that simply is not there. To my knowledge, no arbitral tribunal has yet accepted the CJEU's argumentation.

79.     *Second*, in invoking the "autonomy" of the EU legal order in order to abrogate intra-EU BITs and remove intra-EU disputes from the ambit of the ECT, the CJEU is doing exactly what Article 27 VCLT expressly forbids, namely, "invok[ing] the provisions of its internal law as justification for its failure to perform a treaty." As one authority states, "the principle that on the international level international law is supreme. … Indeed, any other rule would undermine the performance of treaties."[82]

80.     Article 27 is not an invention of the VCLT. In this respect, as in most others, the VCLT is a codification of established international law.[83] A great many arbitral tribunals have invoked Article 27 to bar States from justifying their breaches of international law on the basis of

---

[82] Mark E. Villiger, *Commentary on the 1969 Vienna Convention on the Law of Treaties 370*, 375 (2009).

[83] *Id*. at 374-375.

domestic law,[84] and EU law plainly represents the internal law not only of the EU, but also of all Member States.[85]

81.     *Third*, the ECT expressly makes international law its governing law.  Article 26(6) directs tribunals to "decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."[86]   Moreover, ECT Article 16 provides that no other international agreement (and that includes the Treaty on European Union (the "TEU") and the TFEU) "shall be construed to derogate from any provision of [the substantive parts] of this Treaty or from any right to dispute resolution with respect thereto under this Treaty." In seeking to create a carve-out to the ECT for intra-EU disputes, the CJEU is doing precisely what Article 16 in particular forbids, namely, subordinating international law to national or regional law, and once again failing in its obligation to interpret international treaties in accordance with international law.

82.     The CJEU acknowledges that the ECT is to be construed and applied in accordance with international law.[87] However, it also maintains that, because the EU is the product of a treaty, EU law itself constitutes international law as well and, as such, governs the interpretation of the

---

[84]  *See, e.g., Canfor Corporation; Terminal Forest Products Ltd. v. USA*, ¶ 307 Decision on Jurisdiction, 6 June 2006; *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa BV v. Kazakhstan*, Excerpts of Award, 22 June 2010; *AWG Group Ltd. v. Argentina*, Decision on Liability, 30 July 2010, ¶ 65; *Assets, L.P. v. Argentina*, Award, 22 May 2007; *Liman Caspian Oil BV and NCL Dutch Investment.*

[85] *I.C.W. Europe Investments Limited v. The Czech Republic*, PCA Case No. 2014-22, Award, 15 May 2019, ¶ 416.

[86] *See* Jeswald Salacuse, *The Energy Charter and Bilateral Investment Treaty Regime*, in THE ENERGY CHARTER TREATY: AN EAST-WEST GATEWAY FOR INVESTMENT AND TRADE 321, 328. (Thomas Wälde ed., Kluwer Law International 1996).

[87] *Komstroy* ¶ 48.

ECT.[88]  This is not the place to go deeply into the hierarchical relationship between EU law and general principles of international law. Suffice it to say that general principles of international law constitute the very foundation of international law; no individual treaty, such as the TEU or TFEU, even purports to do that. If general principles of international law could be subordinated to any treaty into which States choose to enter, those principles could become an endangered species. As one tribunal put the matter:

> [EU law] principles … have been developed and applied without regard to the broader obligations of EU Member States under international law. The obligations of an EU Member State under the ECT – an international agreement to which many of the parties are not Member States of the EU – cannot be determined by reference to the primacy or autonomy of EU law but have to be determined by reference to the principles of international law regarding conflicting treaty obligations.[89]

83.    Thus, while EU law may in one sense be regarded as part of international law, it is nevertheless also the internal law of the EU and its Member States.[90] To allow the EU and its Member States to avoid their international law obligations under the ECT by invoking their internal law would give them a privilege that no other ECT Contracting State enjoys. The drafters of the ECT could not possibly have intended to place its members on so dramatically a different footing.[91]

---

[88] *Id.* ¶ 50.

[89] *Landesbank Baden-Württemberg, HSH Nordbank AG, Landesbank Hessen-Thüringen Girozentrale and Norddeutsche Landesbank-Girozentrale v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the Respondent's Application for Reconsideration of the Tribunal's Decision of 11 November 2021 Regarding the "Intra-EU" Jurisdictional Objection (Feb. 22, 2023), ¶ 43.

[90] *See* Verburg, *The Energy Charter Treaty* 137, 142 (2018); Kleinheisterkamp, 'Investment Protection and EU Law 105 (2012); Ottavio Quirico, Investment Governance between the Energy Charter Treaty and the European Union: Resolving Regulatory Conflicts 103 (2020).

[91] The tribunal in *Infracapital F1 S.A.R.L. and Infracapital Solar B.V. v. Kingdom of Spain* rejected the notion that "there [should] be a separate treatment for intra-EU disputes (i.e., where investors and the host State are part of the EU) and non-intra-EU disputes. ICSID Case No.

