FLAMINIO COSTA

and

ENEL (Ente Nazionale Energia Elettrica (National Electricity Board), formerly the Edison Volta undertaking)

on the interpretation of Articles 102, 93, 53 and 37 of the said Treaty

THE COURT

composed of: A. M. Donner, President, Ch. L. Hammes and A. Trabucchi, Presidents of Chambers, L. Delvaux, R. Rossi, R. Lecourt (Rapporteur) and W. Strauß, Judges,

Advocate-General: M. Lagrange
Registrar: A. Van Houtte

gives the following

# JUDGMENT

## Issues of fact and of law

I — Facts and procedure

By Law No 1643 of 6 December 1962 and subsequent decrees the Italian Republic nationalized the production and distribution of electric energy and created an organization, the Ente Nazionale Energia Elettrica (or ENEL) (National Electricity Board) to which the assets of the electricity undertakings were transferred.

In proceedings about the payment of an invoice for electricity between Flaminio Costa and ENEL, before the Giudice Conciliatore, Milan, Mr Costa, as a shareholder of Edison Volta, a company affected by the nationalization, and as an electricity consumer, requested the court to apply Article 177 of the EEC Treaty so as to obtain an interpretation of Articles 102, 93, 53 and 37 of the said Treaty, which Articles, he alleged, had been infringed by the Law of 6 December 1962. The Giudice Conciliatore, by order of 16 January 1964 acceding to this request, decided as follows:

'Having regard to Article 177 of the Treaty of 25 March 1957 establishing the EEC, incorporated into Italian law by Law No 1203 of 14 October 1957, and having regard to the allegation that Law No 1643 of 6 December 1962 and the presidential decrees issued in execution of that Law (No 1670 of 15 December 1962, No 36 of 4 February 1963, No 138 of 25 February 1963 and No 219 of 14 March 1963) infringe Articles 102, 93, 53 and 37 of the aforementioned Treaty, the Court hereby stays the proceedings and orders that a certified copy of the file be transmitted to the Court of Justice of the European Economic Community in Luxembourg.'

This application for a preliminary ruling was transmitted by the Registrar of the Giudice Conciliatore to the Court and was received in the Court Registry on

EXHIBIT 5

organizations aiming, as institutions, to make a concentration of exports and imports calculated to disturb the free movement of goods. That could never be the objective of a public service; moreover international trade in a particular article depends on international agreements and complex administrative procedures and is by its very nature outside the requirements of Article 37 and any provision relating to competition.

The *Commission* finally considers that Article 37 should be applied whenever a State establishes an exclusive right to import or export. To fall within the prohibitions in Article 37 the impugned measure must be intended to operate in the field of the circulation of goods or services. Although nationalization may be considered as permissible under Article 222, the creation of a new monopoly cannot.

However, a factual estimate of the trade in existence between Member States in respect of the commodity in question must be taken into consideration.

There is no need to inquire whether the creation of a monopoly of a commercial character is inconsistent with Article 37 (2), where the importation and exportation of the said commodity are not subject to the discretionary power of the administering body.

## Grounds of judgment

By Order dated 16 January 1964, duly sent to the Court, the Giudice Conciliatore of Milan, 'having regard to Article 177 of the Treaty of 25 March 1957 establishing the EEC, incorporated into Italian law by Law No 1203 of 14 October 1957, and having regard to the allegation that Law No 1643 of 6 December 1962 and the presidential decrees issued in execution of that Law . . . infringe Articles 102, 93, 53 and 37 of the aforementioned Treaty', stayed the proceedings and ordered that the file be transmitted to the Court of Justice.

On the application of Article 177

*On the submission regarding the working of the question*

The complaint is made that the intention behind the question posed was to obtain, by means of Article 177, a ruling on the compatibility of a national law with the Treaty.

