# Cabinet BRIARD

**Lawyer at the Conseil d'Etat and the Cour de cassation**
Hôtel Le Marois
9-11 av. Franklin Delano Roosevelt 75008 PARIS
- Tél :+ 33. 01.44.09.04.58 - secretariat@cabinet-briard.com . **www.cabinet-briard.com**

# AFFIDAVIT

The undersigned, an attorney with the Council of State and the Court of Cassation of France, provides below an attestation in the context of the proceedings initiated by STILEKS SCIENTIFIC AND PRODUCTION FIRM LLC (STILEKS) before Judge Christopher R. Cooper in Washington DC, United States of America.

This attestation does not address the chances of success of an appeal in cassation, but only to the authority of the Court of Cassation, the supreme court of the French judiciary, in light of the preliminary ruling by the Court of Justice of the European Union (CJEU).

1. In a judgment dated September 2, 2021, the CJEU declared that it had jurisdiction to rule on questions that the Paris Court of Appeal referred to it for a preliminary ruling on September 24, 2019, on the interpretation of Article 1, point 6, and Article 26(1) of the Energy Charter Treaty, signed in Lisbon on December 17, 1994 (ECT) and approved on behalf of the European Communities by Decision 98/181/EC, ECSC, Euratom of the Council and the Commission of September 23, 1997.

2. The referral was made in the context of an action for annulment of an arbitral award rendered in Paris (France) on October 25, 2013, in a dispute between the Republic of Moldova and KOMSTROY LLC (now STILEKS).

3. The questions the Paris Court of Appeal posed were as follows:

4. *"Should Article 1, point 6, TEC] be interpreted to mean that a claim arising from a contract for the sale of electricity, which did not involve any contribution by the investor in the host [State], may constitute an 'investment' within the meaning of that article?"*

5. *"Should [Article 26(1) of the EC Treaty] be interpreted to mean that the acquisition, by an investor of a contracting [party], of a claim that was established by an economic operator foreign to the [contracting parties] constitutes an investment?"*

6. *"Should [Article 26(1) TEC] be interpreted to mean that a claim belonging to an investor, and that arises from a contract for the sale of electricity delivered at the border of the host State, may constitute an investment made in the area of another contracting [party], in the absence of any economic activity carried on by the investor in the territory of the latter?"*

7. To declare that it had jurisdiction with respect to litigation unrelated to the law of the European Union, the CJEU gave extensive reasons for its decision (points 21 to 38) and answered the first of the three questions posed in the following terms:

8. *"Articles 1, point 6, and 26(1) of the Energy Charter Treaty, signed in Lisbon on 17 December 1994, approved on behalf of the European Communities by Decision 98/181/EC, ECSC, Euratom of the Council and the Commission of 23 September 1997, must be interpreted to mean that the acquisition, by a company of a contracting party to that treaty, of a claim arising from a contract for the supply of electricity, not associated with an investment, held by a company of a State not party to said treaty against a public company of another contracting party to that same treaty, does not constitute an 'investment' within the meaning of those provisions"*.

9. The court considered that the other two questions were irrelevant in view of the answer given to the first question.

10. It should be emphasized that in this ruling, the CJEU adopted a hypothetical position on the interpretation of the term '*investment*' within the meaning of European Union law, but in no way ruled on the merits of STILEKS' claim against the Republic of Moldova; it left the French national judge entirely free to decide in this respect, within the framework of the European Union law interpretation given.

11. At the Paris Court of Appeal (conclusions notified on October 3, 2022), STILEKS attempted to contextualize the scope of the CJEU's ruling of September 2, 2021, arguing in particular that, since the dispute does not fall within the scope of European Union law, which is an autonomous legal regime, this ruling has only limited authority, as the domestic judge remains free to classify the investment, particularly with regard to the ECT as an act of international law, and that the CJEU had in any case incorrectly assessed and inaccurately characterized the facts of the case.

12. The Paris Court of Appeal did not follow this analysis, which the Republic of Moldova contested.

13. In a decision dated January 10, 2023, it concluded (pages 11 and 12) that the CJEU ruling was legally binding.

14. In fact, the Court of Appeal set out to establish, through a lengthy analysis and within the framework of the theoretical interpretation given by the European courts, that the facts of the case did not indicate the existence of an investment within the meaning of the ECT (pages 13, 14 and 15).

15. No party has yet been served with this judgment. It may therefore still be the subject of an appeal to the Court of Cassation within the time limit prescribed by article 612 of the French Code of Civil Procedure.