84.     Arbitral tribunals have in fact consistently held that, while EU law may possibly pertain to the merits of a given dispute, it does not govern issues of tribunal jurisdiction. A tribunal in a very recent case was quite explicit:

> The Respondent's interpretation of Article 26(6) of the ECT as requiring this Tribunal to apply directly EU law when ascertaining its jurisdiction cannot be upheld. Article 26(6) is indeed concerned with the law applicable to the merits . . .
>
> Thus, the question whether the Tribunal has jurisdiction under Article 26 of the ECT must be established first and foremost pursuant to the terms of Article 26(1)-(5) of the ECT as interpreted pursuant to Articles 31 and 32 of the VCLT. [92]

85.     Another tribunal stated:

> This Tribunal's legal framework is, first and foremost, the international law one. The Tribunal derives its mandate from a public international law instrument, namely, the ECT, so its jurisdictional analysis must be based on the ECT itself as well as other instruments and principles of public international law. [93]

86.     Another tribunal was even more direct: [I]f there must be a "hierarchy" between the norms to be applied by the Tribunal, it must be determined from the perspective of public

---

ARB/16/18, Decision on Respondent's Request for Reconsideration regarding the Intra-EU Objection and the Merits (Feb. 21, 2022), paras. 112-113.

[92] *Sevilla Beheer B.V. v. The Kingdom of Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum (Feb. 11, 2022), ¶ 620.

[93] *Mercuria Energy Group Limited v. The Republic of Poland*, SCC, Final Award (Dec. 29, 2022), ¶ 349; *See also Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability (Nov. 30, 2012), ¶ 4.112; *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award (May 4, 2017, ¶ 199; *Vattenfall AB v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue (Aug. 31, 2018), ¶ 124; *AES Solar and others (PV Investors) v. Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction (Oct. 14, 2014), ¶ 187; *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*; ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (CL-187), ¶ 124.

international law, not of EU law. … EU law does not and cannot "trump" public international law.[94]

87.     As a consequence, all tribunals have assumed jurisdiction over intra-EU cases under the ECT over the host State's and the Commission's objections. Typical is the award in *Sevilla Beheer B.V. and others v. Kingdom of Spain*:

> The Tribunal cannot accept the CJEU's interpretation of Article 26(2)(c) of the ECT as persuasive, as the reasoning of the *Komstroy* Judgment does not provide any analysis of this provision and its alleged inapplicability in an intra-EU context from the perspective of international law.

88.     The above discussion reveals that the CJEU's disregard for international law in its preliminary ruling on the "investment" question in *Komstroy* is not an isolated occurrence. At other points in the *Komstroy* saga – of which the CJEU's assertion of the intra-EU objection is the most conspicuous example – the CJEU fails to adhere to the fundamental principle that international treaties are to be interpreted and applied in accordance with principles of international law. In light of the paramount importance of international law in the U.S. legal system, giving conclusive effect

---

[94] *RREEF Infrastructure (G.P.) Limited v. Kingdom of Spain*, ICSID Case No. ARB/13/30 Decision on Jurisdiction (June 6, 2016) at 17, ¶¶ 25, 87; *see also, Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on the Kingdom of Spain's Request for Reconsideration, 10 January 2022; *Infracapital F1 S.à r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Respondent's Request for Reconsideration Regarding the Intra-EU Objection and the Merits, 1 February 2022; *Landesbank Baden-Württemberg, HSH Nordbank AG, Landesbank Hessen-Thüringen Girozentrale and Norddeutsche Landesbank-Girozentrale v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the Respondent's Application for Reconsideration of the Tribunal's Decision of 11 November 2021 Regarding the "Intra-EU" Jurisdictional Objection, 22 February 2023; *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Judgment of the High Court of Justice of England and Wales [2023] EWHC 1226, 24 May 2023; *Mercuria Energy Group Limited v. Republic of Poland (II)*, SCC Case No. 2019/126, Final Award, 29 December 2022, ¶ 458.

to the annulment of an award based on such serious failure in this regard would be contrary to U.S. public policy.

## VI.   <u>CONCLUSION</u>

89.    This Court is faced in this case with a French judgment annulling an Award that the Court has already, upon serious consideration, enforced, and the appellate court affirmed. The Republic of Moldova is asking this Court to "de-enforce" the Award on the basis of that annulment. Ordinarily, a court, pursuant to Article V(1)(e) of the New York Convention, will deny enforcement of a foreign arbitral award that has been annulled at the seat. But in exceptional circumstances it will enforce the award notwithstanding the annulment, and the Convention allows it to do so. Under established U.S. case law, the circumstance in which a U.S. court will enforce an annulled award is one in which the annulment is deeply problematic from a public policy point of view. For a court to do so is entirely consistent with its obligations under the New York Convention.

90.    Fidelity to international law is at least as fundamental a public policy as those – namely, the principles of non-retroactivity and the finality of arbitral awards -- that in the past have justified U.S. courts in enforcing annulled awards. Due to the disrespect shown by the CJEU's and the Paris Court of Appeal's decisions in the present case, their judgments do not justify this Court, from a public policy point of view, in "de-enforcing" the present Award which, unlike those decisions, affords international law precisely the respect that it is due.

91.    In light of public policy, this Court should maintain in force its order enforcing the *Komstroy* award rather than reverse it in the name of comity to a foreign judgment that is unworthy from an international law point of view.

Dated: September 11, 2023

_____

George  A. Bermann