By the terms of this Article, however, national courts against whose decisions, as in the present case, there is no judicial remedy, must refer the matter to the Court of Justice so that a preliminary ruling may be given upon the 'interpretation of the Treaty' whenever a question of interpretation is raised before them. This provision gives the Court no jurisdiction either to apply the Treaty to a specific case or to decide upon the validity of a provision of

domestic law in relation to the Treaty, as it would be possible for it to do under Article 169.

Nevertheless, the Court has power to extract from a question imperfectly formulated by the national court those questions which alone pertain to the interpretation of the Treaty. Consequently a decision should be given by the Court not upon the validity of an Italian law in relation to the Treaty, but only upon the interpretation of the abovementioned Articles in the context of the points of law stated by the Giudice Conciliatore.

*On the submission that an interpretation is not necessary*

The complaint is made that the Milan court has requested an interpretation of the Treaty which was not necessary for the solution of the dispute before it.

Since, however, Article 177 is based upon a clear separation of functions between national courts and the Court of Justice, it cannot empower the latter either to investigate the facts of the case or to criticize the grounds and purpose of the request for interpretation.

*On the submission that the court was obliged to apply the national law*

The Italian Government submits that the request of the Giudice Conciliatore is 'absolutely inadmissible', inasmuch as a national court which is obliged to apply a national law cannot avail itself of Article 177.

By contrast with ordinary international treaties, the EEC Treaty has created its own legal system which, on the entry into force of the Treaty, became an integral part of the legal systems of the Member States and which their courts are bound to apply.

By creating a Community of unlimited duration, having its own institutions, its own personality, its own legal capacity and capacity of representation on the international plane and, more particularly, real powers stemming from a limitation of sovereignty or a transfer of powers from the States to the Community, the Member States have limited their sovereign rights, albeit within limited fields, and have thus created a body of law which binds both their nationals and themselves.

The integration into the laws of each Member State of provisions which derive from the Community, and more generally the terms and the spirit of the Treaty, make it impossible for the States, as a corollary, to accord

JUDGMENT OF 15.7.1964 — CASE 6/64

precedence to a unilateral and subsequent measure over a legal system accepted by them on a basis of reciprocity. Such a measure cannot therefore be inconsistent with that legal system. The executive force of Community law cannot vary from one State to another in deference to subsequent domestic laws, without jeopardizing the attainment of the objectives of the Treaty set out in Article 5 (2) and giving rise to the discrimination prohibited by Article 7.

The obligations undertaken under the Treaty establishing the Community would not be unconditional, but merely contingent, if they could be called in question by subsequent legislative acts of the signatories. Wherever the Treaty grants the States the right to act unilaterally, it does this by clear and precise provisions (for example Articles 15, 93 (3), 223, 224 and 225). Applications, by Member States for authority to derogate from the Treaty are subject to a special authorization procedure (for example Articles 8 (4), 17 (4), 25, 26, 73, the third subparagraph of Article 93 (2), and 226) which would lose their purpose if the Member States could renounce their obligations by means of an ordinary law.

The precedence of Community law is confirmed by Article 189, whereby a regulation 'shall be binding' and 'directly applicable in all Member States'. This provision, which is subject to no reservation, would be quite meaningless if a State could unilaterally nullify its effects by means of a legislative measure which could prevail over Community law.

It follows from all these observations that the law stemming from the Treaty, an independent source of law, could not, because of its special and original nature, be overridden by domestic legal provisions, however framed, without being deprived of its character as Community law and without the legal basis of the Community itself being called into question.

The transfer by the States from their domestic legal system to the Community legal system of the rights and obligations arising under the Treaty carries with it a permanent limitation of their sovereign rights, against which a subsequent unilateral act incompatible with the concept of the Community cannot prevail. Consequently Article 177 is to be applied regardless of any domestic law, whenever questions relating to the interpretation of the Treaty arise.

The questions put by the Giudice Conciliatore regarding Articles 102, 93, 53, and 37 are directed first to enquiring whether these provisions produce direct effects and create individual rights which national courts must protect, and, if so, what their meaning is.