16. Created in 1790 to ensure the unity of jurisprudence and the equality of all litigants before the law, France's Court of Cassation is a supreme jurisdiction of last resort. Its decisions are not subject to appeal. The Court of Cassation reviews the correctness of proceedings, exercises disciplinary control over the reasoning of appeals court rulings, and implements rules on the correct application of the rule of law. The Court of Cassation almost never determines cases on their merits, and if it does, it remands the dispute to a court of appeal.

17. What grounds for appeal could be raised against the Paris Court of Appeal's decision of January 10, 2023?

18. There could be two kinds.

19. First of all, this judgment could be criticized for holding that it was bound in law to the interpretation the CJEU adopted.

20. Such grounds, which would undoubtedly be based on a misapplication of article 267 of the Treaty on the Functioning of the European Union (TFEU), would have no chance of succeeding.

21. The European legal order is the backbone of the European Union. Through its interpretations of Union law, the CJEU is responsible for ensuring its uniform and effective application in all member states. For this reason, its decisions on preliminary rulings have the force of res judicata (CJCE 3 février 1977 Aff. 52/76, Benedetti c/ Munari, Rec.1977 p. 63: "*a preliminary ruling is binding on the national court as to the interpretation of the Community provisions and acts in question*"). The mechanism of the preliminary ruling is above all intended to enable a dialogue between national courts and the CJEU.

22. For all these reasons, it is certain that in the event of an appeal of the Paris Court of Appeal's decision of January 10, 2023, the Court of Cassation would reject the grounds referred to in point 19.

23. On the other hand, a second ground for annulment could criticize the legal characterization (application of the law to the facts) the Paris Court of Appeal used to determine the non-existence of an investment within the meaning of the EC Treaty, on the grounds of violation of the law (misapplication of the law) or lack of legal basis (inadequacy of the findings of fact) (points 64 to 83).. While it is true that the lower courts were largely inspired by the CJEU's hypothetical approach, the fact remains that they listed, in the concrete circumstances of the case, certain factual elements to deny the disputed claim the classification of an investment (conditions of acquisition of the claim, nature and scope of the agreements, contextual elements, articulation of the contracts, etc.). The Court of Appeal appreciated the importance of these factual elements, some of which are new and independent and some of which were invoked by the defendant, under its proper jurisdiction and the Court of Cassation will not review the conclusion with respect to the importance of the facts. On the other hand, it will be up to the Court of Cassation to judge whether, in the context of the interpretation given by the CJEU, the Court of Appeal correctly applied these elements to rule on the classification of the investment. Lastly, a third ground for appeal could be envisaged. The Court of Cassation reviews the reasoning of appeal court rulings, particularly with regard to the parties' arguments, and therefore an appeal for "failure to reply to pleadings", based on disregard of article 455 of the French Code of Civil Procedure, is possible because the Paris Court of Appeal has failed to respond to all of STILEKS' arguments to the effect that the claim at issue is an investment within the meaning of Article 1 (6) of the EC Treaty (pages 91 to 128 of the pleadings).

24. From this point of view, the debate before the Court of Cassation could make it possible to criticize the judgment of the Paris Court of Appeal of January 10, 2023, in the light of Article 1, point 6, first paragraph of the ECT, without disregarding the authority of the decision handed down by the CJEU. This debate could lead the Court of Cassation to annul the appeal ruling of January 10, 2023, and refer the case back to the Court of Appeal.

25. The undersigned can confirm the foregoing by oral testimony.

26. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Paris, December 21, 2023

François-Henri BRIARD

**Translation Certification**

I, Tiffany N. Compres, hereby certify that I reviewed the foregoing document. I further certify that I am fluent in both French and English and am competent to render an opinion as to the accuracy of the English translation. I further certify that the English translation of the foregoing French document appears, to the best of my knowledge and ability, to be true and accurate.

I certify that the foregoing statements are true and correct under penalty of perjury.

Dated: December 22, 2023.

_____
Tiffany N. Compres
FisherBroyles, LLP
1221 Brickell Avenue Suite 900
Miami, Florida 33131
Tel: 305.342.2957



## Cabinet BRIARD
**Avocat au Conseil d'État et à la Cour de cassation**
Hôtel Le Marois
9-11 av. Franklin Delano Roosevelt 75008 PARIS
• Tél : + 33. 01.44.09.04.58 • secretariat@cabinet-briard.com • www.cabinet-briard.com

# AFFIDAVIT

Le soussigné, avocat au Conseil d'État et à la Cour de cassation de France, fournit ci-après une attestation dans le cadre de la procédure initiée par la société STILEKS SCIENTIFIC AND PRODUCTION FIRM LLC (STILEKS) devant le juge Christopher R. Cooper à Washington D.C., Etats-Unis d'Amériques.

Cette attestation ne porte pas sur les chances de succès d'un pourvoi en cassation mais seulement sur la portée d'un arrêt préjudiciel de la Cour de justice de l'Union européenne (CJUE) au regard du contrôle exercé par la Cour de cassation, juridiction suprême de l'ordre judiciaire français.

*

1. Par un arrêt en date du 2 septembre 2021, la CJUE s'est déclarée compétente pour statuer sur une question préjudicielle présentée le 24 septembre 2019 par la Cour d'appel de Paris portant sur l'interprétation de l'article 1er, point 6, et de l'article 26, paragraphe 1, du traité sur la Charte de l'énergie, signé à Lisbonne le 17 décembre 1994 (TCE) approuvé au nom des Communautés européennes par la décision 98/181/CE, CECA, Euratom du Conseil et de la Commission, du 23 septembre 1997.

2. Cette demande avait été formulée dans le cadre d'un recours en annulation contre une sentence arbitrale rendue à Paris (France) le 25 octobre 2013 dans un litige opposant la République de Moldavie à KOMSTROY LLC (aujourd'hui STILEKS).

3. Les questions posées par la Cour d'appel de Paris étaient les suivantes :

4. « L'article 1ᵉʳ, point 6, du TCE] doit-il être interprété en ce sens qu'une créance issue d'un contrat de vente d'électricité qui n'a impliqué aucun apport de la part de l'*investisseur* dans l'[É]tat d'accueil peut constituer un "*investissement*" au sens de cet article ?

5. L'article 26, paragraphe 1, du TCE] doit-il être interprété en ce sens que constitue un investissement l'acquisition par un investisseur d'une [partie] contractante d'une créance constituée par un opérateur économique étranger aux [parties contractantes] ?

6. L'article 26, paragraphe 1, du TCE] doit-il être interprété en ce sens qu'une créance appartenant à un investisseur, issue d'un contrat de vente d'électricité livrée à la frontière de l'État hôte, peut constituer un investissement réalisé dans la zone d'une autre [partie] contractante, en l'absence de toute activité économique exercée par l'investisseur sur le territoire de cette dernière ? »

7. Pour se déclarer compétente à l'égard d'un litige étranger au droit de l'Union européenne, la CJUE a longuement motivé sa décision (points 21 à 38) et a répondu à la première des trois questions posées dans les termes suivants :

8. « L'article 1ᵉʳ, point 6, et *l'article 26, paragraphe 1, du traité sur la Charte de l'énergie, signé à Lisbonne le 17 décembre 1994*, approuvé au nom des Communautés européennes par la *décision 98/181/CE*, CECA, Euratom du Conseil et de la Commission, du 23 septembre 1997, doivent être interprétés en ce sens que l'*acquisition*, par une entreprise d'une partie contractante de ce *traité*, d'une créance issue d'un contrat de fourniture d'*électricité*, non associé à un investissement, détenue par une entreprise d'un État tiers audit *traité* envers une entreprise publique d'une autre partie contractante du même *traité*, ne constitue pas un « investissement », au sens de ces dispositions ».

9. Elle a estimé que les deux autres questions étaient sans objet, eu égard à la réponse fournie à la première question posée.

10. Il doit être souligné que par cet arrêt, la CJUE a adopté une position de principe sur l'interprétation du terme « *investissement* » au sens du droit de l'Union Européenne mais ne s'est en aucune façon prononcée sur la qualification de la créance de STILEKS à l'égard de la République de Moldavie ; il a laissé le juge national français entièrement libre de sa décision à cet égard, dans le cadre de l'interprétation européenne donnée.

11. Devant la Cour d'appel de Paris (conclusions notifiées le 3 octobre 2022), STILEKS a tenté de relativiser la portée de l'arrêt rendu par la CJUE le 2 septembre 2021 en soutenant notamment que s'agissant d'un litige ne relevant pas du droit de l'Union européenne, ordre juridique autonome, cet arrêt ne présentant qu'une autorité relative, le juge interne demeurant libre de la qualification d'investissement, notamment au regard du TCE en tant qu'acte de droit international et que la CJUE avant en tout état de cause faussement apprécié et inexactement qualifié les faits de l'affaire.

12. La Cour d'appel de Paris n'a pas suivi cette analyse, qui était contestée par la République de Moldavie.

2

13. Par un arrêt du 10 janvier 2023, elle a estimé (pages 11 et 12) que l'arrêt de la CJUE s'imposait à elle en droit.

14. En fait, la cour d'appel s'est ensuite attachée à établir, par une longue analyse et dans le cadre de l'interprétation de principe donnée par le juge européen, que les faits de l'espèce ne caractérisaient par l'existence d'un investissement au sens du TCE (pages 13, 14 et 15).

15. Cet arrêt n'a pas été signifié à partie à ce jour. Il peut donc encore faire l'objet d'un pourvoi en cassation recevable dans le délai prescrit par l'article 612 du Code de procédure civile français.

16. Créée en 1790 pour assurer l'unité de la jurisprudence et réaliser l'égalité des justiciables devant la loi, la Cour de cassation de France est une juridiction suprême de dernier ressort. Ses arrêts ne sont susceptibles d'aucune voie de recours. La Cour de cassation contrôle la régularité de la procédure, exerce un contrôle disciplinaire sur la motivation des arrêts de cours d'appels et met en œuvre un contrôle normatif de bonne application de la règle de droit. La Cour de cassation ne règle quasiment jamais les affaires au fond et si elle casse, renvoie le litige devant une cour d'appel.

17. Quels pourraient être les moyens de cassation susceptibles d'être invoqués à l'égard de l'arrêt de la cour d'appel de Paris du 10 janvier 2023 ?

18. Ils pourraient être de deux ordres.

19. Tout d'abord, il pourrait être fait grief à cet arrêt d'avoir jugé en droit que l'interprétation retenue par la CJUE s'imposait à elle.

20. Un tel moyen de cassation, qui serait sans doute pris d'une fausse application de l'article 267 du Traité sur le Fonctionnement de l'Union Européenne (TFUE), n'aurait aucune chance de prospérer.

21. L'ordre juridique européen est l'épine dorsale de l'Union européenne. La CJUE est chargée d'assurer par ses interprétations du droit de l'Union l'uniformité et l'effectivité de son application dans tous les États-membres. C'est la raison pour laquelle ses décisions en matière préjudicielle sont dotées de l'autorité de la chose interprétée (CJCE 3 février 1977 Aff. 52/76, Benedetti c/ Munari, Rec.1977 p. 63 : « *l'arrêt rendu à titre préjudiciel…lie le juge national quant à l'interprétation des dispositions et actes communautaires en cause* »). Le mécanisme de la question préjudicielle est avant tout destiné à permettre un dialogue des juges nationaux avec le juge suprême européen.

22. Pour toutes ces raisons, il est certain que la Cour de cassation, saisie d'un éventuel pourvoi contre l'arrêt de la cour d'appel de Paris du 10 janvier 2023, rejetterait le grief évoqué au point 19.

3

23. En revanche, un second moyen de cassation pourrait critiquer, sous l'angle d'une violation de la loi (fausse application de la loi) ou d'un défaut de base légale (insuffisance des constatations de fait), l'opération de qualification juridique (application de la loi aux faits) par laquelle la Cour d'appel de Paris s'est attachée à caractériser l'inexistence d'un investissement au sens du TCE (points 64 à 83). S'il est vrai que les juge du fond se sont largement inspirés de l'approche de principe de la CJUE, il demeure qu'ils ont recensé, dans les circonstances concrètes de la cause, certains éléments de fait pour refuser à la créance litigieuse la qualification d'investissement (conditions d'acquisition de la créance, nature et portée des conventions, éléments de contexte, articulation des contrats, *etc.*). Ces éléments de fait, autonomes et nouveaux pour certains d'entre eux, invoqués notamment par la défenderesse, ont été souverainement appréciés par la cour d'appel et ils ne seront pas contrôlés par la Cour de cassation. En revanche, il appartiendra à celle-ci de juger si, dans le cadre de l'interprétation donnée par la CJUE, la cour d'appel les a correctement mis en œuvre pour statuer sur la qualification d'investissement. Enfin, la cour de cassation contrôlant la motivation des arrêts des cours d'appels, notamment au regard de l'argumentation des parties, il pourra être envisagé un troisième moyen de cassation de « *défaut de réponse à conclusions* » tiré de la méconnaissance de l'article 455 du code de procédure civile si en l'espèce, la cour d'appel de Paris n'a pas répondu à l'ensemble des moyens soutenus par STILEKS pour soutenir que la créance litigieuse est un investissement au sens de l'article 1 (6) du TCE (pages 91 à 128 des conclusions).

24. De ce point de vue, le débat devant la Cour de cassation pourrait permettre de critiquer l'arrêt de la Cour d'appel de Paris du 10 janvier 2023 au regard de l'article 1, point 6 premier alinéa du TCE, sans pour autant méconnaître l'autorité de la décision rendue par la cour suprême européenne. Ce débat pourrait conduire la Cour de cassation à casser l'arrêt d'appel du 10 janvier 2023 et à renvoyer l'affaire devant une Cour d'appel de renvoi.

25. Le soussigné peut confirmer les écrits qui précèdent par un témoignage oral.

26. Je déclare, sous peine de parjure en vertu des lois des États-Unis d'Amérique, que ce qui précède est vrai et correct.

Fait à Paris le 21 décembre 2023

**François-Henri BRIARD**

4